TOTAL P.001

FILED
CLERK, U.S. DISTRICT COURT

AUG 1 9 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

1  MARC M. SELTZER (54534)
   mseltzer@susmangodfrey.com
2  BRYAN CAFORIO (261265)
   bcaforio@susmangodfrey.com
3  SUSMAN GODFREY L.L.P.
4  1901 Avenue of the Stars, Suite 950
   Los Angeles, California 90067-6029
5  Telephone: (310) 789-3100
6  Fax: (310) 789-3150

7
8  Attorneys for Plaintiff National Credit Union
   Administration Board
9  (See Signature Page for Names and Addresses
   of Additional Counsel for Plaintiffs)
10

11              UNITED STATES DISTRICT COURT
12             CENTRAL DISTRICT OF CALIFORNIA
13                    WESTERN DIVISION
14

15  NATIONAL CREDIT UNION          Case No. CV 11-05887 GW(JEMx)
    ADMINISTRATION BOARD,
16  as Liquidating Agent of Western  **FIRST AMENDED**
    Corporate Federal Credit Union,  **COMPLAINT**
17                        Plaintiff,
18            vs.                    **JURY TRIAL DEMANDED**
19  RBS SECURITIES, INC., f/k/a RBS  Judge:        Hon. George Wu
20  GREENWICH CAPITAL              Courtroom:    10
    MARKETS, INC., GREENWICH
21  CAPITAL ACCEPTANCE, INC.,
    AMERICAN HOME MORTGAGE
22  ASSETS LLC, LARES ASSET
    SECURITIZATION, INC.,
23  NOMURA ASSET ACCEPTANCE
24  CORP., NOMURA HOME EQUITY
    LOAN, INC., and WACHOVIA
25  MORTGAGE LOAN TRUST, LLC,
26                      Defendants.
27

28

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION ........................................................................ 1

              Table 1 ................................................................................ 3

              Table 2 ................................................................................ 6

II.  PARTIES AND RELEVANT NON-PARTIES ...................................... 6

III.  JURISDICTION AND VENUE .............................................................. 9

IV.  MORTGAGE ORIGINATION AND THE SECURITIZATION
     PROCESS ...................................................................................................... 10

              Figure 1 ............................................................................ 12

V.  RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT ................. 13

              Table 3 .............................................................................. 13

VI.  WESCORP'S PURCHASES ................................................................... 15

              Table 4 .............................................................................. 16

VII.  THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE
     UNDERWRITING GUIDELINES STATED IN THE OFFERING
     DOCUMENTS ............................................................................................. 17

     A.  The Surge in Mortgage Delinquency and Defaults Shortly After
          the Offerings and the High OTD Practices of the Originators
          Demonstrate Systematic Disregard of Underwriting Standards ............. 18

              Table 5 .............................................................................. 19

              Table 6 .............................................................................. 28

     B.  The Surge in Actual Versus Expected Cumulative Losses Is
          Evidence of the Originators' Systematic Disregard of Underwriting
          Standards ......................................................................................... 29

              Figure 2 ............................................................................ 32

     C.  The Collapse of the Certificates' Credit Ratings Is Evidence of
          Systematic Disregard of Underwriting Guidelines ................................... 42

     D.  Revelations Subsequent to the Offerings Show That the
          Originators Systematically Disregarded Underwriting Standards ........... 42

          1.  The Systematic Disregard of Underwriting Standards Was
              Pervasive as Revealed After the Collapse ......................................... 42

FIRST AMENDED COMPLAINT

2. American Home's Systematic Disregard of Underwriting Standards .................................................... 48

3. BankUnited's Systematic Disregard of Underwriting Standards .................................................... 52

4. Countrywide's Systematic Disregard of Underwriting Standards .................................................... 57

5. First Franklin's Systematic Disregard of Underwriting Standards .................................................... 66

6. First National Bank of Nevada's Systematic Disregard of Underwriting Standards .................................................... 71

7. IndyMac Bank's Systematic Disregard of Underwriting Standards .................................................... 75

8. MortgageIT's Systematic Disregard of Underwriting Standards .................................................... 80

9. Option One Mortgage Corporation's Systematic Disregard of Underwriting Standards .................................................... 83

10. Residential Funding Co.'s Systematic Disregard of Underwriting Guidelines .................................................... 85

11. Silver State Mortgage's Systematic Disregard of Underwriting Standards .................................................... 88

12. WaMu's Systematic Disregard of Underwriting Standards .......... 91

E. Loans That Did Not Comply with the Underwriting Guidelines Were Routinely Collateral for RBS-Underwritten RMBS ...................... 102

F. Additional Evidence Confirms That Defective Loans Were Routinely Packaged into RBS's RMBS. ................................................... 104

VIII. THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT ........................................................ 105

A. Offering Documents Misrepresented Weighted Average Loan-to-Value Ratios .................................................... 105

Table 7 ............................................................. 107

Table 8 ............................................................. 108

B. Untrue Statements in the Offering Documents About Owner-Occupancy Ratios .................................................... 108

Table 9 ............................................................. 111

FIRST AMENDED COMPLAINT

C.      Untrue Statements Concerning Compliance with Underwriting
        Guidelines ................................................................................................111

        Table 10 ....................................................................................111

D.      Untrue Statements Concerning Adherence to Stated Underwriting
        Guidelines ................................................................................................113

E.      Untrue Statements Concerning Loan-to-Value Ratios............................141

F.      Untrue Statements Concerning Credit Enhancement.............................144

IX.     THE CLAIMS ARE TIMELY...........................................................................147

X.      NUMEROUS CLAIMS ARE INDEPENDENTLY TIMELY BY
        VIRTUE OF *AMERICAN PIPE* .......................................................................149

XI.     CLAIMS FOR RELIEF .......................................................................................155

        FIRST CLAIM FOR RELIEF Section 11 of the Securities Act (NAA
                2006-AR4)   .................................................................................155

        SECOND CLAIM FOR RELIEF  Section 11 of the Securities Act
                (AHMA 2007-3) ...........................................................................156

        THIRD CLAIM FOR RELIEF Section 11 of the Securities Act
                (HVMLT 2007-5, HVMLT 2007-4, HVMLT 2007-2, HVMLT
                2007-1, HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11,
                HVMLT 2006-10, HVMLT 2006-9, and HVMLT 2006-8) ..................158

        FOURTH CLAIM FOR RELIEF Section 11 of the Securities Act
                (INDX 2006-AR35)........................................................................159

        FIFTH CLAIM FOR RELIEF Section 11 of the Securities Act (LUM
                2007-1)         .................................................................................160

        SIXTH CLAIM FOR RELIEF Section 11 of the Securities Act (NHELI
                2007-1)         .................................................................................161

        SEVENTH CLAIM FOR RELIEF  Section 11 of the Securities Act
                (WMLT 2006-ALT1)........................................................................163

        EIGHTH CLAIM FOR RELIEF Section 12(a)(2) of the Securities Act
                (AHMA 2007-3) ...........................................................................164

        NINTH CLAIM FOR RELIEF Section 12(a)(2) of the Securities Act
                (HVMLT 2007-5, HVMLT 2007-4, HVMLT 2007-2, HVMLT
                2007-1, HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11,
                HVMLT 2006-10, HVMLT 2006-9, HVMLT 2006-8)..........................165

TENTH CLAIM FOR RELIEF Section 12(a)(2) of the Securities Act
(NAA 2006-AR4) ...................................................................................167

ELEVENTH CLAIM FOR RELIEF Section 12(a)(2) of the Securities
Act (INDX 2006-AR35) .........................................................................168

TWELTH CLAIM FOR RELIEF Section 12(a)(2) of the Securities Act
(NHELI 2007-1) .....................................................................................170

THIRTEENTH CLAIM FOR RELIEF Section 12(a)(2) of the Securities
Act (LUM 2007-1) .................................................................................171

FOURTEENTH CLAIM FOR RELIEF Violation of the California
Corporate Securities Law of 1968 Cal. Corp. Code §§ 25401 and
25501 (NAA 2006-AR4, AHMA 2007-3, FFMLT 2005-FFH4,
HVMLT 2007-5, HVMLT 2007-4, HVMLT 2007-2, HVMLT
2007-1, HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11,
HVMLT 2006-10, HVMLT 2006-9, HVMLT 2006-8, INDX
2006-AR35, LUM 2007-1, MHL 2006-1, NHELI 2007-1, SVHE
2005-OPT4) ...........................................................................................173

Table 11 ......................................................................................... App. 1

Table 12 ......................................................................................... App. 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FIRST AMENDED COMPLAINT

1       Plaintiff, the National Credit Union Administration Board ("NCUA Board")

2  brings this action in its capacity as Liquidating Agent of Western Corporate Federal

3  Credit Union ("WesCorp") against RBS Securities, Inc. ("RBS") (f/k/a RBS

4  Greenwich Capital Markets, Inc.) as underwriter and seller, and against Greenwich

5  Capital Acceptance, Inc.; American Home Mortgage Assets LLC; Lares Asset

6  Securitization, Inc.; Nomura Asset Acceptance Corp.; Nomura Home Equity Loan,

7  Inc.; and, Wachovia Mortgage Loan Trust, LLC (collectively, the "Issuer Defendants")

8  as issuers, of certain residential mortgage-backed securities ("RMBS") purchased by

9  WesCorp, and alleges as follows in this First Amended Complaint:[1]

## I.    NATURE OF THE ACTION

11      1.    This action arises out of the sale of RMBS to WesCorp where RBS acted

12  as underwriter and/or seller of the RMBS.

13      2.    Virtually all of the RMBS sold to WesCorp were rated as triple-A (the

14  same rating as United States Treasury Bonds) at the time of issuance.

15      3.    The Issuer Defendants issued and RBS underwrote and sold the RMBS

16  pursuant to registration statements, prospectuses, and/or prospectus supplements

17  (collectively, the "Offering Documents").  These Offering Documents contained

18  untrue statements of material fact or omitted to state material facts in violation of

19  Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C.

20  §§ 77k, 77*l*(a)(2) ("Section 11" and "Section 12(a)(2)," respectively), and the California

21  Corporate Securities Law of 1968, Cal. Corp. Code §§ 25401, 25501 ("California

22  Corporate Securities Law").

23      4.    The NCUA Board expressly disclaims and disavows any allegation in this

24  complaint that could be construed as alleging fraud.

---

[1]  Plaintiff acknowledges and respects the rulings issued by the Court.  Certain claims and allegations are repled herein to preserve such issues for appeal.

5.      The Offering Documents described, among other things, the mortgage underwriting standards of the originators (the "Originators") that made the mortgages that were pooled and served as the collateral for the RMBS purchased by WesCorp.

6.      The Offering Documents represented that the Originators adhered to the underwriting guidelines set out in the Offering Documents for the mortgages in the pools collateralizing the RMBS.

7.      The Offering Documents also represented that the loan pools underlying the RMBS had certain characteristics.  These material representations included the weighted average loan-to-value ("LTV") ratio, the weighted average combined loan-to-value ratio ("CLTV"), and owner occupancy rates ("OOR").

8.      LTV represents the amount of the loans as a percentage of the value of the mortgaged properties.  A lower LTV number indicated that the loans were less likely to default because the borrower had greater equity, and in the event of default, that the balance of the loans could be recovered by selling the properties.

9.      OOR represents the percentage of borrowers who occupied the mortgaged properties.  A higher OOR number indicated that the loans were less likely to default, as borrowers are much less likely to default on their primary residence than an investment property or vacation home.

10.     In fact, the Originators had systematically abandoned the stated underwriting guidelines in the Offering Documents.  Because the mortgages in the pools collateralizing the RMBS were largely underwritten without adherence to the underwriting standards stated in the Offering Documents, the RMBS were significantly riskier than represented.  Also, properties were routinely overvalued at the time of origination, rendering the average LTV ratios inaccurate.  And the Offering Documents represented that a significant number of properties were owner-occupied, when in fact, they were not.  Indeed, a material percentage of the loans collateralizing the RMBS were all but certain to become delinquent or default shortly after origination.  As a result, the RMBS were destined from inception to perform poorly.

FIRST AMENDED COMPLAINT

11. These untrue statements and omissions of fact were material because the value of RMBS is largely a function of the cash flow from the principal and interest payments on the mortgage loans collateralizing the RMBS. Thus, the performance of the RMBS is tied to the borrower's ability to repay the loan.

12. WesCorp purchased the RMBS listed in Table 1 (*infra*) through initial offerings directly from RBS by means of prospectuses or oral communications. Thus, RBS is liable for material untrue statements and omissions of fact under Section 11, Section 12(a)(2), and/or the California Corporate Securities Law for the RMBS listed in Table 1.

**Table 1**

| CUSIP[2] | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 65538DAB1 | Alternative Loan Trust 2006-AR4 ("NAA 2006-AR4") | Nomura Asset Acceptance Corporation | WesCorp | 11/17/06 | $12,778,000 |
| 026935AD8 | American Home Mortgage Assets Trust 2007-3 ("AHMA 2007-3") | American Home Mortgage Assets LLC | WesCorp | 6/1/07 | $30,339,000 |
| 32027NXE6 | First Franklin Mortgage Loan Trust 2005-FFH4 ("FFMLT 2005-FFH4") | Financial Asset Securities Corp | WesCorp | 11/30/05 | $10,000,000 |
| 41162CAD3 | HarborView 2006-10 ("HVMLT 2006-10") | Greenwich Capital Acceptance, Inc | WesCorp | 10/18/06 | $90,000,000 |
| 41162GAB8 | HarborView 2006-11 ("HVMLT 2006-11") | Greenwich Capital Acceptance, Inc | WesCorp | 10/27/06 | $18,934,000 |
| 41162DAG4 | HarborView 2006-12 ("HVMLT 2006-12") | Greenwich Capital Acceptance, Inc | WesCorp | 10/19/06 | $80,000,000 |

---

[2] "CUSIP" stands for "Committee on Uniform Securities Identification Procedures." A CUSIP number is used to identify most securities, including certificates of RMBS. *See* CUSIP Number, http://www.sec.gov/answers/cusip.htm.

| CUSIP[2] | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 41162DAH2 | HVMLT 2006-12 | Greenwich Capital Acceptance, Inc | WesCorp | 11/29/06 | $120,000,000 |
| 41162NAD9 | HarborView 2006-14 ("HVMLT 2006-14") | Greenwich Capital Acceptance, Inc | WesCorp | 12/5/06 | $60,000,000 |
| 41162NAH0 | HVMLT 2006-14 | Greenwich Capital Acceptance, Inc | WesCorp | 12/5/06 | $99,827,000 |
| 41161GAE3 | HarborView 2006-8 ("HVMLT 2006-8") | Greenwich Capital Acceptance, Inc | WesCorp | 8/1/06 | $105,693,000 |
| 41161XAM8 | HarborView 2006-9 ("HVMLT 2006-9") | Greenwich Capital Acceptance, Inc | WesCorp | 8/18/06 | $100,000,000 |
| 41164MAF4 | HarborView 2007-1 ("HVMLT 2007-1") | Greenwich Capital Acceptance, Inc | WesCorp | 2/14/07 | $48,602,000 |
| 41164MAP2 | HVMLT 2007-1 | Greenwich Capital Acceptance, Inc | WesCorp | 2/16/07 | $56,000,000 |
| 41164LAC3 | HarborView 2007-2 ("HVMLT 2007-2") | Greenwich Capital Acceptance, Inc | WesCorp | 3/1/07 | $55,000,000 |
| 41164YAD3 | HarborView 2007-4 ("HVMLT 2007-4") | Greenwich Capital Acceptance, Inc | WesCorp | 5/30/07 | $98,667,000 |
| 41165AAC6 | HarborView 2007-5 ("HVMLT 2007-5") | Greenwich Capital Acceptance, Inc | WesCorp | 6/26/07 | $55,000,000 |
| 41165AAD4 | HVMLT 2007-5 | Greenwich Capital Acceptance, Inc | WesCorp | 6/26/07 | $71,000,000 |
| 45667SAN7 | IndyMac INDX Mortgage Loan Trust 2006-AR35 ("INDX 2006-AR35") | IndyMac MBS, Inc | WesCorp | 11/28/06 | $180,000,000 |

- 4 -                                   FIRST AMENDED COMPLAINT

| CUSIP[2] | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 45667SAP2 | INDX 2006-AR35 | IndyMac MBS, Inc | WesCorp | 11/28/06 | $20,000,000 |
| 55028CAA3 | Luminent Mortgage Trust 2007-1 ("LUM 2007-1") | Lares Asset Securitization, Inc | WesCorp | 1/23/07 | $35,000,000 |
| 55028CAB1 | LUM 2007-1 | Lares Asset Securitization, Inc | WesCorp | 1/23/07 | $20,400,000 |
| 61915RCL8 | MortgageIT Mortgage Loan Trust 2006-1 ("MHL 2006-1") | Greenwich Capital Acceptance, Inc | WesCorp | 2/17/06 | $35,710,500 |
| 65537KAB6 | Nomura Home Equity Loan, Inc , Home Equity Loan Trust, Series 2007-1 ("NHELI 2007-1") | Nomura Home Equity Loan, Inc | WesCorp | 1/23/07 | $40,000,000 |
| 65537KAC4 | NHELI 2007-1 | Nomura Home Equity Loan, Inc | WesCorp | 1/23/07 | $30,000,000 |
| 83611MJM1 | Soundview Home Loan Trust 2005-OPT4 ("SVHE 2005-OPT4") | Financial Asset Securities Corp | WesCorp | 11/22/05 | $18,037,000 |

13.    WesCorp purchased each RMBS listed in Table 2 (*infra*) pursuant to and traceable to a registration statement containing an untrue statement of a material fact or that omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.  RBS was an underwriter for each of the securities listed in Table 2.  RBS also acted as seller for the HVMLT 2006-9 and HVMLT 2007-1 Certificates listed in Table 2.  Thus, RBS is liable for material untrue statements and omissions of fact under Section 11 for the RMBS listed in Table 2 and for material untrue statements and omissions of fact under the California Blue Sky law for the HVMLT 2006-9 and HVMLT 2007-1 Certificates.

FIRST AMENDED COMPLAINT

**Table 2**

| CUSIP | ISSUING ENTITY | SELLER | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|-------|----------------|--------|-----------|-------|------------|------------|
| 41161XAN6 | HVMLT 2006-9 | RBS | Greenwich Capital Acceptance, Inc | WesCorp | 3/8/07 | $22,810,706 |
| 41164MAP2 | HVMLT 2007-1 | RBS | Greenwich Capital Acceptance, Inc | WesCorp | 3/12/07 | $6,921,395 |
| 55028CAE5 | LUM 2007-1 | | Lares Asset Securitization, Inc | WesCorp | 3/1/07 | $25,074,560 |
| 92978GAC3 | Wachovia Mortgage Loan Trust, Series 2006-ALT1 ("WMLT 2006-ALT1") | | Wachovia Mortgage Loan Trust, LLC | WesCorp | 11/30/06 | $44,376,000 |

14.     The RMBS WesCorp purchased suffered a significant drop in market value.  WesCorp has suffered significant losses from those RMBS purchased despite the NCUA Board's mitigation efforts.

## II.     PARTIES AND RELEVANT NON-PARTIES

15.     The National Credit Union Administration ("NCUA") is an independent agency of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions, and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF").  The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions.  The TCCUSF was created in 2009 to allow the NCUA to borrow funds from the United States Department of the Treasury ("Treasury Department") for the purposes of stabilizing corporate credit unions under conservatorship or liquidation, or corporate credit unions threatened with conservatorship or liquidation.  The NCUA must repay all monies borrowed from the Treasury Department for the purposes of the TCCUSF by 2021.  The NCUA has

regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF.  The NCUA is under the management of the NCUA Board.  *See* Federal Credit Union Act, 12 U.S.C. §§ 1751, 1752a(a) ("FCUA").

16.    WesCorp was a federally chartered corporate credit union with its offices and principal place of business in San Dimas, California.  As a corporate credit union, WesCorp provided investment and financial services to other credit unions.

17.    The NCUA Board placed WesCorp into conservatorship on March 20, 2009, pursuant to the FCUA, 12 U.S.C. § 1751 *et seq.*  On October 1, 2010, the NCUA Board placed WesCorp into involuntary liquidation and appointed itself Liquidating Agent.

18.    Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as Liquidating Agent has succeeded to all rights, titles, powers, and privileges of WesCorp and of any member, account holder, officer, or director of WesCorp, with respect to WesCorp and its assets, including the right to bring the claims asserted by them in this action.  As Liquidating Agent, the NCUA Board has all the powers of the members, directors, officers, and committees of WesCorp and succeeds to all rights, titles, powers, and privileges of WesCorp.  *See* 12 U.S.C. § 1787(b)(2)(A).  The NCUA Board may also sue on WesCorp's behalf.  *See* 12 U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2).

19.    Prior to being placed into conservatorship and involuntary liquidation, WesCorp was the second-largest corporate credit union in the United States.

20.    Any recoveries from this legal action will reduce the total losses resulting from the failure of WesCorp.  Losses from WesCorp's failure must be paid from the NCUSIF or the TCCUSF.  Expenditures from these funds must be repaid through assessments against all federally-insured credit unions.  Because of the expenditures resulting from WesCorp's failure, federally-insured credit unions will experience larger assessments, thereby reducing federally-insured credit unions' net worth.  Reductions in net worth can adversely affect the dividends that individual members of credit unions receive for the savings on deposit at their credit union.  Reductions in net

1   worth can also make loans for home mortgages and automobile purchases more

2   expensive and difficult to obtain.  Any recoveries from this action will help to reduce

3   the amount of any future assessments on federally-insured credit unions throughout

4   the system, reducing the negative impact on federally-insured credit unions' net worth.

5   Recoveries from this action will benefit credit unions and their individual members by

6   increasing net worth resulting in more efficient and lower-cost lending practices.

7       21.   Defendant RBS Securities Inc. is a United States Securities and Exchange

8   Commission ("SEC") registered broker-dealer.  RBS Securities, Inc. is a wholly-owned

9   subsidiary of The Royal Bank of Scotland Group.  Prior to 2009, RBS Securities, Inc.

10  was known as "RBS Greenwich Capital Markets, Inc."  In 2000, The Royal Bank of

11  Scotland acquired Greenwich Capital Markets, Inc., renaming it "RBS Greenwich

12  Capital Markets, Inc."

13      22.   RBS acted as an underwriter of all the RMBS that are the subject of this

14  Complaint and that are listed in Tables 1 and 2 (*supra*).  RBS is a Delaware corporation

15  with its principal place of business in Connecticut.

16      23.   Greenwich Capital Acceptance, Inc. is the depositor and issuer of the

17  HVMLT 2007-5, HVMLT 2007-4, HVMLT 2007-2, HVMLT 2007-1, HVMLT 2006-

18  14, HVMLT 2006-12, HVMLT 2006-11, HVMLT 2006-10, HVMLT 2006-9, and

19  HVMLT 2006-8 offerings.  Greenwich Capital Acceptance, Inc. is a Delaware

20  corporation with its principal place of business in Maryland.

21      24.   American Home Mortgage Assets LLC is the depositor and issuer of the

22  AHMA 2007-3 offering.  American Home Mortgage Assets LLC is a Delaware

23  corporation with its principal place of business in New York.

24      25.   Lares Asset Securitization, Inc. is the depositor and issuer of the LUM

25  2007-1 offering.  Lares Asset Securitization, Inc. is a Delaware corporation with its

26  principal place of business in California.

27

28

FIRST AMENDED COMPLAINT

1    26.    Nomura Asset Acceptance Corp. is the depositor and issuer of the NAA

2    2006-AR4 offering.  Nomura Asset Acceptance Corp. is a Delaware corporation with

3    its principal place of business in New York.

4    27.    Nomura Home Equity Loan, Inc. is the depositor and issuer of the

5    NHELI 2007-1 offering.  Nomura Home Equity Loan, Inc. is a Delaware corporation

6    with its principal place of business in New York.

7    28.    Wachovia Mortgage Loan Trust, LLC is the depositor and issuer of the

8    WMLT 2006-ALT1 offering.  Wachovia Mortgage Loan Trust, LLC is a Delaware

9    corporation with its principal place of business in North Carolina.

10   **III.    JURISDICTION AND VENUE**

11   29.    This Court has subject matter jurisdiction pursuant to:  (a) 12 U.S.C.

12   § 1789(a)(2), which provides that "[a]ll suits of a civil nature at common law or in

13   equity to which the [NCUA Board] shall be a party shall be deemed to arise under the

14   laws of the United States, and the United States district courts shall have original

15   jurisdiction thereof, without regard to the amount in controversy"; and (b) 28 U.S.C.

16   § 1345, which provides that "the district courts shall have original jurisdiction of all

17   civil actions, suits or proceedings commenced by the United States, or by any agency

18   or officer thereof expressly authorized to sue by Act of Congress."

19   30.    Venue is proper in this District under Section 22 of the Securities Act, 15

20   U.S.C. § 77v(a), because the transactions at issue occurred in San Dimas, California,

21   the headquarters of WesCorp.  This Court has personal jurisdiction over each

22   Defendant because they offered/sold the RMBS at issue in this Complaint to

23   WesCorp in this District; prepared/disseminated the Offering Documents containing

24   untrue statements or omissions of material fact as alleged herein to WesCorp in this

25   District; and/or are residents of/conduct business in this District.

26

27

28

FIRST AMENDED COMPLAINT

## IV.   MORTGAGE ORIGINATION AND THE SECURITIZATION PROCESS

31.     RMBS are asset-backed securities.  A pool or pools of residential mortgages are the assets that back or collateralize the RMBS certificates purchased by investors.

32.     Because residential mortgages are the assets collateralizing RMBS, the origination of mortgages commences the process that leads to the creation of RMBS. Originators decide whether to loan potential borrowers money to purchase residential real estate through a process called mortgage underwriting.  The originator applies its underwriting standards or guidelines to determine whether a particular borrower is qualified to receive a mortgage for a particular property.  The underwriting guidelines consist of a variety of metrics including:  the borrower's debt, income, savings, credit history, and credit score; whether the property will be owner-occupied; and the amount of the loan compared to the value of the property at issue (the "loan-to-value" or "LTV" ratio), among other things.  Underwriting guidelines are designed to ensure that:  (1) the borrower has the means to repay the loan, (2) the borrower will likely repay the loan, and (3) the loan is secured by sufficient collateral in the event of default.

33.     Historically, originators made mortgage loans to borrowers and held the loans.  Originators profited as they collected monthly principal and interest payments directly from the borrower.  Originators also retained the risk that the borrower would default on the loan.

34.     This changed in the 1970s when the Government National Mortgage Association ("Ginnie Mae"), the Federal National Mortgage Association ("Fannie Mae"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac") began purchasing "conforming loans" (loans underwritten in accordance with Fannie Mae and Freddie Mac underwriting guidelines) from originators and "securitizing" them for resale to investors as RMBS.

FIRST AMENDED COMPLAINT

35.     More recently, originators, usually working with investment banks, began securitizing "non-conforming" loans.  Non-conforming loans (loans not written in compliance with Fannie Mae or Freddie Mac guidelines) are also known as "nonprime" or "private label" loans and include "Alt-A" and "subprime" loans. Despite the non-conforming nature of the underlying mortgages, the securitizers of such RMBS were able to obtain triple-A credit ratings by using "credit enhancement" (explained *infra*) when they securitized the non-conforming loans.

36.     All of the loans collateralizing the RMBS at issue in this Complaint are private-label mortgage loans.

37.     The issuance of RMBS collateralized by non-conforming loans peaked in 2006.  The securitization process shifted the originators' focus from ensuring the ability of borrowers to repay their mortgages to ensuring that the originator could process (and obtain fees from) an ever-larger loan volume for distribution as RMBS. This practice is known as "originate-to-distribute" ("OTD").

38.     Securitization begins with a "sponsor" that purchases loans in bulk from one or more originators.  The sponsor transfers title of the loans to an entity called the "depositor."

39.     The depositor transfers the loans to a trust called the "issuing entity."

40.     The issuing entity issues "notes" and/or "certificates" representing an ownership interest in the cash flow from the mortgage pool underlying the securities (*i.e.*, the principal and interest generated as borrowers make monthly payments on the mortgages in the pool).

41.     The depositor files required documents (such as registration statements and prospectuses) with the SEC so that the certificates can be offered to the public.

42.     One or more "underwriters"—like RBS—then sell the certificates to investors.

43.     A loan "servicer" collects payments from borrowers on individual mortgages as part of a pool of mortgages, and the issuing entity allocates and

distributes the income stream generated from the mortgage loan payments to the RMBS investors.

44.     Figure 1 (*infra*) depicts a typical securitization process.

## Figure 1

FIRST AMENDED COMPLAINT

45.     Because securitization, as a practical matter, shifts the risk of default on the mortgage loans from the originator of the loan to the RMBS investor, the originator's adherence to mortgage underwriting guidelines as represented in the offering documents with respect to the underlying mortgage loans is critical to the investors' ability to evaluate the expected performance of the RMBS.

## V.     RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT

46.     RMBS offerings are generally divided into slices or "tranches," each of which represents a different level of risk.  RMBS certificates denote the particular tranches of the security purchased by the investor.

47.     The credit rating for an RMBS reflects an assessment of the creditworthiness of that RMBS and indicates the level of risk associated with that RMBS.  Standard & Poor's ("S&P") and Moody's Investors Service, Inc. ("Moody's") are the credit rating agencies that assigned credit ratings to the RMBS in this case.

48.     The credit rating agencies use letter-grade rating systems as shown in Table 3 (*infra*).

## Table 3
*Credit Ratings*

| Moody's | S&P | Definitions | Grade Type |
|---------|-----|-------------|------------|
| Aaa | AAA | Prime (Maximum Safety) | INVESTMENT GRADE |
| Aa1<br>Aa2<br>Aa3 | AA+<br>AA<br>AA- | High Grade, High Quality | |
| A1<br>A2<br>A3 | A+<br>A<br>A- | Upper Medium Grade | |
| Baa1<br>Baa2<br>Baa3 | BBB+<br>BBB<br>BBB- | Medium Grade | |
| Ba2<br>Ba3 | BB<br>BB- | Non-Investment Grade, or Speculative | SPECULATIVE GRADE |
| B1<br>B2<br>B3 | B+<br>B<br>B- | Highly Speculative, or Substantial Risk | |
| Caa2<br>Caa3 | CCC+ | In Poor Standing | |
| Ca | CCC<br>CCC- | Extremely Speculative | |
| C | - | May be in Default | |
| - | D | Default | |

FIRST AMENDED COMPLAINT

49.     Moody's purportedly awards the coveted "Aaa" rating to structured finance products that are "of the highest quality, with minimal credit risk." Moody's Investors Service, *Moody's Rating Symbols & Definitions* at 6 (August 2003), *available at* http://www.rbcpa.com/Moody's_ratings_and_definitions.pdf. Likewise, S&P rates a product "AAA" when the "obligor's capacity to meet its financial commitment on the obligation is extremely strong." Standard & Poor's, *Ratings Definitions*, *available at* https://www.globalcreditportal.com/ratingsdirect/renderArticle.do?articleId=1019442&SctArtId=147045&from=CM&nsl_code=LIME.

50.     In fact, RMBS could not be sold unless they received one of the highest "investment grade" ratings on most tranches from one or more credit rating agencies, because the primary market for RMBS is institutional investors, such as WesCorp, that are generally limited to buying only securities with the highest credit ratings. *See, e.g.,* NCUA Credit Risk Management Rule, 12 C.F.R. § 704.6(d)(2) (2010) (prohibiting corporate credit unions from investing in securities rated below AA-); *but see, e.g.,* Alternatives to the Use of Credit Ratings, 77 Fed. Reg. 74,103 (Dec. 13, 2012) (to be codified at 12 C.F.R. pts. 703, 704, 709, and 742).

51.     While the pool of mortgages underlying the RMBS may not have been sufficient to warrant a triple-A credit rating, various forms of "credit enhancement" were used to obtain a triple-A rating on the higher tranches of RMBS.

52.     One form of credit enhancement is "structural subordination." The tranches, and their risk characteristics *relative* to each other, are often analogized to a waterfall. Investors in the higher or "senior" tranches are the first to be paid as income is generated *when borrowers* make their monthly payments. After investors in the most senior tranche are paid, investors in the next subordinate or "junior" tranche are paid, and so on down to the most subordinate or lowest tranche.

53.     In the event mortgages in the pool default, the resulting loss is absorbed by the subordinate tranches first.

FIRST AMENDED COMPLAINT

54.     Accordingly, senior tranches are deemed less risky than subordinate tranches and therefore receive higher credit ratings.

55.     Another form of credit enhancement is overcollateralization. Overcollateralization is the inclusion of a higher dollar amount of mortgages in the pool than the par value of the security.  The spread between the value of the pool and the par value of the security acts as a cushion in the event of a shortfall in expected cash flow.

56.     Other forms of credit enhancement include "excess spread," monoline insurance, obtaining a letter of credit, and "cross-collateralization."  "Excess spread" involves increasing the interest rate paid to the purchasers of the RMBS relative to the interest rate received on the cash flow from the underlying mortgages.  Monoline insurance, also known as "wrapping" the deal, involves purchasing insurance to cover losses from any defaults.  Letters of credit can also be purchased to cover defaults. Finally, some RMBS are "cross-collateralized," *i.e.*, when a tranche in an RMBS experiences rapid prepayments or disproportionately high realized losses, principal and interest collected from another tranche is applied to pay principal or interest, or both, to the senior certificates in the loan group experiencing rapid prepayment or disproportionate losses.

## VI.    WESCORP'S PURCHASES

57.     WesCorp purchased only the highest-rated tranches of RMBS.  All but two were rated triple-A at the time of issuance.  These securities have since been downgraded below investment grade just a few years after they were sold (*see infra* Table 4).

FIRST AMENDED COMPLAINT

**Table 4**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Credit Ratings of RMBS Purchases Original/Recent** | | | | | | | | |
| **CUSIP** | **ISSUER NAME** | **BUYER** | **ORIGINAL RATING S&P** | **ORIGINAL RATING MOODY'S** | **First Downgrade Below Investment Grade S&P** | **First Downgrade Below Investment Grade MOODY'S** | **RECENT RATING S&P** | **RECENT RATING MOODY'S** |
| 65538DAB1 | NAA 2006-AR4 | WesCorp | AAA 12/4/2006 | Aaa 11/30/2006 | B 8/20/2008 | Caa1 7/25/2008 | D 8/19/2009 | C 9/2/2010 |
| 026935AD8 | AHMA 2007-3 | WesCorp | AA 6/14/2007 | Aaa 6/14/2007 | B 10/30/2008 | C 2/02/2009 | D 2/24/2010 | C 2/2/2009 |
| 32027NXE6 | FFMLT 2005-FFH4 | WesCorp | AA 12/28/2005 | Aa2 12/22/2005 | B- 8/04/2008 | B1 3/19/2009 | B- 8/4/2009 | C 4/6/2010 |
| 41162CAD3 | HVMLT 2006-10 | WesCorp | AAA 11/22/2006 | Aaa 11/21/2006 | CCC 8/14/2009 | Caa3 2/20/2009 | CC 5/11/2011 | C 12/5/2010 |
| 41162GAB8 | HVMLT 2006-11 | WesCorp | AAA 12/22/2006 | Aaa 12/20/2006 | B 1/16/2009 | Ba1 9/08/2008 | CC 2/16/2010 | C 11/19/2010 |
| 41162DAG4 | HVMLT 2006-12 | WesCorp | AAA 12/19/2006 | Aaa 12/13/2006 | B 4/14/2009 | Ca 2/20/2009 | CCC 7/24/2009 | C 12/5/2010 |
| 41162DAH2 | HVMLT 2006-12 | WesCorp | AAA 12/19/2006 | Aaa 12/13/2006 | N/A | N/A | AA+ 11/8/2010 | Aa3 11/23/2008 |
| 41162NAD9 | HVMLT 2006-14 | WesCorp | AAA 12/27/2006 | Aaa 12/22/2006 | BB 4/21/2009 | Caa3 1/29/2009 | CCC 8/14/2009 | C 11/19/2010 |
| 41162NAH0 | HVMLT 2006-14 | WesCorp | AAA 12/27/2006 | Aaa 12/22/2006 | B 10/09/2008 | Ca 1/29/2009 | D 6/23/2010 | C 11/19/2010 |
| 41161GAE3 | HVMLT 2006-8 | WesCorp | AAA 9/5/2006 | Aaa 8/4/2006 | B 4/14/2009 | Ca 2/20/2009 | D 9/24/2010 | C 12/5/2010 |
| 41161XAM8 | HVMLT 2006-9 | WesCorp | AAA 10/18/2006 | Aaa 10/4/2006 | CCC 4/15/2009 | Ca 2/20/2009 | CCC 4/15/2009 | C 12/5/2010 |
| 41161XAN6 | HVMLT 2006-9 | WesCorp | AAA 10/18/2006 | Aaa 10/4/2006 | B 4/15/2009 | Ca 2/20/2009 | CCC 8/14/2009 | C 12/5/2010 |
| 41164MAF4 | HVMLT 2007-1 | WesCorp | NR | Aaa 2/26/2007 | NR | C 2/20/2009 | NR | C 2/20/2009 |
| 41164MAP2 | HVMLT 2007-1 | WesCorp | AAA 3/22/2007 | Aaa 3/9/2007 | B 10/20/2008 | Ca 2/20/2009 | CCC 8/14/2009 | C 12/5/2010 |
| 41164LAC3 | HVMLT 2007-2 | WesCorp | AAA 4/3/2007 | Aaa 3/30/2007 | CCC 8/14/2009 | Caa3 2/20/2009 | CCC 8/14/2009 | C 12/5/2010 |
| 41164YAD3 | HVMLT 2007-4 | WesCorp | NR | Aaa 6/14/2007 | NR | Ba1 9/08/2008 | NR | C 12/5/2010 |
| 41165AAC6 | HVMLT 2007-5 | WesCorp | AAA 7/26/2007 | Aaa 7/12/2007 | CCC 7/24/2009 | Caa3 2/20/2009 | CCC 7/24/2009 | C 12/5/2010 |
| 41165AAD4 | HVMLT 2007-5 | WesCorp | AAA 7/26/2007 | Aaa 7/12/2007 | CCC 7/24/2009 | Ca 2/20/2009 | D 5/25/2010 | C 12/5/2010 |
| 45667SAN7 | INDX 2006-AR35 | WesCorp | AAA 12/1/2006 | Aaa 11/29/2006 | CCC 8/19/2009 | Caa3 1/29/2009 | D 3/18/2011 | Caa3 1/29/2009 |
| 45667SAP2 | INDX 2006-AR35 | WesCorp | AAA 12/1/2006 | Aaa 11/29/2006 | B 10/30/2008 | B3- 8/19/2008 | D 12/24/2009 | C 10/12/2010 |
| 55028CAA3 | LUM 2007-1 | WesCorp | AAA 2/1/2007 | Aaa 1/25/2007 | CCC 7/24/2009 | Caa1 2/20/2009 | CCC 7/24/2009 | Caa3 12/14/2010 |
| 55028CAB1 | LUM 2007-1 | WesCorp | AAA 2/1/2007 | Aaa 1/25/2007 | CCC 7/24/2009 | Ca 2/20/2009 | CC 2/16/2010 | Caa3 12/14/2010 |
| 55028CAE5 | LUM 2007-1 | WesCorp | AAA 2/1/2007 | Aaa 1/25/2007 | B 10/27/2008 | Ca 2/20/2009 | D 6/23/2010 | C 12/5/2010 |
| 61915RCL8 | MHL 2006-1 | WesCorp | AAA 3/2/2007 | Aaa 2/22/2006 | BB 10/20/2008 | Ba1 8/04/2008 | D 2/24/2010 | C 12/9/2010 |
| 65537KAB6 | NHELI 2007-1 | WesCorp | AAA 2/2/2007 | Aaa 1/31/2007 | B+ 10/06/2008 | Ba3 7/25/2008 | D 11/25/2009 | Ca 9/2/2010 |
| 65537KAC4 | NHELI 2007-1 | WesCorp | AAA 2/2/2007 | Aaa 1/31/2007 | B 10/06/2008 | Caa1 7/25/2008 | D 6/25/2009 | C 9/2/2010 |
| 83611MJM1 | SVHE 2005-OPT4 | WesCorp | AA 12/1/2005 | NR | B 10/13/2008 | NR | CCC 8/4/2009 | NR |
| 92978GAC3 | WMLT 2006-ALT1 | WesCorp | AAA 1/3/2007 | Aaa 12/27/2006 | B 10/27/2008 | Ba3 8/20/2008 | B- 2/2/2010 | Caa2 1/14/2010 |

FIRST AMENDED COMPLAINT

58.     At the time of purchase, WesCorp was not aware of the untrue statements or omissions of material facts in the Offering Documents of the RMBS.  If WesCorp had known about the Originators' pervasive disregard of underwriting standards—contrary to the representations in the Offering Documents—WesCorp would not have purchased the certificates.

59.     The securities' substantial loss of market value has injured WesCorp and the NCUA Board.

## VII.  THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE UNDERWRITING GUIDELINES STATED IN THE OFFERING DOCUMENTS

60.     The performance and value of RMBS are largely contingent upon borrowers repaying their mortgages.  The loan underwriting guidelines ensure that the borrower has the means to repay the mortgage and that the RMBS is secured by sufficient collateral in the event of reasonably anticipated defaults on underlying mortgage loans.

61.     With respect to RMBS collateralized by loans written by originators that systematically disregarded their stated underwriting standards, the following pattern is present:

a)     a surge in borrower delinquencies and defaults on the mortgages in the pools (*see infra* Section VII.A and Table 5);

b)     actual losses to the underlying mortgage pools within the first 12 months after the offerings vastly exceeded expected losses (*see infra* Section VII.B and Figure 2); and,

c)     a high percentage of the underlying mortgage loans were originated for distribution, as explained below (*see infra* Table 6 and accompanying allegations).

d)     downgrades of the RMBS by credit rating agencies from high, investment-grade ratings when purchased to much lower ratings,

including numerous "junk" ratings (*see infra* Section VII.C and *supra* Table 4).

62.     These factors support a finding that the Originators failed to originate the mortgages in accordance with the underwriting standards stated in the Offering Documents.

63.     This conclusion is further corroborated by reports that the Originators that contributed mortgage loans to the RMBS at issue in this Complaint abandoned the underwriting standards described in the RMBS Offering Documents.  *See infra* Section VII.D.

64.     This conclusion is further corroborated by evidence that the RMBS underwritten by RBS at issue in this Complaint were collateralized by a substantial number of loans that were originated contrary to the stated underwriting standards (*see infra* Sections VII.E-F).

**A.     The Surge in Mortgage Delinquency and Defaults Shortly After the Offerings and the High OTD Practices of the Originators Demonstrate Systematic Disregard of Underwriting Standards**

65.     Residential mortgages are generally considered delinquent if no payment has been received for more than 30 days after payment is due.  Residential mortgages where no payment has been received for more than 90 days (or three payment cycles) are generally considered to be in default.

66.     The surge in delinquencies and defaults following the offerings evidences the systematic flaws in the Originators' underwriting process (*see infra* Table 5).

67.     The Offering Documents reported zero or near zero delinquencies and defaults at the time of the offerings (*see infra* Table 5).

68.     The pools of mortgages collateralizing the RMBS experienced delinquency and default rates as high as 9.63% after only three months, up to 23.04% at six months, and reaching 43.78% at one year (*see infra* Table 5).

FIRST AMENDED COMPLAINT

69.     As of May 2011, nearly half (45.09%) of the mortgage collateral across all of the RMBS that WesCorp purchased was in delinquency, bankruptcy, foreclosure, or was real estate owned ("REO"), which means that a bank or lending institution owns the property after a failed sale at a foreclosure auction (*see infra* Table 5).

70.     Table 5 (*infra*) reflects the delinquency, foreclosure, bankruptcy, and REO rates on the RMBS as to which claims are asserted in this Complaint.  The data presented in the last five columns are from the trustee reports (dates and page references as indicated in the parentheticals).  The shadowed rows reflect the group of mortgages in the pool underlying the specific tranches purchased by WesCorp; however, some trustee reports include only the aggregate data.  For the RMBS with multiple groups, aggregate information on all the groups is included because the tranches are cross-collateralized.

**Table 5**

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 65538DAB1 | NAA 2006-AR4 Aggregate (P S dated November 30, 2006) | Zero  (S-34) | 27% (Dec , p 9) | 2 69% (Feb , p 9) | 7 32%   (May, p 9) | 17 63% (Nov , p 9) | 42 39% (May 2011, p 9) |
| | AHMA 2007-3 Aggregate (June 5, 2007) | Zero  (S-40) | 0% (June, p 10) | 4 99% (Aug , p 10) | 13 90% (Nov , p 10) | 27 47% (May, p 10) | 46 49% (May 2011, p 11) |
| | AHMA 2007-3: Group I-1 | Zero  (S-40) | 0% (June, p 12) | 2 62% (Aug , p 12) | 8 63% (Nov , p 12) | 23 58% (May, p 12) | 52 52% (May 2011, p 12) |
| 026935AD8 | AHMA 2007-3: Group I-2 *Class I-2A-2 in Group I-2 (S-12) | Zero  (S-40) | 0% (June, p 12) | 9 63% (Aug , p 12) | 23 04% (Nov , p 12) | 43 78% (May, p 12) | 62 39% (May 2011, p 12) |

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | AHMA 2007-3: Group II-1 | Zero (S-40) | 0% (June, p 13) | 2 04% (Aug, p 13) | 5 74% (Nov , p 13) | 15 73% (May, p 13) | 42 32% (May 2011, p 13) |
| | AHMA 2007-3: Group II-2 | Zero (S-40) | 0% (June, p 13) | 3 72% (Aug, p 13) | 12 44% (Nov , p 13) | 25 55% (May, p 13) | 42 85% (May 2011, p 13) |
| | AHMA 2007-3: Group III | Zero (S-40) | 0% (June, p 14) | 5 16% (Aug, p 14) | 16 35% (Nov , p 14) | 18 05% (May, p 14) | 13 85% (May 2011, p 14) |
| | FFMLT 2005-FFH4 Aggregate (P S dated November 30, 2005) | | 80% (Dec , p 12) | 2 16% (Feb , p 12) | 3 83% (May, p 12) | 9 64% (Nov , p 12) | 49 43% (May 2011, p 13) |
| 32027NXE6 | FFMLT 2005-FFH4 Group 1 *Class M-2 in Groups 1 and 2 (S-72) | | 73% (Dec , p 13) | 1 38% (Feb , p 13) | 2 58% (May, p 13) | 8 66% (Nov , p 13) | 46 37% (May 2011, p 14) |
| 32027NXE6 | FFMLT 2005-FFH4 Group 2 *Class M-2 in Groups 1 and 2 (S-72) | | 88% (Dec , p 14) | 3 09% (Feb , p 14) | 5 39% (May, p 14) | 10 92% (Nov , p 14) | 54 40% (May 2011, p 15) |
| | HVMLT 2006-10 Aggregate (P S dated November 10, 2006) | 15% of the mortgage loans were 30-59 days delinquent (S-27) | 14% (Nov , p 10) | 67% (Jan , p 10) | 1 12% (Apr , p 10) | 5 47% (Apr , p 10) | 28 99% (May 2011, p 10) |
| | HVMLT 2006-10 Group 1 | 15% of the mortgage loans were 30-59 days delinquent (S-27) | 07% (Nov , p 11) | 55% (Jan , p 11) | 56% (Apr , p 11) | 5 38% (Apr , p 11) | 32 57% (May 2011, p 11) |

- 20 -

FIRST AMENDED COMPLAINT

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 41162CAD3 | HVMLT Group 2 *Class 2A-1B and 2A-1C in Group 2 (S-6) | 15% of the mortgage loans were 30-59 days delinquent (S-27) | 19% (Nov , p 11) | 74% (Jan , p 11) | 1 44% (Apr , p 11) | 5 52% (Apr , p 11) | 26 97% (May 2011, p 11) |
| 41162GAB8 | HVMLT 2006-11 (P S dated November 10, 2006) | Zero (S-20) | 38% (Nov , p 9) | 1 46% (Jan , p 9) | 2 44% (Apr , p 9) | 9 07% (Apr , p 9) | 50 38% (May 2011, p 9) |
|  | HVMLT 2006-12 Aggregate (P S dated December 11, 2006) | Zero (S-28) | 0% (Dec , p 11) | 57% (Feb , p 11) | 1 41% (May, p 10) | 7 37% (Nov , p 10) | 61 77% (May 2011, p 11) |
|  | HVMLT 2006-12 Group 1 | Zero (S-28) | 0% (Dec , p 12) | 46% (Feb , p 13) | 1 01% (May, p 11) | 6 88% (Nov , p 11) | 63 08% (May 2011, p 12) |
| 41162DAG4 41162DAH2 | HVMLT 2006-12 Group 2 *Class 2A-1B, 2A-2B and 2A-2C in Group 2 (S-7) | Zero (S-28) | 0% (Dec , p 12) | 61% (Feb , p 13) | 1 53% (May, p 11) | 7 55% (Nov , p 11) | 61 27% (May 2011, p 12) |
|  | HVMLT 2006-14 Aggregate (December 20, 2006) | Zero (S-26) | 17% (Jan , p 11) | 78% (Mar , p 10) | 1 97% (June, p 10) | 8 61% (Dec , p 10) | 36 66% (May 2011, p 11) |
|  | HVMLT 2006-14 Group 1 | Zero (S-26) | 20% (Jan , p 13) | 39% (Mar , p 12) | 74% (June, p 12) | 6 45% (Dec , p 12) | 37 01% (May 2011, p 12) |
| 41162NAD9 41162NAH0 | HVMLT 2006-14 Group 2 *Class 2A-1B and 2A-2C in Group 2 (S-7) | Zero (S-26) | 16% (Jan , p 13) | 90% (Mar , p 12) | 2 36% (June, p 12) | 9 29% (Dec , p 12) | 36 54% (May 2011, p 12) |
|  | HVMLT 2006-8 Aggregate (P S dated August 28, 2006) | 2 78% of the mortgage loans were 30-59 days delinquent in payment, and 0 48% were 60-89 days delinquent in payment (S-24) | 5 59% (Sept , p 11) | 5 68% (Nov , p 11) | 5 48% (Feb , p 10) | 9 16% (Aug , p 10) | 46 43% (May 2011, p 10) |

- 21 -

FIRST AMENDED COMPLAINT

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | HVMLT 2006-8 Group 1 | 2 78% of the mortgage loans were 30-59 days delinquent in payment, and 0 48% were 60-89 days delinquent in payment (S-24) | 3 78% (Sept , p 13) | 4 12% (Nov , p 13) | 3 40% (Feb , p 12) | 8 11% (Aug , p 12) | 45 29% (May 2011, p 11) |
| 41161GAE3 | HVMLT 2006-8 Group 2 *Class 2A-1C in Group 2 (S-7) | 2 78% of the mortgage loans were 30-59 days delinquent in payment, and 0 48% were 60-89 days delinquent in payment (S-24) | 6 51% (Sept , p 13) | 6 50% (Nov , p 13) | 6 54% (Feb , p 12) | 9 75% (Aug , p 12) | 47 13% (May 2011, p 11) |
| | HVMLT 2006-9 Aggregate (P S dated October 3, 2006) | Zero  (S-26) | 0% (Oct , p 10) | 31% (Dec , p 10) | 99% (Mar , p 10) | 5 32% (Sept , p 10) | 61 34% (May 2011, p 10) |
| | HVMLT 2006-9 Group 1 | Zero  (S-26) | 0% (Oct , p 11) | 31% (Dec , p 11) | 67% (Mar , p 11) | 4 96% (Sept , p 11) | 58 93% (May 2011, p 15) |
| 41161XAM8 41161XAN6 | HVMLT 2006-9 Group 2 *Class 2A-1C1 and 2A-1B2 in Group 2 (S-7) | Zero  (S-26) | 0% (Oct , p 12) | 31% (Dec , p 12) | 1 14% (Mar , p 12) | 5 50% (Sept , p 12) | 62 52% (May 2011, p 19) |
| | HVMLT 2007-1 Aggregate (P S dated March 7, 2007) | 0 04% of the mortgage loans were at least 30 days but less than 60 days delinquent in payment, and 0 03% were 60 days or more delinquent in payment (S-24) | 32% (Mar , p 10) | 1 08% (May, p 10) | 2 88% (Aug , p 10) | 12 86% (Feb , p 10) | 62 01% (May 2011, p 10) |
| 41164MAF4 | HVMLT 2007-1 Group 1 *Class B-1 in both loan groups  (S-6) | 0 04% of the mortgage loans were at least 30 days but less than 60 days delinquent in payment, and 0 03% were 60 days or more delinquent in payment (S-24) | 25% (Mar , p 11) | 1 05% (May, p 11) | 2 32% (Aug , p 11) | 10 83% (Feb , p 11) | 57 52% (May 2011, p 11) |

FIRST AMENDED COMPLAINT

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 41164MAP2 41164MAF4 | HVMLT 2007-1 Group 2 *Class 2A-1C2 in Group 2 and Class B-1 in both groups  (S-6) | 0 04% of the mortgage loans were at least 30 days but less than 60 days delinquent in payment, and 0 03% were 60 days or more delinquent in payment (S-24) | 37% (Mar , p 11) | 1 10% (May, p 11) | 3 29% (Aug , p 11) | 14 29% (Feb , p 11) | 65 17% (May 2011, p 11) |
| | HVMLT 2007-2 Aggregate (P S dated March 29, 2007) | 64% of the mortgage loans were 30 days or more delinquent (S-25) | 1 40% (Apr , p 10) | 2 84% (June, p 10) | 6 45% (Sept , p 10) | 16 00% (Mar , p 10) | 39 27% (May 2011, p 10) |
| | HVMLT 2007-2 Group 1 | 64% of the mortgage loans were 30 days or more delinquent (S-25) | 84% (Apr , p 11) | 1 18% (June, p 11) | 3 15% (Sept , p 11) | 10 64% (Mar , p 11) | 37 72% (May 2011, p 11) |
| 41164LAC3 | HVMLT 2007-2 Group 2 *Class 2A-1B in Group 2 (S-7) | 64% of the mortgage loans were 30 days or more delinquent (S-25) | 1 63% (Apr , p 11) | 3 45% (June, p 11) | 7 66% (Sept , p 11) | 17 93% (Mar , p 11) | 39 94% (May 2011, p 11) |
| | HVMLT 2007-4 Aggregate (P S dated June 13, 2007) | 26% of the mortgage loans were 30 days or more delinquent (S-26) | 69% (June, p 11) | 2 62% (Aug , p 10) | 5 90% (Nov , p 10) | 14 04% (May, p 10) | 29 24% (May 2011, p 10) |
| | HVMLT 2007-4 Group 1 | 26% of the mortgage loans were 30 days or more delinquent (S-26) | 44% (June, p 12) | 77% (Aug , p 11) | 1 73% (Nov , p 11) | 4 88% (May, p 11) | 24 24% (May 2011, p 11) |
| 41164YAD3 | HVMLT 2007-4 Group 2 *Class 2A-3 in Group 2 (S-7) | 26% of the mortgage loans were 30 days or more delinquent (S-26) | 78% (June, p 12) | 3 31% (Aug , p 11) | 7 45% (Nov , p 11) | 17 40% (May, p 11) | 31 52% (May 2011, p 11) |

- 23 -

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 41165AAC6 41165AAD4 | HVMLT 2007-5 Aggregate *Classes A-1B and A-1C (P S dated July 11, 2007) | Zero (S-23) | 0% (July, p 10) | 55% (Sept, p 10) | 1 88% (Dec , p 9) | 7 42% (June, p 9) | 35 23% (May 2011, p 9) |
| | HVMLT 2007-5 Group 1 | Zero (S-23) | 0% (July, p 11) | 0 00% (Sept , p 11) | 32% (Dec , p 10) | 3 31% (June, p 10) | 30 32% (May 2011, p 10) |
| | HVMLT 2007-5 Group 2 | Zero (S-23) | 0% (July, p 11) | 60% (Sept , p 11) | 2 01% (Dec , p 10) | 7 75% (June, p 10) | 35 71% (May 2011, p 10) |
| | INDX 2006-AR35 Aggregate (P S dated November 29, 2006) | Zero (S-36) | 2 42% (Dec , p 10) | 3 76% (Feb , p 10) | 6 42% (May, p 10) | 16 16% (Nov , p 10) | 43 06% (May 2011, p 10) |
| | INDX 2006-AR35 Group 1 | Zero (S-36) | 1 67% (Dec , p 11) | 2 99% (Feb , p 11) | 6 16% (May, p 11) | 15 58% (Nov , p 11) | 44 60% (May 2011, p 15) |
| 45667SAN7 45667SAP2 | INDX 2006-AR35 Group 2 *Classes 2-A-1A, 2-A-3A and 2-A-3B in Group 2 (S-11) | Zero (S-36) | 2 89% (Dec , p 12) | 4 25% (Feb , p 12) | 6 58% (May, p 12) | 16 54% (Nov , p 12) | 41 99% (May 2011, p 20) |
| | LUM 2007-1 Aggregate (P S dated January 24, 2007) | Zero (S-24) | 1 24% (Feb , p 11) | 2 56% (Apr , p 11) | 4 82% (July, p 11) | 11 32% (Jan , p 11) | 45 39% (May 2011, p 11) |
| 55028CAA3 55028CAB1 | LUM 2007-1 Group 1 *Classes I-A-1 and I-A-2 in Group 1 (S-7) | Zero (S-24) | 1 14% (Feb , p 13) | 2 54% (Apr , p 13) | 4 32% (July, p 13) | 9 95% (Jan , p 13) | 43 19% (May 2011, p 12) |

FIRST AMENDED COMPLAINT

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 55028CAE5 | LUM 2007-1 Group 2 *Class II-A-3 in Group 2 (S-7) | Zero  (S-24) | 1 40% (Feb , p 13) | 2 59% (Apr , p 13) | 5 55% (July, p 13) | 13 40% (Jan , p 13) | 49 11% (May 2011, p 12) |
| | MHL 2006-1 Aggregate (P S dated February 17, 2006) | | 17% (Mar , p 13) | 1 89% (May, p 13) | 3 03% (Aug , p 13) | 5 75% (Feb , p 13) | 24 42% (May 2011, p 13) |
| | MHL 2006-1 Group 1-A1 | 27% of the mortgage loans were 30 days or more delinquent (S-31) | 0% (Mar , p 14) | 1 37% (May, p 14) | 1 33% (Aug , p 14) | 2 18% (Feb , p 14) | 18 12% (May 2011, p 15) |
| | MHL 2006-1 Group 1-A2 | 26% of the mortgage loans were 30 days or more delinquent (S-47) | 27% (Mar , p 14) | 2 74% (May, p 14) | 4 35% (Aug , p 14) | 8 05% (Feb , p 14) | 23 14% (May 2011, p 15) |
| 61915RCL8 | MHL 2006-1 Group 2 *Class 2-A-1C in Group 2 (S-8) | 34% of the mortgage loans were 30 days or more delinquent (S-54) | 18% (Mar , p 15) | 1 30% (May, p 15) | 2 80% (Aug , p 15) | 5 91% (Feb , p 15) | 31 62% (May 2011, p 14) |
| | NHELI 2007-1 Aggregate (P S dated January 29, 2007) | Zero  (S-57) | 16% (Feb , p 13) | 5 05% (Apr , p 13) | 11 90% (July, p 13) | 24 01% (Jan , p 13) | 46 39% (May 2011, p 13) |
| 65537KAB6 65537KAC4 | NHELI 2007-1 Group 2 *Classes 2-A-1A and 2-A-1B in Group 2 (S-i) | Zero  (S-57) | 19% (Feb , p 14) | 7 00% (Apr , p 15) | 14 26% (July, p 15) | 27 54% (Jan , p 15) | 47 53% (May 2011, p 14) |

FIRST AMENDED COMPLAINT

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | SVHE 2005-OPT4 Aggregate (P S dated November 22, 2005) | Zero (37) | 12% (Dec , p 12) | 1 87% (Feb , p 12) | 04% (May, p 11) | 8 51% (Nov , p 11) | 36 08% (May 2011, p 12) |
| 83611MJM1 | SVHE 2005-OPT4 Group 1 *Classes M-1 and M-2 in Groups 1 and 2 (S-68) | Zero (37) | 05% (Dec , p 13) | 2 13% (Feb , p 13) | 3 34% (May, p 12) | 9 3% (Nov , p 12) | 34 35% (May 2011, p 13) |
| 83611MJM1 | SVHE 2005-OPT4 Group 2 *Classes M-1 and M-2 in Groups 1 and 2 (S-68) | Zero (37) | 2% (Dec , p 14) | 1 6% (Feb , p 14) | 2 72% (May, p 13) | 7 71% (Nov , p 13) | 37 66% (May 2011, p 14) |
| 92978GAC3 | WMLT 2006-ALT1 (P S dated December 19, 2006) | Zero (S-32) | 94% (Jan , p 14) | 2 13% (Mar , p 14) | 4 14% (June, p 14) | 10 84% (Dec , p 14) | 31 95% (May 2011, p 12) |

71.   This early spike in delinquencies and defaults, which occurred almost immediately after these RMBS were purchased by WesCorp, was later discovered to be indicative of the Originators' systematic disregard of their stated underwriting guidelines.

72.   The phenomenon of borrower default shortly after origination of the loans is known as "Early Payment Default."  Early Payment Default evidences borrower misrepresentations and other misinformation in the origination process resulting from the systematic failure of the Originators to apply the underwriting guidelines described in the Offering Documents.

FIRST AMENDED COMPLAINT

73.     A November 2008 Federal Reserve Board study attributed the rise in defaults, in part, to "[d]eteriorating lending standards," and posited that "the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors."  Christopher J. Mayer *et al.*, *The Rise in Mortgage Defaults* 15-16 (Fed. Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-59).

74.     In January 2011, the Financial Stability Oversight Council, chaired by United States Treasury Secretary Timothy Geithner, issued a report analyzing the effects of risk retention requirements in mortgage lending on the broader economy. *See* FIN. STABILITY OVERSIGHT COUNCIL, MACROECONOMIC EFFECTS OF RISK RETENTION REQUIREMENTS (2011) ("FSOC Risk Retention Report").  The FSOC Risk Retention Report focused on stabilizing the mortgage lending industry through larger risk retention requirements in the industry that can "incent better lending decisions" and "help to mitigate some of the pro-cyclical effects securitization may have on the economy."  *Id.* at 2.

75.     The FSOC Risk Retention Report observed that the securitization process often incentivizes poor underwriting by shifting the risk of default from the originators to the investors, while obscuring critical information concerning the actual nature of the risk.  The FSOC Risk Retention Report stated:

> The securitization process involves multiple parties with varying incentives and information, thereby breaking down the traditional direct relationship between borrower and lender.  The party setting underwriting standards and making lending decisions (the originator) and the party making structuring decisions (the securitizer) are often exposed to minimal or no credit risk.  By contrast, the party that is most exposed to credit risk (the investor) often has less influence over underwriting standards and may have less information about the borrower.  As a result, originators and securitizers that do not retain risk can, at least in the short run, maximize their own returns by lowering loan underwriting standards

1    in ways that investors may have difficulty detecting. The originate-to-
2    distribute model, as it was conducted, exacerbated this weakness by
3    compensating originators and securitizers based on volume, rather than
4    on quality.

5    *Id.* at 3.

6    76. Indeed, originators that wrote a high percentage of their loans for
7    distribution were more likely to disregard underwriting standards, resulting in poorly
8    performing mortgages, in contrast to originators that originated and then held most of
9    their loans.

10   77. High OTD originators profited from mortgage origination fees without
11   bearing the risks of borrower default or insufficient collateral in the event of a default.
12   Divorced from these risks, high OTD originators were incentivized to push loan
13   quantity over quality.

14   78. Table 6 (*infra*) shows the percentage of loans originated for distribution
15   relative to all the loans made by the Originator for the years 2005, 2006, and 2007, for
16   those Originators in this Complaint with high OTD percentages. The data was
17   obtained from the Home Mortgage Disclosure Act database.

### Table 6

| Originator | OTD % 2005 | OTD % 2006 | OTD % 2007 |
|---|---|---|---|
| American Home Mortgage Corp | 91 9 | 62 4 | |
| American Home Mortgage Investment Corp | 100 | 100 | 100 |
| Countrywide Home Loans, Inc | 98 5 | 96 5 | 98 4 |
| First Federal Bank of California | 0 | 20 6 | 54 3 |
| First National Bank of Nevada | 88 0 | 79 8 | 89 4 |
| IndyMac Bank, F S B | 81 1 | 87 7 | 82 8 |
| Kay-Co Investment Inc  dba Pro30 Funding | | 99 4 | |
| Metrocities Mortgage, LLC | 99 96 | 100 | 100 |
| MortgageIT, Inc | 55 5 | 98 8 | 100 |
| Option One Mortgage Corporation | 92 2 | 72 7 | 58 2 |
| Paul Financial, LLC | 85 2 | 83 4 | 99 1 |
| Residential Mortgage Capital | 99 9 | 100 | 100 |

FIRST AMENDED COMPLAINT

**B.     The Surge in Actual Versus Expected Cumulative Losses Is Evidence of the Originators' Systematic Disregard of Underwriting Standards**

79.     The actual defaults in the mortgage pools underlying the RMBS WesCorp purchased exceeded expected defaults so quickly and by so wide a margin that a significant portion of the mortgages could not have been underwritten as represented in the Offering Documents.

80.     Every month, the RMBS trustee reports the number and outstanding balance of all loans in the mortgage pools that have defaulted.  The running total of this cumulative default balance is referred to as the "gross loss."

81.     When defaulted loans are foreclosed upon, the proceeds from the foreclosures are distributed to the investors and any shortfall on the defaulted loan balances is realized as a loss.  The running total of this cumulative realized loss (defaulted loan balance minus recovery in foreclosure) is referred to as the "net loss."

82.     "Actual loss" is the economic loss the mortgage pool experiences in fact. So "actual gross loss" is the actual cumulative sum of the balance of the loans in default for a particular security.  Likewise, "actual net loss" is the actual cumulative realized loss on defaulted loans after foreclosure.

83.     At the time a security is rated, the rating agency calculates an amount of "expected loss" using a model based on historical performance of similar securities. So "expected gross loss" is the expected cumulative sum of the balance of the loans in default for a particular security.  Likewise, "expected net loss" is the expected cumulative realized loss on defaulted loans after foreclosure.  The amount of expected net loss drives the credit ratings assigned to the various tranches of RMBS.

84.     Each credit rating has a "rating factor," which can be expressed in multiples of the amount of credit enhancement over expected net loss (in equation form:  $CE/ENL = RF$).  Thus, the rating factor expresses how many times the

FIRST AMENDED COMPLAINT

expected net loss is covered by credit enhancement.  A "triple-A" rated security would have a rating factor of "5," so would require credit enhancement of five times the amount of the expected net loss.  A "double-A rating" would have a rating factor of "4," and thus would require credit enhancement equaling four times the expected net loss.  A "single-A" rating would have a rating factor of "3" and would require credit enhancement of three times expected net loss.  A "Baa" rating would require credit enhancement of  2—1.5 times expected net loss, and a "Ba" rating or lower requires some amount of credit enhancement less than 1.5 times expected net loss.

85.     Accordingly, by working backwards from this equation, one can infer expected net loss in an already-issued offering.  For example, assume there is a $100 million offering backed by $100 million of assets, with a triple-A rated senior tranche with a principal balance of $75 million.  This means the non-senior tranches, in aggregate, have a principal balance of $25 million.  The $25 million amount of the non-senior tranches in this hypothetical offering serves as the credit enhancement for the senior tranche.  Therefore, on our hypothetical $100 million offering, the expected net loss would be $5 million, which is the amount of the credit enhancement on the triple-A rated senior tranche—$25 million—divided by the rating factor for triple-A rated securities—5.  The following equation illustrates: $25,000,000/5 = $5,000,000.

86.     Expected gross loss can be then mathematically derived by applying an "expected recovery rate" to the expected net loss ($EGL = ENL/(1 - ERR)$).

87.     A comparison of actual gross losses to expected gross losses for a particular security can be made graphically by plotting the actual versus expected loss data on a line graph.  Figure 2 (*infra*) is a series of such line graphs.  Figure 2 illustrates the actual gross loss (again, actual defaults) for the pools backing the RMBS purchased by WesCorp experienced in the first 12 months after issuance compared to the expected gross loss (again, expected defaults) for those pools during the same time period.

- 30 -                                          FIRST AMENDED COMPLAINT

88.     The actual gross loss data in Figure 2 (*infra*) was obtained from ABSNET, a resource for asset-backed securities related data.  The expected gross losses were calculated by "grossing up" the rating-implied expected net losses using an expected recovery rate of 85%.

89.     As the graphs show, the actual gross losses (the solid lines) far exceeded the expected gross losses (the dotted lines) for the period analyzed.  That means that the actual balance of defaulted loans in the first 12 months following issuance far exceeded the expected balance of defaulted loans based on historical performance.

### Figure 2



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Alternative Loan Trust 2006-AR4 | 39723 | 1 | $ - | $ 881,637 |
| Alternative Loan Trust 2006-AR4 | 39723 | 2 | $ - | $ 962,968 |
| Alternative Loan Trust 2006-AR4 | 39723 | 3 | $ 1,901,772 | $ 1,051,631 |
| Alternative Loan Trust 2006-AR4 | 39723 | 4 | $ 7,464,605 | $ 1,148,255 |
| Alternative Loan Trust 2006-AR4 | 39723 | 5 | $ 7,310,855 | $ 1,253,515 |
| Alternative Loan Trust 2006-AR4 | 39723 | 6 | $ 7,310,855 | $ 1,368,137 |
| Alternative Loan Trust 2006-AR4 | 39723 | 7 | $ 11,290,671 | $ 1,492,899 |
| Alternative Loan Trust 2006-AR4 | 39723 | 8 | $ 24,181,875 | $ 1,628,633 |
| Alternative Loan Trust 2006-AR4 | 39723 | 9 | $ 28,385,840 | $ 1,776,228 |
| Alternative Loan Trust 2006-AR4 | 39723 | 10 | $ 45,560,714 | $ 1,936,629 |
| Alternative Loan Trust 2006-AR4 | 39723 | 11 | $ 47,163,113 | $ 2,110,842 |
| Alternative Loan Trust 2006-AR4 | 39723 | 12 | $ 50,115,861 | $ 2,299,928 |

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| American Home Mortgage Assets Trust 2007-3 | 41708 | 1 | $ - | $ 2,232,609 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 2 | $ 20,399,980 | $ 2,438,567 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 3 | $ 49,464,549 | $ 2,663,093 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 4 | $ 76,378,883 | $ 2,907,778 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 5 | $ 103,617,642 | $ 3,174,333 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 6 | $ 130,873,934 | $ 3,464,595 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 7 | $ 140,742,932 | $ 3,780,536 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 8 | $ 163,847,101 | $ 4,124,262 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 9 | $ 187,001,069 | $ 4,498,024 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 10 | $ 185,965,334 | $ 4,904,215 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 11 | $ 206,785,530 | $ 5,345,381 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 12 | $ 226,605,691 | $ 5,824,213 |

FIRST AMENDED COMPLAINT

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 1 | $ 4,157,138 | $ 5,089,278 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 2 | $ 6,017,078 | $ 5,558,764 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 3 | $ 9,357,150 | $ 6,070,576 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 4 | $ 10,723,986 | $ 6,628,339 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 5 | $ 11,705,031 | $ 7,235,956 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 6 | $ 17,425,209 | $ 7,897,616 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 7 | $ 20,756,714 | $ 8,617,809 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 8 | $ 27,245,055 | $ 9,401,340 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 9 | $ 31,707,712 | $ 10,253,337 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 10 | $ 35,498,901 | $ 11,179,259 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 11 | $ 38,255,707 | $ 12,184,906 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 12 | $ 44,937,612 | $ 13,276,413 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2006-8 | 38787 | 1 | $ - | $ 2,969,076 |
| HarborView 2006-8 | 38787 | 2 | $ 844,510 | $ 3,242,974 |
| HarborView 2006-8 | 38787 | 3 | $ 2,248,223 | $ 3,541,564 |
| HarborView 2006-8 | 38787 | 4 | $ 3,195,493 | $ 3,866,962 |
| HarborView 2006-8 | 38787 | 5 | $ 5,503,145 | $ 4,221,445 |
| HarborView 2006-8 | 38787 | 6 | $ 7,929,141 | $ 4,607,456 |
| HarborView 2006-8 | 38787 | 7 | $ 6,810,649 | $ 5,027,615 |
| HarborView 2006-8 | 38787 | 8 | $ 8,830,028 | $ 5,484,726 |
| HarborView 2006-8 | 38787 | 9 | $ 9,472,044 | $ 5,981,780 |
| HarborView 2006-8 | 38787 | 10 | $ 10,903,395 | $ 6,521,962 |
| HarborView 2006-8 | 38787 | 11 | $ 12,058,271 | $ 7,108,654 |
| HarborView 2006-8 | 38787 | 12 | $ 15,824,121 | $ 7,745,437 |



- 33 -

FIRST AMENDED COMPLAINT



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2006-9 | 39173 | 1 | $ - | $ 6,428,529 |
| HarborView 2006-9 | 39173 | 2 | $ - | $ 7,021,561 |
| HarborView 2006-9 | 39173 | 3 | $ - | $ 7,668,057 |
| HarborView 2006-9 | 39173 | 4 | $ 2,570,574 | $ 8,372,597 |
| HarborView 2006-9 | 39173 | 5 | $ 6,353,042 | $ 9,140,109 |
| HarborView 2006-9 | 39173 | 6 | $ 6,758,658 | $ 9,975,885 |
| HarborView 2006-9 | 39173 | 7 | $ 11,655,574 | $ 10,885,598 |
| HarborView 2006-9 | 39173 | 8 | $ 13,825,145 | $ 11,875,316 |
| HarborView 2006-9 | 39173 | 9 | $ 17,538,934 | $ 12,951,517 |
| HarborView 2006-9 | 39173 | 10 | $ 29,668,715 | $ 14,121,098 |
| HarborView 2006-9 | 39173 | 11 | $ 39,916,025 | $ 15,391,381 |
| HarborView 2006-9 | 39173 | 12 | $ 54,441,864 | $ 16,770,120 |

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2006-10 | 39466 | 1 | $ - | $ 4,146,641 |
| HarborView 2006-10 | 39466 | 2 | $ - | $ 4,529,169 |
| HarborView 2006-10 | 39466 | 3 | $ - | $ 4,946,182 |
| HarborView 2006-10 | 39466 | 4 | $ - | $ 5,400,637 |
| HarborView 2006-10 | 39466 | 5 | $ - | $ 5,895,711 |
| HarborView 2006-10 | 39466 | 6 | $ - | $ 6,434,818 |
| HarborView 2006-10 | 39466 | 7 | $ 8,680,070 | $ 7,021,616 |
| HarborView 2006-10 | 39466 | 8 | $ 11,141,881 | $ 7,660,021 |
| HarborView 2006-10 | 39466 | 9 | $ 14,725,771 | $ 8,354,211 |
| HarborView 2006-10 | 39466 | 10 | $ 20,454,135 | $ 9,108,634 |
| HarborView 2006-10 | 39466 | 11 | $ 24,280,421 | $ 9,928,015 |
| HarborView 2006-10 | 39466 | 12 | $ 32,908,115 | $ 10,817,352 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2006-11 | 39604 | 1 | $ - | $ 620,128 |
| HarborView 2006-11 | 39604 | 2 | $ - | $ 677,335 |
| HarborView 2006-11 | 39604 | 3 | $ 1,541,596 | $ 739,700 |
| HarborView 2006-11 | 39604 | 4 | $ 2,586,325 | $ 807,663 |
| HarborView 2006-11 | 39604 | 5 | $ 1,614,729 | $ 881,701 |
| HarborView 2006-11 | 39604 | 6 | $ 2,697,387 | $ 962,324 |
| HarborView 2006-11 | 39604 | 7 | $ 5,548,956 | $ 1,050,080 |
| HarborView 2006-11 | 39604 | 8 | $ 8,395,221 | $ 1,145,553 |
| HarborView 2006-11 | 39604 | 9 | $ 10,039,321 | $ 1,249,369 |
| HarborView 2006-11 | 39604 | 10 | $ 10,546,521 | $ 1,362,193 |
| HarborView 2006-11 | 39604 | 11 | $ 12,059,557 | $ 1,484,731 |
| HarborView 2006-11 | 39604 | 12 | $ 11,489,433 | $ 1,617,731 |

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2006-12 | 39654 | 1 | $ - | $ 6,998,409 |
| HarborView 2006-12 | 39654 | 2 | $ - | $ 7,644,013 |
| HarborView 2006-12 | 39654 | 3 | $ - | $ 8,347,820 |
| HarborView 2006-12 | 39654 | 4 | $ 4,084,060 | $ 9,114,816 |
| HarborView 2006-12 | 39654 | 5 | $ 11,094,460 | $ 9,950,367 |
| HarborView 2006-12 | 39654 | 6 | $ 19,896,280 | $ 10,860,234 |
| HarborView 2006-12 | 39654 | 7 | $ 31,022,567 | $ 11,850,591 |
| HarborView 2006-12 | 39654 | 8 | $ 40,963,688 | $ 12,928,047 |
| HarborView 2006-12 | 39654 | 9 | $ 60,192,493 | $ 14,099,652 |
| HarborView 2006-12 | 39654 | 10 | $ 88,526,405 | $ 15,372,914 |
| HarborView 2006-12 | 39654 | 11 | $ 96,055,571 | $ 16,755,807 |
| HarborView 2006-12 | 39654 | 12 | $ 96,131,151 | $ 18,256,769 |

- 35 -

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView  2006-14 | 39668 | 1 | $                        - | $        3,574,654 |
| HarborView  2006-14 | 39668 | 2 | $                        - | $        3,904,416 |
| HarborView  2006-14 | 39668 | 3 | $           368,396 | $        4,263,907 |
| HarborView  2006-14 | 39668 | 4 | $        6,858,408 | $        4,655,674 |
| HarborView  2006-14 | 39668 | 5 | $      13,473,277 | $        5,082,458 |
| HarborView  2006-14 | 39668 | 6 | $      16,771,582 | $        5,547,200 |
| HarborView  2006-14 | 39668 | 7 | $      21,587,406 | $        6,053,056 |
| HarborView  2006-14 | 39668 | 8 | $      28,030,117 | $        6,603,399 |
| HarborView  2006-14 | 39668 | 9 | $      39,750,069 | $        7,201,833 |
| HarborView  2006-14 | 39668 | 10 | $      44,347,316 | $        7,852,191 |
| HarborView  2006-14 | 39668 | 11 | $      59,770,494 | $        8,558,546 |
| HarborView  2006-14 | 39668 | 12 | $      74,945,944 | $        9,325,209 |

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView  2007-1 | 40906 | 1 | $           470,016 | $        4,486,867 |
| HarborView  2007-1 | 40906 | 2 | $                        - | $        4,900,781 |
| HarborView  2007-1 | 40906 | 3 | $           740,974 | $        5,352,010 |
| HarborView  2007-1 | 40906 | 4 | $        3,422,669 | $        5,843,752 |
| HarborView  2007-1 | 40906 | 5 | $      11,572,487 | $        6,379,446 |
| HarborView  2007-1 | 40906 | 6 | $      17,645,257 | $        6,962,786 |
| HarborView  2007-1 | 40906 | 7 | $      27,455,285 | $        7,597,731 |
| HarborView  2007-1 | 40906 | 8 | $      33,429,089 | $        8,288,517 |
| HarborView  2007-1 | 40906 | 9 | $      37,706,844 | $        9,039,664 |
| HarborView  2007-1 | 40906 | 10 | $      37,339,557 | $        9,855,987 |
| HarborView  2007-1 | 40906 | 11 | $      48,483,984 | $      10,742,596 |
| HarborView  2007-1 | 40906 | 12 | $      47,750,914 | $      11,704,903 |

FIRST AMENDED COMPLAINT



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView  2007-2 | 40907 | 1 | $          647,551 | $          1,785,903 |
| HarborView  2007-2 | 40907 | 2 | $        1,783,440 | $          1,950,652 |
| HarborView  2007-2 | 40907 | 3 | $        1,699,532 | $          2,130,255 |
| HarborView  2007-2 | 40907 | 4 | $      11,140,763 | $          2,325,982 |
| HarborView  2007-2 | 40907 | 5 | $      12,498,521 | $          2,539,204 |
| HarborView  2007-2 | 40907 | 6 | $      33,584,483 | $          2,771,390 |
| HarborView  2007-2 | 40907 | 7 | $      46,188,913 | $          3,024,116 |
| HarborView  2007-2 | 40907 | 8 | $      55,536,048 | $          3,299,069 |
| HarborView  2007-2 | 40907 | 9 | $      61,318,518 | $          3,598,047 |
| HarborView  2007-2 | 40907 | 10 | $      69,284,016 | $          3,922,967 |
| HarborView  2007-2 | 40907 | 11 | $      69,215,449 | $          4,275,863 |
| HarborView  2007-2 | 40907 | 12 | $      83,515,196 | $          4,658,889 |

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2007-4 | 41472 | 1 | $                    - | $          1,484,815 |
| HarborView 2007-4 | 41472 | 2 | $        1,475,896 | $          1,621,790 |
| HarborView 2007-4 | 41472 | 3 | $        4,503,163 | $          1,771,113 |
| HarborView 2007-4 | 41472 | 4 | $      12,670,740 | $          1,933,842 |
| HarborView 2007-4 | 41472 | 5 | $      18,897,311 | $          2,111,117 |
| HarborView 2007-4 | 41472 | 6 | $      26,420,698 | $          2,304,158 |
| HarborView 2007-4 | 41472 | 7 | $      33,546,631 | $          2,514,277 |
| HarborView 2007-4 | 41472 | 8 | $      40,719,514 | $          2,742,875 |
| HarborView 2007-4 | 41472 | 9 | $      52,660,914 | $          2,991,449 |
| HarborView 2007-4 | 41472 | 10 | $      58,084,757 | $          3,261,590 |
| HarborView 2007-4 | 41472 | 11 | $      63,355,076 | $          3,554,991 |
| HarborView 2007-4 | 41472 | 12 | $      73,274,190 | $          3,873,442 |

- 37 -                                     FIRST AMENDED COMPLAINT



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2007-5 | 41776 | 1 | $ - | $ 1,359,786 |
| HarborView 2007-5 | 41776 | 2 | $ - | $ 1,485,226 |
| HarborView 2007-5 | 41776 | 3 | $ 751,500 | $ 1,621,975 |
| HarborView 2007-5 | 41776 | 4 | $ 2,920,614 | $ 1,771,002 |
| HarborView 2007-5 | 41776 | 5 | $ 7,632,190 | $ 1,933,349 |
| HarborView 2007-5 | 41776 | 6 | $ 12,511,060 | $ 2,110,135 |
| HarborView 2007-5 | 41776 | 7 | $ 15,835,944 | $ 2,302,561 |
| HarborView 2007-5 | 41776 | 8 | $ 21,143,592 | $ 2,511,910 |
| HarborView 2007-5 | 41776 | 9 | $ 24,750,664 | $ 2,739,552 |
| HarborView 2007-5 | 41776 | 10 | $ 20,932,966 | $ 2,986,945 |
| HarborView 2007-5 | 41776 | 11 | $ 29,635,152 | $ 3,255,640 |
| HarborView 2007-5 | 41776 | 12 | $ 34,563,869 | $ 3,547,276 |

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 1 | $ - | $ 1,734,368 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 2 | $ - | $ 1,894,364 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 3 | $ - | $ 2,068,783 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 4 | $ - | $ 2,258,863 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 5 | $ 1,848,000 | $ 2,465,932 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 6 | $ 3,866,023 | $ 2,691,418 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 7 | $ 13,740,659 | $ 2,936,851 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 8 | $ 21,838,012 | $ 3,203,870 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 9 | $ 27,603,649 | $ 3,494,221 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 10 | $ 31,428,103 | $ 3,809,765 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 11 | $ 34,423,595 | $ 4,152,477 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 12 | $ 43,899,521 | $ 4,524,450 |

FIRST AMENDED COMPLAINT

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Luminent Mortgage  Trust 2007-1 | 40299 | 1 | $                    - | $            837,607 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 2 | $                    - | $            914,876 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 3 | $                    - | $            999,112 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 4 | $         1,982,522 | $         1,090,910 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 5 | $         3,098,851 | $         1,190,913 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 6 | $         7,535,538 | $         1,299,811 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 7 | $         8,877,706 | $         1,418,342 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 8 | $         7,269,659 | $         1,547,298 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 9 | $         7,809,257 | $         1,687,522 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 10 | $         6,135,975 | $         1,839,912 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 11 | $       11,639,877 | $         2,005,424 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 12 | $       13,374,400 | $         2,185,068 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 1 | $                    - | $            676,065.76 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 2 | $                    - | $            738,432.90 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 3 | $                    - | $            806,422.58 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 4 | $            560,000.00 | $            880,516.57 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 5 | $         1,254,257.17 | $            961,233.11 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 6 | $         2,470,257.89 | $         1,049,128.74 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 7 | $         2,628,457.17 | $         1,144,800.05 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 8 | $         4,055,807.17 | $         1,248,885.24 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 9 | $         3,738,676.18 | $         1,362,065.53 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 10 | $         4,116,310.48 | $         1,485,066.24 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 11 | $         5,153,808.11 | $         1,618,657.50 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 12 | $         7,103,777.17 | $         1,763,654.58 |

FIRST AMENDED COMPLAINT

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 1 | $ 159,200 | $ 1,737,954 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 2 | $ 619,200 | $ 1,898,280 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 3 | $ 23,542,962 | $ 2,073,060 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 4 | $ 42,794,130 | $ 2,263,533 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 5 | $ 36,287,162 | $ 2,471,030 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 6 | $ 37,717,522 | $ 2,696,982 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 7 | $ 69,224,811 | $ 2,942,923 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 8 | $ 86,609,785 | $ 3,210,493 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 9 | $ 90,655,311 | $ 3,501,444 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 10 | $ 112,784,673 | $ 3,817,641 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 11 | $ 96,635,919 | $ 4,161,062 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 12 | $ 105,724,469 | $ 4,533,804 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 1 | $ 1,212,442 | $ 6,716,668 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 2 | $ 1,512,469 | $ 7,336,281 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 3 | $ 3,073,678 | $ 8,011,754 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 4 | $ 5,331,109 | $ 8,747,873 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 5 | $ 5,676,196 | $ 9,549,786 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 6 | $ 12,008,162 | $ 10,423,024 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 7 | $ 19,248,543 | $ 11,373,512 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 8 | $ 23,426,005 | $ 12,407,591 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 9 | $ 30,776,311 | $ 13,532,030 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 10 | $ 35,034,668 | $ 14,754,033 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 11 | $ 44,624,482 | $ 16,081,254 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 12 | $ 52,570,998 | $ 17,521,790 |



FIRST AMENDED COMPLAINT

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 1 | $ - | $ 571,225 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 2 | $ 907,000 | $ 623,920 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 3 | $ 3,477,778 | $ 681,366 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 4 | $ 3,865,958 | $ 743,970 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 5 | $ 4,775,290 | $ 812,169 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 6 | $ 8,398,870 | $ 886,435 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 7 | $ 8,047,724 | $ 967,270 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 8 | $ 8,645,036 | $ 1,055,214 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 9 | $ 11,762,701 | $ 1,150,843 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 10 | $ 17,071,099 | $ 1,254,769 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 11 | $ 21,346,144 | $ 1,367,643 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 12 | $ 23,684,214 | $ 1,490,155 |



90.     As clearly shown in Figure 2 (*supra*), actual losses spiked almost immediately after issuance of the RMBS.  Borrowers defaulted on the underlying mortgages soon after loan origination, rapidly eliminating the RMBS's credit enhancement.  For example, in the AHMA 2007-3 offering (shown in Figure 2), actual gross losses at month 12 exceeded $226 million, nearly 39 times the expected gross losses of $5.8 million.

91.     This immediate increase in actual gross losses—at a rate far greater than expected gross losses—is strong evidence that the Originators systematically disregarded the underwriting standards in the Offering Documents.

92.     Because credit enhancement is designed to ensure triple-A performance of triple-A rated RMBS, the evidence that credit enhancement has failed (*i.e.*, actual losses swiftly surged past expected losses shortly after the offering) substantiates that a critical number of mortgages in the pool were not written in accordance with the underwriting guidelines stated in the Offering Documents.

### C. The Collapse of the Certificates' Credit Ratings Is Evidence of Systematic Disregard of Underwriting Guidelines

93.    Virtually all of the RMBS WesCorp purchased were rated triple-A at issuance.

94.    Moody's and S&P have since downgraded the RMBS WesCorp purchased to well below investment grade (*see supra* Table 4).

95.    A rating downgrade is material.  The total collapse in the credit ratings of the RMBS WesCorp purchased, typically from triple-A to non-investment speculative grade, is evidence of the Originators' systematic disregard of underwriting guidelines, amplifying that these securities were impaired from the outset.

### D. Revelations Subsequent to the Offerings Show That the Originators Systematically Disregarded Underwriting Standards

96.    Public disclosures subsequent to the issuance of the RMBS reinforce the allegation that the Originators systematically abandoned their stated underwriting guidelines.

#### 1. The Systematic Disregard of Underwriting Standards Was Pervasive as Revealed After the Collapse

97.    Mortgage originators experienced unprecedented success during the mortgage boom.  Yet their success was illusory.  As the loans they originated began significantly to underperform, the demand for their products subsided.  It became evident that originators had systematically disregarded their underwriting standards.

98.    The Office of the Comptroller of the Currency (the "OCC"), an office within the United States Department of the Treasury, published a report in November 2008 listing the "Worst Ten" metropolitan areas with the highest rates of foreclosures and the "Worst Ten" originators with the largest numbers of foreclosures in those areas ("2008 'Worst Ten in the Worst Ten' Report").  In this report, the OCC emphasized the importance of adherence to underwriting standards in mortgage loan origination

1     The quality of the underwriting process—that is, determining through

2     analysis of the borrower and market conditions that a borrower is highly

3     likely to be able to repay the loan as promised—is a major determinant of

4     subsequent loan performance.  The quality of underwriting varies across

5     lenders, a factor that is evident through comparisons of rates of

6     delinquency, foreclosure, or other loan performance measures across loan

7     originators.

8         99.    Recently, government reports and investigations and newspaper reports

9 have uncovered the extent of the pervasive abandonment of underwriting standards.

10 The Permanent Subcommittee on Investigations in the United States Senate ("PSI")

11 recently released its report detailing the causes of the financial crisis.  Using

12 Washington Mutual Bank ("WaMu") as a case study, the PSI concluded through its

13 investigation:

14     Washington Mutual was far from the only lender that sold poor quality

15     mortgages and mortgage backed securities that undermined U.S. financial

16     markets.  The Subcommittee investigation indicates that Washington

17     Mutual was emblematic of a host of financial institutions that knowingly

18     originated, sold, and securitized billions of dollars in high risk, poor

19     quality home loans.  These lenders were not the victims of the financial

20     crisis; the high risk loans they issued became the fuel that ignited the

21     financial crisis.

22 STAFF OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, 112TH CONG., WALL

23 STREET AND THE FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE 50

24 (Subcomm. Print 2011) ("PSI Wall Street Report").

25         100.    Indeed, the Financial Crisis Inquiry Commission ("FCIC") issued its final

26 report in January 2011 that detailed, among other things, the collapse of mortgage

27 underwriting standards and subsequent collapse of the mortgage market and wider

28 economy.  *See* FIN CRISIS INQUIRY COMM'N, FINAL REPORT OF THE NATIONAL

COMMISSION ON THE CAUSES OF THE FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES (2011) ("FCIC Report").

101.    The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics" during the housing and financial crisis.  "Unfortunately—as has been the case in past speculative booms and busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis."  *Id.* at xxii.  The FCIC found that the current economic crisis had its genesis in the housing boom:

> [I]t was the collapse of the housing bubble—fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages—that was the spark that ignited a string of events, which led to a full-blown crises in the fall of 2008.  Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id.* at xvi.

102.    During the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan.  The FCIC Report found "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007."  *Id.* at xxii.  Early Payment Default is a significant indicator of pervasive disregard for underwriting standards.  The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards. . . ."  *Id.*

103.    In this lax lending environment, mortgage lenders went unchecked, originating mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities.  As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences."

FIRST AMENDED COMPLAINT

1        Less than a year later, they noted that certain high-risk loans they were

2        making could result not only in foreclosures but also in "financial and

3        reputational catastrophe" for the firm.  But they did not stop.

4  *Id.*

5        104.   Lenders and borrowers took advantage of this climate, with borrowers

6  willing to take on loans and lenders anxious to get those borrowers into the loans,

7  ignoring even loosened underwriting standards.  The FCIC Report observed:  "Many

8  mortgage lenders set the bar so low that lenders simply took eager borrowers'

9  qualifications on faith, often with a willful disregard for a borrower's ability to pay."

10  *Id.* at xxiii.

11        105.   In an interview with the FCIC, Alphonso Jackson, the Secretary of the

12  Department of Housing and Urban Affairs ("HUD") from 2004 to 2008, related that

13  HUD had heard about mortgage lenders "running wild, taking applications over the

14  Internet, not verifying people's income or their ability to have a job."  *Id.* at 12-13

15  (internal quotation marks omitted).

16        106.   Chairman of the Federal Reserve Board, Benjamin Bernanke, spoke to

17  the decline of underwriting standards in this speech before the World Affairs Council

18  of Greater Richmond on April 10, 2008:

19        First, at the point of origination, underwriting standards became

20        increasingly compromised.  The best-known and most serious case is that

21        of subprime mortgages, mortgages extended to borrowers with weaker

22        credit histories.  To a degree that increased over time, these mortgages

23        were often poorly documented and extended with insufficient attention

24        to the borrower's ability to repay.  In retrospect, the breakdown in

25        underwriting can be linked to the incentives that the originate-to-

26        distribute model, as implemented in this case, created for the originators.

27        Notably, the incentive structures sometimes often tied originator revenue

28        to loan volume, rather than to the quality of the loans being passed up

1    the chain. Investors normally have the right to put loans that default

2    quickly back to the originator, which should tend to apply some

3    discipline to the underwriting process. However, in the recent episode,

4    some originators had little capital at stake, reducing their exposure to the

5    risk that the loans would perform poorly.

6    Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs

7    Council of Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The*

8    *Report of the President's Working Group on Financial Markets*, Apr. 10, 2008.

9    107. Investment banks securitized loans that were not originated in

10    accordance with underwriting guidelines, and failed to disclose this fact in RMBS

11    offering documents. As the FCIC Report noted:

12    The Commission concludes that firms securitizing mortgages failed to

13    perform adequate due diligence on the mortgages they purchased and at

14    times knowingly waived compliance with underwriting standards.

15    Potential investors were not fully informed or were misled about the

16    poor quality of the mortgages contained in some mortgage-related

17    securities. These problems appear to have been significant.

18    FCIC Report at 187.

19    108. The lack of disclosure regarding the true underwriting practices of the

20    Originators in the Offering Documents at issue in this Complaint put WesCorp at a

21    severe disadvantage. The FSOC explained that the origination and securitization

22    process contains inherent "information asymmetries" that put investors at a

23    disadvantage regarding critical information concerning the quality and performance of

24    RMBS. The FSOC Risk Retention Report described the information disadvantage for

25    investors of RMBS:

26    One important informational friction highlighted during the recent

27    financial crisis has aspects of a "lemons" problem that exists between the

28    issuer and investor. An originator has more information about the ability

    FIRST AMENDED COMPLAINT

1     of a borrower to repay than an investor, because the originator is the
2     party making the loan.  Because the investor is several steps removed
3     from the borrower, the investor may receive less robust loan
4     performance information.  Additionally, the large number of assets and
5     the disclosures provided to investors may not include sufficient
6     information on the quality of the underlying financial assets for investors
7     to undertake full due diligence on each asset that backs the security.

8  FSOC Risk Retention Report at 9 (footnote omitted).

9         109.   Because investors had limited or no access to information concerning the

10  actual quality of loans underlying the RMBS, the "originate-to-distribute" model

11  created a situation where the origination of low quality mortgages through poor

12  underwriting thrived.  The FSOC found:

13     In the originate-to-distribute model, originators receive significant
14     compensation upfront without retaining a material ongoing economic
15     interest in the performance of the loan.  This reduces the economic
16     incentive of originators and securitizers to evaluate the credit quality of
17     the underlying loans carefully.  Some research indicates that securitization
18     was associated with lower quality loans in the financial crisis.  For
19     instance, one study found that subprime borrowers with credit scores just
20     above a threshold commonly used by securitizers to determine which
21     loans to purchase defaulted at significantly higher rates than those with
22     credit scores below the threshold.  By lower underwriting standards,
23     securitization may have increased the amount of credit extended,
24     resulting in riskier and unsustainable loans that otherwise may not have
25     been originated.

26  *Id.* at 11 (footnote omitted).

27        110.   The FSOC reported that, as the "originate-to-distribute" model became

28  more pervasive in the mortgage industry, underwriting practices weakened across the

- 47 -                                    FIRST AMENDED COMPLAINT

1   industry.  The FSOC Risk Retention Report found "[t]his deterioration was

2   particularly prevalent with respect to the verification of the borrower's income, assets,

3   and employment for residential real estate loans. . . ." *Id.*

4      111.   In sum, the disregard of underwriting standards was pervasive across

5   originators.  The failure to adhere to underwriting standards directly contributed to the

6   sharp decline in the quality of mortgages that became part of mortgage pools

7   collateralizing RMBS.  The lack of adherence to underwriting standards for the loans

8   underlying RMBS was not disclosed to investors in the offering materials.  The nature

9   of the securitization process, with the investor several steps removed from the

10  origination of the mortgages underlying the RMBS, made it difficult for investors to

11  ascertain how the RMBS would perform.

12     112.   As discussed below, facts have recently come to light that show many of

13  the Originators that contributed to the loan pools underlying the RMBS at issue in this

14  Complaint engaged in these underwriting practices.

15  **2.   American Home's Systematic Disregard of Underwriting**
16  **Standards**

17     113.   American Home Mortgage Investment Corp. was a real estate investment

18  trust that invested in RMBS consisting of loans originated and serviced by its

19  subsidiaries.  It was the parent of American Home Mortgage Holdings, Inc., which in

20  turn was the parent of American Home Mortgage Corp., a retail lender of mortgage

21  loans.  Collectively, these entities are referred to herein as "American Home."

22     114.   American Home originated or contributed a material portion of the loans

23  in the mortgage pools underlying the AHMA 2007-3, HVMLT 2007-5, HVMLT 2007-

24  2, and HVMLT 2006-14 offerings.  *See infra* Table 10.

25     115.   Edmund Andrews, an economics reporter for the New York Times,

26  recounted his own experience using American Home as a lender.  According to

27  Andrews, he was looking to purchase a home in 2004, and his real estate agent referred

28  him to a loan officer at American Home.  The American Home loan officer began the

ordeal by asking Andrews how large of a loan he needed.  Andrews, who had a monthly take home pay of $2,777, advised the loan officer that he had hefty child support and alimony payments to an ex-wife.  Andrews would be relying on his then-unemployed fiancée to earn enough money to meet his monthly obligations—including the mortgage.  Andrews reported:

> As I quickly found out, American Home Mortgage had become one of the fastest-growing mortgage lenders in the country.  One of its specialties was serving people just like me:  borrowers with good credit scores who wanted to stretch their finances far beyond what our incomes could justify.  In industry jargon, we were "Alt-A" customers, and we usually paid slightly higher rates for the privilege of concealing our financial weaknesses.
>
> I thought I knew a lot about go-go mortgages.  I had already written several articles about the explosive growth of liar's loans, no-money-down loans, interest-only loans and other even more exotic mortgages.  I had interviewed people with very modest incomes who had taken out big loans.  Yet for all that, I was stunned at how much money people were willing to throw at me.
>
> [The American Home loan officer] called back the next morning.  "Your credit scores are almost perfect," he said happily.  "Based on your income, you can qualify for a mortgage of about $500,000."
>
> What about my alimony and child-support obligations?  No need to mention them.  What would happen when they saw the automatic withholdings in my paycheck?  No need to show them.  If I wanted to

FIRST AMENDED COMPLAINT

1    buy a house, [the American Home loan officer] figured, it was my job to

2    decide whether I could afford it.  His job was to make it happen.

3

4    "I am here to enable dreams," he explained to me long afterward.  [The

5    American Home loan officer]'s view was that if I'd been unemployed for

6    seven years and didn't have a dime to my name but I wanted a house, he

7    wouldn't question my prudence.  "Who am I to tell you that you

8    shouldn't do what you want to do?  I am here to sell money and to help

9    you do what you want to do.  At the end of the day, it's your signature on

10   the mortgage—not mine."

11   Edmund L. Andrews, *My Personal Credit Crisis*, N.Y. TIMES, May 17, 2009, at MM46.

12        116.   The American Home loan officer steered Andrews to a stated-income

13   loan so that he would not have to produce paychecks or tax returns that would reveal

14   his alimony and child support obligations.  The loan officer wanted to limit disclosure

15   of Andrews's alimony and child support payments when an existing mortgage showed

16   up under Andrews's name.  Although his ex-wife was solely responsible for that

17   mortgage under the terms of the couple's separation agreement, the only way Andrews

18   could explain that fact would be to produce the agreement, which would also reveal

19   his alimony and child support obligations.  According to Andrews:

20   [The American Home loan officer] didn't get flustered.  If Plan A didn't

21   work, he would simply move down another step on the ladder of

22   credibility.  Instead of "stating" my income without documenting it, I

23   would take out a "no ratio" mortgage and not state my income at all.  For

24   the price of a slightly higher interest rate, American Home would verify

25   my assets, but that was it.  Because I wasn't stating my income, I couldn't

26   have a debt-to-income ratio, and therefore, I couldn't have too much

27   debt.  I could have had four other mortgages, and it wouldn't have

28

- 50 -

1    mattered.    American  Home  was  practically  begging  me  to  take  the

2    money.

3    *Id.*

4        117.    American Home ultimately approved Andrews's application.  Not

5    surprisingly, Andrews was unable to afford his monthly mortgage payments.

6        118.    American Home's lack of adherence to underwriting guidelines was set

7    forth in detail in a 165-page amended class action complaint filed June 4, 2008, in *In re*

8    *American Home Mortgage Sec Litig*, No. 07-md-1898 (TCP) (E.D.N.Y.).  Investors in

9    American Home common/preferred stock alleged that the company misrepresented

10   itself as a conservative lender, when, based on statements from more than 33

11   confidential witnesses and internal company documents, American Home in reality

12   was a high risk lender, promoting quantity of loans over quality by targeting borrowers

13   with poor credit, violating company underwriting guidelines, and providing incentives

14   for employees to sell risky loans, regardless of the borrowers' creditworthiness.  *See*

15   Am. Class Action Compl., *In re American Home Mortgage Sec. Litig.*, No. 07-md-1898

16   (E.D.N.Y. filed June 4, 2008) ("American Home ACC").

17       119.    According to the American Home ACC, former American Home

18   employees recounted that underwriters were consistently bullied by sales staff when

19   underwriters challenged questionable loans, while exceptions to American Home's

20   underwriting guidelines were routinely applied.  *See id.* at 43.

21       120.    The American Home ACC cited to witnesses who were former American

22   Home employees.  These witnesses reported that American Home management told

23   underwriters not to decline a loan, regardless of whether the loan application included

24   fraud.  *See id.*

25       121.    Another former American Home employee stated that American Home

26   routinely made exceptions to its underwriting guidelines to be able to close loans.

27   When American Home mortgage underwriters raised concerns to the sales department

28   about the pervasive use of exceptions to American Home's mortgage underwriting

FIRST AMENDED COMPLAINT

1   practices, the sales department contacted American Home headquarters to get

2   approval for the use of exceptions.  Indeed, it was commonplace to overrule mortgage

3   underwriters' objections to approving a loan to facilitate loan approval.  *See id.* at 44.

4       122.    A former American Home auditor confirmed this account that American

5   Home mortgage underwriters were regularly overruled when they objected to loan

6   originations.  *See id.*

7       123.    The parties settled the litigation on January 14, 2010, for $37.25 million.

8       124.    American Home's lax lending practices landed it in the 2008 "Worst Ten

9   in the Worst Ten" Report.  American Home came in 8th in Las Vegas, Nevada, and

10  9th in both Detroit, Michigan, and Miami, Florida.  *See* 2008 "Worst Ten in the Worst

11  Ten" Report.  When the OCC issued the 2009 "Worst Ten in the Worst Ten" Report,

12  American Home again featured prominently, appearing in the top ten in six of the ten

13  worst metropolitan areas (4th in both Fort Pierce-Port St. Lucie, Florida, and Fort

14  Myers-Cape Coral, Florida; 7th in Vallejo-Fairfield-Napa, California; 8th in Las Vegas,

15  Nevada; 9th in Stockton-Lodi, California; and 10th in Bakersfield, California).  *See*

16  2009 "Worst Ten in the Worst Ten" Report.

### 3.      BankUnited's Systematic Disregard of Underwriting Standards

17

18

19      125.    BankUnited FSB was a federal savings bank headquartered in Coral

20  Gables, Florida.  BankUnited FSB became BankUnited in 2009 after being seized by

21  the FDIC and sold to a group of investors.

22      126.    BankUnited originated or contributed a material number of the loans in

23  the mortgage pools underlying the HVMLT 2006-10 and HVMLT 2006-8 offerings.

24  *See infra* Table 10.

25      127.    BankUnited actively participated in the nonprime and option ARM

26  mortgage lending boom from 2005 to 2007.  In its 10-Q quarterly report filed with the

27  SEC on August 25, 2008, BankUnited acknowledged that it had been

28

advised by the [Office of Thrift Supervision ("OTS")] of certain concerns that BankUnited has agreed to address. Several of the measures addressing these concerns were already in progress at the time the Company and the Bank entered into agreements with the OTS to address the concerns. At this time, some of the measures have been completed and others are in progress. These measures include efforts to seek to raise at least $400 million of capital and to submit an alternative capital plan to be applicable if the Company is unable to raise the $400 million; termination of the option ARM loan program (other than in the wealth management area and, in certain limited circumstances, for loan modifications); termination of reduced and no documentation loan programs; reduction of the portfolio of negative amortization loans; and enhanced monitoring and internal reporting, as well as reporting to regulators on option ARM loan reduction efforts, preservation and enhancement of capital, mortgage insurance and liquidity strength. The Bank also agreed to enhance its policies and procedures regarding the Bank's allowance for loan losses, including increasing the allowance to a level which has already been attained. The Bank has also agreed to maintain capital ratios substantially in excess of the minimum required ratios to be deemed well-capitalized upon raising the agreed upon amount of capital.

BankUnited Form 10-Q Quarterly Report for the SEC, Aug. 25, 2008, at 22.

128.   On September 19, 2008, OTS, the agency that regulates banks focusing on mortgage lending, issued a cease and desist order to BankUnited that prohibited BankUnited from issuing new loans under its reduced documentation and pay-option ARM programs.  OTS also required BankUnited to enhance its monitoring and internal reporting.

129.   An April 16, 2009 article in the South Florida Business Journal reported:

FIRST AMENDED COMPLAINT

[Payment option adjustable-rate mortgages], which are the main source of BankUnited's problems, allow borrowers to pay less than the monthly interest accruing on their mortgages so that the balance grows. At a time when home values have declined, that can leave borrowers with high payments on a home that's worth less than they owe on their mortgage.

BankUnited's $5.89 billion in option ARMs accounted for 51 percent of its loan portfolio on Dec. 31.

"I wouldn't be surprised to see the institution shut down tomorrow, but I have said that so many times about BankUnited coming into a Friday – that it's no sure thing," [said a senior banking analyst].

Brian Bandell, *BankUnited Given 20 Days to Strike Deal*, S. Fla. Bus. J., Apr. 16, 2009, *available at* www.bizjournals.com/southflorida/stories/2009/04/13/daily53.html.

130.    The FDIC reprimanded BankUnited in a November 2009 letter, according to this Dec. 11, 2009 article in the Palm Beach Post:

In a scathing letter, the Federal Deposit Insurance Corp. accuses former Chairman Alfred Camner, former Chief Executive Ramiro Ortiz and 13 others of "negligence, gross negligence and/or breach of fiduciary duties related to certain residential loans."

The FDIC letter focuses on BankUnited's fatal attraction to Option ARMs, the risky mortgages that gave boom-time borrowers three choices each month: Make a full payment of principal and interest, make a minimum payment that results in the loan balance growing, or pay some amount in between. As South Florida home prices plummeted and jobless rates soared, Option ARMs have gone bad in droves.

FIRST AMENDED COMPLAINT

In a Nov. 5 letter that's now part of the BankUnited bankruptcy court file, the FDIC lambastes the bankers for their "loose lending policies" and demands civil damages. Among other things, the FDIC accuses the bankers of:

- "Encouraging an extremely liberal and aggressive lending mentality to 'make the loan as long as the borrower has a pulse.'

- "Engaging in reckless, high-risk, and limited-scrutiny lending to fuel the bank's aggressive and rapid growth — in direct contradiction to public representations of the bank's conservative lending and strict underwriting policies.

- "Approving and putting in place a compensation structure that drove the bank's directors and officers to pursue recklessly risky lending and business practices."

The FDIC says those practices caused $227 million in loan losses in addition to the $4 billion hit the FDIC took.

Jeff Ostrowski, *FDIC Moves Against BankUnited Execs*, The Palm Beach Post, Dec. 11, 2009, *available at* http://www.palmbeachpost.com/news/business/fdic-moves-against-bankunited-execs/nLn6H/.

131.   After OTS placed BankUnited into receivership, the Office of the Inspector General ("OIG") of the Department of Treasury released a Material Loss Review of BankUnited in June 2010. The Material Loss Review concluded:

The primary cause of BankUnited's failure was a high-risk growth strategy with excessive <u>concentration</u> in option adjustable-rate mortgages (option ARM) without implementing adequate controls to manage the associated risks. Option ARMs are high-risk loans that feature, among other things, the possibility of <u>negative amortization</u> and payment shock as rates reset. Deficient underwriting and credit administration, combined with the rapid decline in the real estate market, resulted in the

1  deterioration of the thrift's asset quality, including a substantial volume of

2  problem loans and significant loan losses.

3  OIG, Audit Report: Safety and Soundness, Material Loss Review of BankUnited, FSB

4  (OIG-10-042), at 2 (June 22, 2010), *available at* http://www.treasury.gov/about/

5  organizational-structure/ig/Documents/OIG10042%20(BankUnited%20MLR).pdf.

6  132.  The BankUnited Material Loss Review found that BankUnited did not

7  have any instructions on how to determine whether a stated income was reasonable:

8  Additionally, until October 2007 BankUnited did not have any formal

9  guidelines to document its reasonableness tests of borrowers' reported

10  income for stated income loans. This was a significant deficiency in that

11  more than 65 percent of BankUnited's option ARMs were made based

12  on (1) stated income or (2) stated income and stated assets. Therefore,

13  approximately 75 percent of BankUnited's option ARMs originated

14  between 2006 and 2007 were not prudently underwritten in a safe and

15  sound manner based on existing OTS guidance.

16  *Id.* at 16.

17  133.  The Material Loss Review further found that:

18  BankUnited marketed its option ARM loan products through a network

19  of third-party mortgage brokers (more than 4,000 in 2006, when the

20  thrift's production of these loans was at its peak). According to OTS

21  examination documentation, BankUnited evaluated the brokers'

22  performance primarily in terms of productivity or volume.  Other criteria,

23  such as credit quality and adherence to loan policy with respect to the

24  loans they placed, were secondary.  BankUnited also granted mortgage

25  brokers wide discretion in setting the margins for the option ARMs.

26  Loans with higher margins resulted in greater broker compensation.  The

27  brokers therefore had a financial incentive to place borrowers in large

28

- 56 -                                    FIRST AMENDED COMPLAINT

loans with high margins, with only secondary regard if any for credit quality.   These factors, coupled with the already reduced underwriting standards, led to the very poor asset quality of the option ARMs.

*Id.* at 9-10 (footnote omitted).

134.   A confidential witness in Amended Complaint, *In re BankUnited Sec. Litig.*, No. 08-22572 (S.D. Fla. filed June 30, 2009) described BankUnited systematic disregard of its underwriting guidelines.   According to that confidential witness, who worked at BankUnited as an in-house appraiser from August 2005 through December 2007, there was "extreme pressure to hit numbers" and "pressure to pass on deals without diligent review" from the loan production staff.   The confidential witness stated that BankUnited's CEO was personally involved in loosening the appraisal review process, stating that when reviewing inappropriate appraisals, "cut them, but not too many."   This employee documented approximately 500 incidents of overstated property values.   *Id.* ¶¶ 28-32.

### 4.   Countrywide's Systematic Disregard of Underwriting Standards

135.   Countrywide was among the largest originators of residential mortgages in the United States during the period at issue in this Complaint.   Countrywide originated or contributed a material portion of the loans in the mortgage pools underlying the HVMLT 2007-1, HVMLT 2006-12, HVMLT 2006-11, and HVMLT 2006-9 offerings.   *See infra* Table 10.

136.   In October 2009, the House Committee on Oversight and Government Reform launched an investigation into the entire subprime mortgage industry, including Countrywide, focusing on "whether mortgage companies employed deceptive and predatory lending practices, or improper tactics to thwart regulation, and the impact of those activities on the current crisis."   Press Release, Comm. on Oversight & Government Reform, Statement of Chairman Towns on Committee

1    Investigation Into Mortgage Crisis at 1 (Oct. 23, 2009) (internal quotation marks
2    omitted).

3          137.   On May 9, 2008, the New York Times noted that minimal
4    documentation and stated income loans—Countrywide's No Income/No Assets
5    Program and Stated Income/Stated Assets Program—have "bec[o]me known [within
6    the mortgage industry] as 'liars' loans' because many [of the] borrowers falsified their
7    income." Floyd Norris, *A Little Pity, Please, for Lenders*, N.Y. TIMES, May 9, 2008, at C1.

8          138.   In a television special titled, "If You Had a Pulse, We Gave You a Loan,"
9    Dateline NBC reported on March 27, 2009:

10         To highlight just how simple it could be to borrow money, Countrywide
11         marketed one of its stated-income products as the "Fast and Easy loan."

13         As manager of Countrywide's office in Alaska, Kourosh Partow pushed
14         Fast and Easy loans and became one of the company's top producers.

16         He said the loans were "an invitation to lie" because there was so little
17         scrutiny of lenders.  "We told them the income that you are giving us will
18         not be verified.  The asset that you are stating will not be verified."

20         He said they joked about it:  "If you had a pulse, we gave you a loan.  If
21         you fog the mirror, give you a loan."

23         But it turned out to be no laughing matter for Partow.  Countrywide fired
24         him for processing so-called "liar loans" and federal prosecutors charged
25         him with crimes.  On April 20, 2007, he pleaded guilty to two counts of
26         wire fraud involving loans to a real estate speculator; he spent 18 months
27         in prison.

In an interview shortly after he completed his sentence, Partow said that the practice of pushing through loans with false information was common and was known by top company officials. "It's impossible they didn't know."

. . .

During the criminal proceedings in federal court, Countrywide executives portrayed Partow as a rogue who violated company standards.

But former senior account executive Bob Feinberg, who was with the company for 12 years, said the problem was not isolated. "I don't buy the rogue. I think it was infested."

He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray. He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path. It was not just the matter of stated income loans, said Feinberg. Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.

In many instances, Feinberg said, that meant borrowers were getting loans that were "guaranteed to fail."

139.   On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives, alleging securities fraud. Specifically, the SEC alleged that Mozilo and the others misled investors about the credit risks that Countrywide created with its mortgage origination business, telling investors that Countrywide was primarily involved in prime mortgage lending, when it was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines. *See* Compl. for Violations of the

1   Federal Securities Laws, *SEC v. Mozilo*, No. CV 09-3994-JFW (C.D. Cal. filed June 4,

2   2009).  Mozilo and the other executives settled the charges with the SEC for $73

3   million on October 15, 2010.  *See* Walter Hamilton & E. Scott Reckard, *Angelo Mozilo,*

4   *Other Former Countrywide Execs Settle Fraud Charges*, L.A. TIMES, Oct. 16, 2010, at A1.

5       140.   Internal Countrywide e-mails the SEC released in connection with its

6   lawsuit show the extent to which Countrywide systematically deviated from its

7   underwriting guidelines.  For instance, in an April 13, 2006 e-mail from Mozilo to

8   other top Countrywide executives, Mozilo stated that Countrywide was originating

9   home mortgage loans with "serious disregard for process, compliance with guidelines

10   and irresponsible behavior relative to meeting timelines."  E-mail from Angelo Mozilo

11   to Eric Sieracki and other Countrywide Executives (Apr. 13, 2006 7:42 PM PDT).

12   Mozilo also wrote that he had "personally observed a serious lack of compliance

13   within our origination system as it relates to documentation and generally a

14   deterioration in the quality of loans originated versus the pricing of those loan[s]."  *Id.*

15   (internal quotation marks omitted).

16       141.   Indeed, in September 2004, Mozilo had voiced his concern over the

17   "clear deterioration in the credit quality of loans being originated," observing that "the

18   trend is getting worse" because of competition in the non-conforming loans market.

19   With this in mind, Mozilo argued that Countrywide should "seriously consider

20   securitizing and selling ([Net Interest Margin Securities]) a substantial portion of

21   [Countrywide's] current and future sub prime [sic] residuals."  E-mail from Angelo

22   Mozilo to Stan Kurland & Keith McLaughlin, Managing Directors, Countrywide (Sept.

23   1, 2004 8:17 PM PDT).

24       142.   To protect themselves against poorly underwritten loans, parties that

25   purchase loans from an originator frequently require the originator to repurchase any

26   loans that suffer Early Payment Default.

27       143.   In the first quarter of 2006, HSBC Holdings plc ("HSBC"), a purchaser

28   of Countrywide's 80/20 subprime loans, began to force Countrywide to repurchase

1  certain loans that HSBC contended were defective under the parties' contract.  In an e-

2  mail sent on April 17, 2006, Mozilo asked, "[w]here were the breakdowns in our

3  system that caused the HSBC debacle including the creation of the contract all the way

4  through the massive disregard for guidelines set forth by both the contract and

5  corporate."  E-mail from Angelo Mozilo to Dave Sambol, former Executive Managing

6  Director and Chief of Mortgage Banking and Capital Markets, Countrywide Financial

7  (Apr. 17, 2006 5:55 PM PST).  Mozilo continued:

8        In all my years in the business I have never seen a more toxic prduct. [sic]

9        It's not only subordinated to the first, but the first is subprime.   In

10        addition, the [FICOs] are below 600, below 500 and some below 400. . . .

11        With real estate values coming down . . . the product will become

12        increasingly worse.  There has [sic] to be major changes in this program,

13        including substantial increases in the minimum [FICO].

14  *Id.*

15        144.   Countrywide sold a product called the "Pay Option ARM."  This loan

16  was a 30-year adjustable rate mortgage that allowed the borrower to choose between

17  various monthly payment options, including a set minimum payment.  In a June 1,

18  2006 e-mail, Mozilo noted that most of Countrywide's Pay Option ARMs were based

19  on stated income and admitted that "[t]here is also some evidence that the information

20  that the borrower is providing us relative to their income does not match up with IRS

21  records."  E-mail from Angelo Mozilo to Carlos Garcia, former CFO of Countrywide

22  Financial, and Jim Furash, former President of Countrywide Bank (June 1, 2006 10:38

23  PM PST).

24        145.   An internal quality control report e-mailed on June 2, 2006, showed that,

25  for stated income loans, 50.3% of loans indicated a variance of 10% or more from the

26  stated income in the loan application.  *See* E-mail from Clifford Rossi, Chief Risk

27  Officer, Countrywide, to Jim Furash, Executive, CEO, Countrywide Bank, N.A.,

28  among others (June 2, 2006 12:28 PM PDT).

FIRST AMENDED COMPLAINT

146.   Countrywide, apparently, was "flying blind" on how one of its popular loan products, the Pay Option ARM loan, would perform, and, admittedly, had "no way, with any reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet." E-mail from Angelo Mozilo to Dave Sambol, Managing Director Countrywide (Sept. 26, 2006 10:15 AM PDT). Yet such loans were securitized and passed on to unsuspecting investors such as WesCorp.

147.   With growing concern over the performance of Pay Option ARM loans in the waning months of 2007, Mozilo advised that he "d[id]n't want any more Pay Options originated for the Bank." E-mail from Angelo Mozilo to Carlos Garcia, former Managing Director, Countrywide (Nov. 3, 2007 5:33 PM PST). In other words, if Countrywide was to continue to originate Pay Option ARM loans, it was not to hold onto the loans. Mozilo's concerns about Pay Option ARM loans were rooted in "[Countrywide's] inability to underwrite [Pay Option ARM loans] combined with the fact that these loans [we]re inherently unsound unless they are full doc, no more than 75% LTV and no piggys." *Id.*

148.   In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all of the corrective processes that will be put into effect to permanently avoid the errors of both judgement [sic] and protocol that have led to the issues that we face today" and that "the people responsible for the origination process understand the necessity for adhering to the guidelines for 100% LTV sub-prime product. This is the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances." E-mail from Angelo Mozilo to the former Countrywide Managing Directors (Mar. 27, 2006 8:53 PM PST).

149.   Yet Countrywide routinely found exceptions to its underwriting guidelines without sufficient compensating factors. In an April 14, 2005 e-mail, Frank Aguilera, a Countrywide managing director, explained that the "spirit" of Countrywide's exception policy was not being followed. He noted a "significant

concentration of similar exceptions" that "denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy."  E-mail from Frank Aguilera, Managing Director, Countrywide to John McMurray, Managing Director, Countrywide (Apr. 14, 2005 12:14 PM PDT).  Aguilera continued:  "The continued concentration in these same categories indicates either a) inadequate controls in place to mange [sic] rogue production units or b) general disregard for corporate program policies and guidelines."  *Id*.  Aguilera observed that pervasive use of the exceptions policy was an industry-wide practice:

> It appears that [Countrywide Home Loans]' loan exception policy is more loosely interpreted at [Specialty Lending Group] than at the other divisions.  I understand that [Correspondent Lending Division] has decided to proceed with a similar strategy to appease their complaint customers. . . .  [Specialty Lending Group] has clearly made a market in this unauthorized product by employing a strategy that Blackwell has suggested is prevalent in the industry. . . .

*Id*.

150.   Internal reports months after an initial push to rein in the excessive use of exceptions with a "zero tolerance" policy showed the use of exceptions remained excessive.  E-mail from Frank Aguilera, Managing Director, Countrywide, to Brian Kuelbs, Managing Director, Countrywide, among others (June 12, 2006 10:13 AM PDT).

151.   In February 2007, nearly a year after pressing for a reduction in the overuse of exceptions and as Countrywide claimed to be tightening lending standards, Countrywide executives found that exceptions continued to be used at an unacceptably high rate.  Frank Aguilera stated that any "[g]uideline tightening should be considered purely optics with little change in overall execution unless these exceptions can be contained."  E-mail from Frank Aguilera, Managing Director, Countrywide, to Mark

FIRST AMENDED COMPLAINT

1    Elbuam, Managing Director, Countrywide, among others (Feb. 21, 2007 4:58 PM

2    PST).

3          152.   John McMurray, a former Countrywide managing director, expressed his

4    opinion in a September 2007 e-mail that "the exception process has never worked

5    properly."  E-mail from John McMurray, Managing Director, Countrywide, to Jess

6    Lederman, Managing Director, Countrywide (Sept. 7, 2007 10:12 AM PDT).

7          153.   Countrywide conceded that the poor performance of loans it originated

8    was, in many cases, due to poor underwriting.  In April 2007, Countrywide noticed

9    that its high CLTV stated income loans were performing worse than those of its

10   competitors.  After reviewing many of the loans that went bad, a Countrywide

11   executive stated that "in most cases [poor performance was] due to poor underwriting

12   related to reserves and verification of assets to support reasonable income."  E-mail

13   from Russ Smith, Countrywide, to Andrew Gissinger, Managing Director,

14   Countrywide (Apr. 11, 2007 7:58 AM PDT).

15         154.   On October 6, 2008, 39 states announced that Countrywide agreed to

16   pay up to $8 billion in relief to homeowners nationwide to settle lawsuits and

17   investigations regarding Countrywide's deceptive lending practices.

18         155.   On July 1, 2008, NBC Nightly News aired the story of a former

19   Countrywide regional Vice President, Mark Zachary, who sued Countrywide after he

20   was fired for questioning his supervisors about Countrywide's poor underwriting

21   practices.

22         156.   According to Zachary, Countrywide pressured employees to approve

23   unqualified borrowers.  Countrywide's mentality, he said, was "what do we do to get

24   one more deal done.  It doesn't matter how you get there [*i.e.*, how the employee

25   closes the deal]. . . ."  NBC Nightly News, Countrywide Whistleblower Reports "Liar

26   Loans" (July 1, 2008) ("July 1, 2008 NBC Nightly News").  Zachary also stated that the

27   practices were not the work of a few bad apples, but rather:  "It comes down, I think

28   from the very top that you get a loan done at any cost."  *Id.*

157.   Zachary also told of a pattern of:  (1) inflating home appraisals so buyers could borrow enough to cover closing costs, but leaving the borrower owing more than the house was truly worth; (2) employees steering borrowers who did not qualify for a conventional loan into riskier mortgages requiring little or no documentation, knowing they could not afford it; and (3) employees coaching borrowers to overstate their income in order to qualify for loans.

158.   NBC News interviewed six other former Countrywide employees from different parts of the country, who confirmed Zachary's description of Countrywide's corrupt culture and practices.  Some said that Countrywide employees falsified documents intended to verify borrowers' debt and income to clear loans.  NBC News quoted a former loan officer:  "'I've seen supervisors stand over employees' shoulders and watch them . . . change incomes and things like that to make the loan work.'"  July 1, 2008 NBC Nightly News.

159.   Not surprisingly, Countrywide's default rates reflected its approach to underwriting.  *See* 2008 "Worst Ten in the Worst Ten" Report.  Countrywide appeared on the top ten list in six of the ten markets:  4th in Las Vegas, Nevada; 8th in Sacramento, California; 9th in Stockton, California, and Riverside, California; and 10th in Bakersfield, California, and Miami, Florida.  When the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report, Countrywide appeared on the top ten list in every market, holding 1st place in Las Vegas, Nevada; 2nd in Reno, Nevada; 3rd in Merced, California; 6th in Fort Myers-Cape Coral, Florida, Modesto, California, and Stockton-Lodi, California; 7th in Riverside-San Bernardino, California, and Fort Pierce-Port St. Lucie, Florida; 8th in Vallejo-Fairfield-Napa, California; and 9th in Bakersfield, California.  *See* 2009 "Worst Ten in the Worst Ten" Report.

### 5.    First Franklin's Systematic Disregard of Underwriting Standards

160.   First Franklin Financial Corporation ("First Franklin") originated or contributed a material portion of the loans in the mortgage pool underlying the FFMLT 2005-FFH4 offering.  *See infra* Table 10.

161.   First Franklin faces a class action suit that alleges it systemically disregarded its underwriting guidelines when originating mortgages that were subsequently securitized into RMBS.  *See* Corrected Am. Compl. For Rescission and Damages, *Federal Home Loan Bank of Chicago v. Banc of America*, No. 10-ch-45003 (Ill. Cir. Ct. Apr. 8, 2011) ("FHLB Chicago Am. Compl.").

162.   Statements from confidential witnesses in the FHLB Chicago Am. Complaint represented that First Franklin originated mortgage loans in violation of its stated underwriting standards.

163.   According to one confidential witness who was an underwriter at a First Franklin branch in Georgia from March 2004 to November 2007, account executives at First Franklin were making "$100,000 a month in commissions," which was based off of the number and dollar amount of loans processed.  Due to this incentive structure, account executives would often pressure underwriters to approve loans that should not have been approved.  The executives would simply override the underwriter's decision so that, according to this confidential witness, "Nine out of ten times, the loan went through." *Id.* ¶¶ 387-88.

164.   That same confidential witness explained that First Franklin used contract appraisers who inflated property values.  "The[r]e were homes with busted out windows and the meter boxes [] missing" that appraised for $300,000.  He also knew that many fake W-2s had been attached to loan applications because the tax withholdings did not match the income.  Further, he knew that mortgage brokers who referred loan applications to First Franklin were "whiting out or faxing over" the

FIRST AMENDED COMPLAINT

1  actual numbers and writing in new numbers so that the loans would work. *Id.* ¶¶ 400,

2  402.

3        165.   Another confidential witness was an underwriter and account executive

4  at a First Franklin branch in Ohio from 2000 until 2007.  Account executives were

5  responsible for maintaining relationships with mortgage brokers that referred loan

6  applications to the originating banks.  This confidential witness stated that "account

7  executives paid processors cash under the table to help them get loans closed," and

8  went on to describe how one loan processor was caught manipulating the loan

9  documents in order to close more loans. *Id.* ¶ 389.

10        166.   One confidential witness, who was an underwriter at a First Franklin

11  branch in Washington from 2005 until November 2007, described how the systematic

12  disregard for underwriting standards grew worse after First Franklin purchased OwnIt

13  Mortgage and OwnIt employees began working with the confidential witness.  She

14  stated that OwnIt employees "were used to approving anything.  They'd say, 'If we

15  don't' approve it, somebody else will. So why lose the money?'"  This witness's

16  manager was a former OwnIt employee who would often override her employees'

17  decisions to decline loans in order to meet performance goals.  The witness also noted

18  that First Franklin employees manipulated applications so that they would be

19  approved. *Id.* ¶¶ 390, 406.

20        167.   The confidential witness who worked at the Ohio branch represented

21  that there was enormous pressure from management to close loans at any cost.

22  "[P]eople were working until 8 p.m. on Saturdays and Sundays" in order to close the

23  loans, stated the witness.  As a result, "a lot of loans slipped through.  People were

24  tired of being beat up.  With the rush of loans, stuff could have been overlooked.

25  Maybe the conditions didn't exactly meet the guidelines."  During the last few days of

26  the month, a drove of employees would go to the branch manager "begging for

27  exceptions to close their loans."  The witness recalls one instance where the branch

28

1    manager came out of his office and yelled: "Oh f*** it!  Just close the f***ing loans."
2    *Id.* ¶ 395.

3         168.    Another confidential witness, who was, among other things, an account
4    executive and underwriter at a First Franklin branch in Utah from 1996 until 2008,
5    noted that account executives would often approach branch managers about
6    overturning an underwriter's decision to reject a loan, and said that "some loans were
7    approved that were not compliant with guidelines."  *Id.* ¶ 396.

8         169.    That same confidential witness also encountered the "blatant fraud" first
9    hand.  She recalled a $500,000 loan application for a home that was supposed to be
10   owner occupied even though the same borrower ahd purchased a $1,000,000 home in
11   the same neighborhood a month earlier and also claimed that it would be owner
12   occupied.  Although the underwriter was successful in blocking that particular
13   application, her manager was mad at her for catching it.  Other similar loans were
14   approved.  *See id.* ¶ 404.

15        170.    When First Franklin began downsizing its mortgage operation in late
16   2007, it ordered all of its remaining underwriters to assist in loss mitigation.  The
17   confidential witness from the Utah branch was one of them.  She reported that the
18   loss mitigation group was tasked with reviewing the quality of a number of First
19   Franklin's loans: she reported that among the loans she reviewed, fifty percent were
20   not compliant with First Franklin's guidelines, citing problems such as inflated
21   appraisal values, insufficient employment verification, and disqualifying credit scores.
22   *See id.* ¶ 398.

23        171.    According to another confidential witness, who was an underwriter at a
24   First Franklin branch in Florida from 1999 until 2007, loan document manipulation at
25   First Franklin grew to disconcerting levels.  The witness stated that "a lot of fraudulent
26   loans were going through. There was tons of fraud going on."  *Id.* ¶ 401.

27        172.    FHLB's complaint survived the defendants' motion to dismiss, with the
28   court stating "the Bank has provided evidentiary facts, such as testimony, AVM

analysis of appraisal values, delinquency and foreclosure rates, and pleadings from other civil actions involving the defendants, which demonstrate the strength of the Bank's case" that the originators systematically disregarded their underwriting standards. Order, FHLB, No. 10-45033 (Ill. Cir. Ct. Sept. 19, 2012) ("FHLB Ill. Order").

173.   Statements from confidential witnesses in a lawsuit brought by American International Group ("AIG") against Bank of America provide further evidence of First Franklin's systematic disregard of its underwriting guidelines. *See* Compl., *Am. Int'l Grp. v. Bank of Am. Corp.*, No. 652199/2011 (N.Y. Sup. Ct., N.Y. Cnty. filed Aug. 8, 2011), *removed to* No. 11-cv-10549 (C.D. Cal.).

174.   In that suit, a former First Franklin underwriter from 2005 to 2007, said First Franklin's lending practices were "basically criminal." Underwriters were required to depart from underwriting guidelines in ways "that we did not agree with, but had to do" in order to keep their jobs. That former employee also divulged that managers would call appraisers directly "if they didn't get exactly what they wanted" and would request re-appraisal until a satisfactory number was returned. When she and another employee "spoke out" about these practices, they were fired. *Id.* ¶ 301.

175.   Another former senior underwriter at First Franklin until 2005, said her manager would override her decisions not to fund problematic loans, believing that the defects would not be discovered since First Franklin only audited 5% of its loans. She recalled several instances when she rejected unreasonable stated income loans only to be overturned by her managers. One such instance involved a cocktail waitress who claimed to make $5,000 per month while working at the equivalent of an IHOP. *See id.* ¶ 302.

176.   That same senior underwriter revealed that her manager would routinely "sign off" on appraisals that used "crazy" comparable properties that were over a mile away. The manager would also pick appraisers who he knew would give favorable appraisals: "He would pick the appraiser who would do what he wanted . . . he'd say,

'don't use that guy, use this guy.'"  The manager even instructed the senior underwriter to change appraisals and to omit key details about properties.  *Id.* ¶ 303.

177.   That same senior underwriter further explained how First Franklin's bonus structure motivated the behavior she witnessed.  She received a $50 bonus for every approved loan, ultimately bringing in $150,000 a year even though her base salary was $55,000.  *See id.*

178.   Another First Franklin underwriter corroborated the problems caused by First Franklin's bonus structure.  She claimed some of her fellow underwriters "would approve anything" in order to be paid more.  She explained that the bonus structure was not based on loans reviewed but only on loans approved.  Even if an underwriter resisted the temptation to approve a faulty loan, his or her manager would redirect the loan application to someone else who would "sign behind your back."  *Id.* ¶ 304.

179.   First Franklin has also been sued by Ambac Assurance Corporation, a company that provided monoline insurance, a form of credit enhancement for certain certificates in a RMBS.  After paying hundreds of millions of dollars to certificate holders as a result of the many defaults and delinquencies on First Franklin-originated loans, Ambac reviewed 1,750 First Franklin loans.  It found that 94% had material defects, including:

- Rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property;

- Failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- Inflated appraisals; and

- Pervasive violations of the loan originator's own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with debt-to-income and loan-to-value ratios above the allowed maximums, or

1      (iii) with relationships to the applicable originator or other non-arm's-

2      length relationships.

3   Compl., *Ambac Assurance Corp. v. First Franklin Fin. Corp.*, ¶¶ 82-83, 651217/2012 (N.Y.

4   Sup. Ct. filed Apr. 16, 2012).

5          180.   As shown by statements from former employees, First Franklin's actual

6   mortgage underwriting practices deviated widely from its stated guidelines.  This

7   systematic disregard of underwriting standards led to toxic loans being bundled into

8   securities and sold to investors who did not know, and could not have known, about

9   the true nature of the loans backing their securities.

10             **6.     First National Bank of Nevada's Systematic Disregard of
                        Underwriting Standards**

11

12          181.   First National Bank of Nevada ("FNBN") originated or contributed a

13   material portion of loans in the mortgage pool underlying the NAA 2006-AR4

14   offering.  *See infra* Table 10.

15          182.   First National Bank Arizona ("FNB Arizona"), FNB Nevada, and First

16   Heritage Bank were controlled by First National Bank Holding Company ("FNB

17   Holding"), collectively ("FNB Group").  All were under common management.  *See*

18   Department of the Treasury, Office of the Inspector General, *Audit Report: Safety and

19   Soundness: Material Loss Review of First National Bank of Nevada and First Heritage Bank,*

20   *National Association* at 4 (Feb. 27, 2009) ("FNB Nevada OIG Report"), *available at*

21   http://www.treasury.gov/about/organizational-structure/ig/Documents/

22   oig09033.pdf; David Enrich and Damian Paletta, *Failed Lender Played Regulatory Angles*,

23   Wall St. J. (Oct. 3, 2008), *available at* http://online.wsj.com/article/

24   SB122298993937000343.html.

25          183.   For residential mortgage lending, the names FNB Arizona and FNB

26   Nevada were interchangeable.  FNB Arizona ran the FNB Group's residential

27   mortgage lending operation.  *See* FNB Nevada OIG Report at 4.

28

184.    The amount of mortgage loans originated by FNB Nevada grew from $1.5 billion in 2001 to $7 billion in 2006.  *See* Enrich and Paletta, *Failed Lender Played Regulatory Angles*.  FNB Nevada was an OTD lender; in 2006, $6.9 billion of its loans were packaged into RMBS.  *See* FNB Nevada OIG Report at 5.

185.    A series of investigations by the OCC detail how FNB Nevada achieved its rapid growth by pervasively disregarding its underwriting guidelines.

186.    In 2004, the OCC inspected FNB Nevada and determined that it needed better "[p]rocedures to reduce underwriting exceptions" and better "[p]olicies and internal controls over the use of appraisers."  FNB Nevada OIG Report at 44.

187.    A 2005 OCC investigation found that "[c]redit underwriting and administration need improvement.  The quickness of loan production has had priority over quality.  Issues include loan appraisal violations (repeat issue) and inadequate practices over standby letters of credit."  It recommended FNB Nevada "develop and implement procedures and accountability that are effective in reducing the high level of underwriting exceptions (repeat issue)" and reduce the number of employee and vendor errors in loan origination.  It also cited FNB Nevada for two regulatory violations—failing to appraise properties prior to closing and failing to use independent appraisers.  *Id.* at 44-46.

188.    A 2006 investigation found that FNB Nevada still had not implemented "effective procedures and processes to reduce the level and number of underwriting exceptions."  The OCC also noted that appraisers' reports were often missing or incomplete.  *Id.* at 47

189.    In 2007, FNB Nevada's liquidity problems prompted the OCC to initiate an informal enforcement action.  It cited several matters requiring the direct attention of the bank's board, including internal loan review that lacked independence due to executive management influence, understaffed internal loan review, staffing levels and expertise that were not commensurate with the complexities of the bank's operations, and (yet again) the need to reduce underwriting exceptions.  *See id.* at 48-50.

FIRST AMENDED COMPLAINT

1     190.   FNB Nevada's underwriting practices became so poor that in 2007 it was

2 unable to sell $683 million of residential mortgages to securitizers.  It was also forced

3 to repurchase a number of its poorly underwritten mortgages.  This contributed to a

4 liquidity crisis for the entire FNB Group.  *See id.* at 2, 6.

5     191.   On June 30, 2008 FNB Arizona merged into FNB Nevada.  Shortly

6 thereafter, the OCC closed FNB Nevada and appointed the FDIC as its receiver.

7 Press Release, *OCC Closes First National Bank of Nevada and Appoints FDIC Receiver* (July

8 25, 2008), *available at* http://www.occ.gov/news-issuances/news-releases/2008/nr-

9 occ-2008-87.html.

10     192.   In its capacity as receiver for FNB Nevada, the FDIC sued the former

11 directors and officers of the FNB Group.  Compl., *FDIC v. Dorris*, No. 11-1652 (D.

12 Ariz. filed Aug. 23, 2011).  The FDIC alleged the same pervasive disregard of

13 underwriting guidelines described above.  *See id.* ¶¶ 38-42.

14     193.   That complaint detailed how the bank's compensation structure was tied

15 to the volume of loans originated, creating an incentive for bank employees to

16 disregard the underwriting guidelines.  *See id.* ¶ 30.  FNB Nevada also used many

17 mortgage brokers who had the same volume-based incentive to disregard underwriting

18 guidelines and to inflate appraisals.  *See id.* ¶¶ 33-34.

19     194.   The suit settled less than two months after it was filed.  Final Judgment

20 Order, *FDIC v. Dorris*, Doc. 15, No 11-1652 (D. Ariz. Oct. 13, 2011).

21     195.   Evidence uncovered in *Plumbers' Union Local No. 12 Pension Fund v.*

22 *Nomura Asset Acceptance Corp.*, No. 08-10446 (D. Mass. filed Oct. 1, 2012) further

23 highlights FNB Nevada's disregard of its underwriting guidelines.  There, the Court

24 allowed the Plumber's Union to engage in limited discovery, which uncovered four

25 pertinent pieces of evidence:

26     •     "[T]hree 'representative' no-document loans that [FNB Nevada]

27           originated.  In each of these 'No Doc' loans, the borrower's income was

28           either unknown or unverified, or inadequate to make payments on the

underlying mortgage, or if not, the borrower's debt to income ratio (DTI) belied any realistic probability that the borrower could keep up with mortgage payments over the life of the loan."

- "[T]he declaration of Susan Wright, who underwrote loans at [FNB Nevada] in 2006 and 2007 and generally corroborates the Complaint's allegations about [FNB Nevada]'s underwriting practices."  "Wright describes [FNB Nevada]'s business model as trying to 'make as many loans as possible and then sell them as quickly as possible' and explains that their underwriting practices instructed underwriters to remove income and asset information already in the possession of [FNB Nevada] from 'No Doc' loans.  She states that [FNB Nevada] regularly made loans to borrowers whom '[FNB Nevada] knowingly qualified on the basis of what appeared to be obviously false information [and] [FNB Nevada] did not appear to reasonably expect that the borrowers would be able to repay these loans.'"

- "[S]everal emails generated by [FNB Nevada] employees, including Mortgage Division President Pat Lamb; Vice President of Risk Management Renea Aderhold; 'SVP Ops/Communication Manager' Beth Rothmuller; Senior Vice President Lisa Sleeper; and Senior Vice President and Risk Officer Eric Meschen, which collectively paint a picture of a devil-may-care underwriting culture."

- "[T]he expert report of Ira Holt, an accountant who performed a forensic analysis of 408 of the Trusts' loans using the [FNB Nevada] guidelines that were in place when they were originated. Holt found that 108 (26.5%) had material defects that violated even [FNB Nevada]'s slack underwriting standards."  "According to Holt, he was unable to 're-

FIRST AMENDED COMPLAINT

1    underwrite' some of the 408 loans because of the lack of documentation,

2    as well as the 'scrubbing' of the applicant's disqualifying data by [FNB

3    Nevada].  According to plaintiffs, the number of loans in the sample with

4    material defects may be considerably higher than Holt's estimates."

5  *Plumber's Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 08-10446-

6  RGS, 2012 WL 4480735, at *3 & nn. 6, 8 (D. Mass. Oct. 1, 2012).

7    196.   The Court held allegations based on that evidence were sufficient to

8  survive a motion to dismiss.  *See id.* at *3 ("[D]efendants' efforts to impugn plaintiffs'

9  evidence is largely factual in nature and better fitted to a summary judgment motion

10  than the relaxed pleading standard that attaches to a Rule 12(b)(6) motion.").

11    197.   Lehman Brothers has also sued FNB Nevada for selling mortgages

12  containing misrepresentations about borrowers' finances, employment, and the nature

13  of the property.  That case settled for an undisclosed amount.  *See* Philip Shiskin,

14  *Bankers Escape Big Penalties in FDIC Failed Bank Case* (Feb. 23, 2012), *available at*

15  http://www.reuters.com/article/2012/02/23/us-bankers-fdic-

16  idUSTRE81M1UH20120223; Compl., *Lehman Mortg. Trust Mortg. v. First Nat'l Bank of*

17  *Nev.*, Nos. CV2006-018929 (AZ Super. Ct., Maricopa Cnty. filed Dec. 12, 2006).

### 7.    IndyMac Bank's Systematic Disregard of Underwriting Standards

18
19
20    198.   IndyMac Bank ("IndyMac") originated or contributed a material portion

21  of the loans in the mortgage pools underlying the INDX 2006-AR35, LUM 2007-1,

22  and HVMLT 2006-14 offerings.  *See infra* Table 10.

23    199.   On July 11, 2008, just four months after IndyMac filed its 2007 Annual

24  Report, federal regulators seized IndyMac in what was among one of the largest bank

25  failures in U.S. history.  IndyMac filed for bankruptcy on July 31, 2008.

26    200.   On March 4, 2009, the Office of the Inspector General of the United

27  States Department of the Treasury ("Treasury OIG") issued Audit Report No. OIG-

28  09-032, titled "Safety and Soundness:  Material Loss Review of IndyMac Bank, FSB"

        FIRST AMENDED COMPLAINT

1  (the "IndyMac OIG Report"), reporting the results of the Treasury OIG's review of

2  the failure of IndyMac.  The IndyMac OIG Report portrays IndyMac as a company

3  determined to originate as many loans as possible, as quickly as possible, without

4  regard for the quality of the loans, the creditworthiness of the borrowers, or the value

5  of the underlying collateral.

6       201.   According to the IndyMac OIG Report, "[t]he primary causes of

7  IndyMac's failure were . . . associated with its" "aggressive growth strategy" of

8  "originating and securitizing Alt-A loans on a large scale."  IndyMac OIG Report at 2.

9  The report found, "IndyMac often made loans without verification of the borrower's

10  income or assets, and to borrowers with poor credit histories.  Appraisals obtained by

11  IndyMac on underlying collateral were often questionable as well."  *Id.*

12      202.   IndyMac "encouraged the use of nontraditional loans," engaged in

13  "unsound underwriting practices," and "did not perform adequate underwriting," in an

14  effort to "produce as many loans as possible and sell them in the secondary market."

15  *Id.* at 11, 21.  The IndyMac OIG Report reviewed a sampling of loans in default and

16  found "little, if any, review of borrower qualifications, including income, assets, and

17  employment."  *Id.* at 11.

18      203.   IndyMac was not concerned by the poor quality of the loans or the fact

19  that borrowers simply "could not afford to make their payments" because, "as long as

20  it was able to sell those loans in the secondary mortgage market," IndyMac could

21  remain profitable.  *Id.* at 2-3.

22      204.   IndyMac's "risk from its loan products . . . was not sufficiently offset by

23  other underwriting parameters, primarily higher FICO scores and lower LTV ratios."

24  *Id.* at 31.

25      205.   Unprepared for the downturn in the mortgage market and the sharp

26  decrease in demand for poorly underwritten loans, IndyMac found itself "hold[ing]

27  $10.7 billion of loans it could not sell in the secondary market."  *Id.* at 3.  This proved

28  to be a weight it could not bear, and IndyMac ultimately failed.  *See id.*

206.   In June 2008, the Center for Responsible Lending ("CRL") published a report titled *IndyMac: What Went Wrong? How an 'Alt-A' Leader Fueled its Growth with Unsound and Abusive Mortgage Lending* (June 30, 2008) ("CRL Report"), *available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/indymac_what_went_ wrong.pdf.  The CRL Report detailed the results of the CRL's investigation into IndyMac's lending practices.  CRL based its report on interviews with former IndyMac employees and reviewed numerous lawsuits filed against IndyMac.  The CRL Report summarized the results of its investigation as follows:

> IndyMac's story offers a body of evidence that discredits the notion that the mortgage crisis was caused by rogue brokers or by borrowers who lied to bankroll the purchase of bigger homes or investment properties. CRL's investigation indicates many of the problems at IndyMac were spawned by top-down pressures that valued short-term growth over protecting borrowers and shareholders' interests over the long haul.

CRL Report at 1.

207.   CRL reported that its investigation "uncovered substantial evidence that [IndyMac] engaged in unsound and abusive lending during the mortgage boom, routinely making loans without regard to borrowers' ability to repay [the mortgage loans]." *Id.* at 2.

208.   The CRL Report stated that "IndyMac pushed through loans with fudged or falsified information or simply lowered standards so dramatically that shaky loans were easy to approve." *Id.*

209.   The CRL Report noted that, "[a]s IndyMac lowered standards and pushed for more volume," "the quality of [IndyMac's] loans became a running joke among its employees." *Id.* at 3.

210.   Former IndyMac mortgage underwriters explained that "loans that required no documentation of the borrowers' wages" were "[a] big problem" because

FIRST AMENDED COMPLAINT

"these loans allowed outside mortgage brokers and in-house sales staffers to inflate applicants' [financial information] . . . and make them look like better credit risks." *Id.* at 8. These "shoddily documented loans were known inside the company as 'Disneyland loans'—in honor of a mortgage issued to a Disneyland cashier whose loan application claimed an income of $90,000 a year." *Id.* at 3.

211.   The CRL also found evidence that: (1) managers pressured underwriters to approve shaky loans in disregard of IndyMac's underwriting guidelines; and (2) managers overruled underwriters' decisions to deny loans that were based upon falsified paperwork and inflated appraisals. For instance, Wesley E. Miller, who worked as a mortgage underwriter for IndyMac in California from 2005 to 2007, told the CRL:

> [W]hen he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed. "There's a lot of pressure when you're doing a deal and you know it's wrong from the get-go—that the guy can't afford it," Miller told CRL. "And then they pressure you to approve it."
>
> The refrain from managers, Miller recalls, was simple: "Find a way to make this work."

*Id.* at 9 (footnote omitted).

212.   Likewise, Audrey Streater, a former IndyMac mortgage underwriting team leader, stated: "I would reject a loan and the insanity would begin. It would go to upper management and the next thing you know it's going to closing." *Id.* at 1, 3. Streater also said the "prevailing attitude" at IndyMac was that underwriting was "window dressing—a procedural annoyance that was tolerated because loans needed an underwriter's stamp of approval if they were going to be sold to investors." *Id.* at 8.

213.   Scott Montilla, who was an IndyMac mortgage loan underwriter in Arizona during the same time period, told the CRL that IndyMac management would

override his decision to reject loans about 50% of the time.  *See id.* at 9.  According to Montilla:

> "I would tell them:  'If you want to approve this, let another underwriter do it, I won't touch it—I'm not putting my name on it,'" Montilla says.  "There were some loans that were just blatantly overstated. . . .  Some of these loans are very questionable.  They're not going to perform."

*Id.* at 10.

214.  Montilla and another IndyMac mortgage underwriter told the CRL that borrowers did not know their stated incomes were being inflated as part of the application process.  *See id.* at 14.

215.  On July 2, 2010, the FDIC sued certain former officers of IndyMac's Homebuilder Division ("HBD"), alleging that IndyMac disregarded its underwriting practices, among other things, and approved loans to borrowers who were not creditworthy or for projects with insufficient collateral.  *See* Compl. ¶ 6, *FDIC v. Van Dellen*, No. 2:10-cv-04915-DSF (C.D. Cal. filed July 2, 2010).

216.  After a month-long jury trial, the jury returned a unanimous verdict in favor of the FDIC for $169 million in damages.

217.  IndyMac currently faces a class action lawsuit alleging disregard of underwriting standards that adversely affected the value of the purchased RMBS.  *See* Class Action Compl., *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-4583 (S.D.N.Y. filed May 14, 2009).  On June 21, 2010, the class action suit survived a motion to dismiss.

218.  Like loan purchasers, insurers of RMBS also typically require the insured party to repurchase loans suffering Early Payment Default in order to protect themselves against fraud and poor underwriting.

219.  MBIA filed a breach of contract claim against IndyMac (with the FDIC representing IndyMac as conservator and receiver) in May 2009, claiming that IndyMac made contractual misrepresentations concerning its adherence to its

FIRST AMENDED COMPLAINT

underwriting standards in processing mortgage loan applications.  *See* Compl., *MBIA Ins. Corp. v. IndyMac Bank, FSB*, No. 1:09-cv-01011-CKK (D.D.C. filed May 29, 2009). A motion to dismiss is pending.

220.    IndyMac's failure to abide by its underwriting standards left investors holding severely downgraded junk securities.  As a result of IndyMac's systematic disregard of its underwriting standards, the OCC included IndyMac in the OCC's 2008 "Worst Ten in the Worst Ten" Report.  IndyMac ranked 10th in Las Vegas, Nevada, in both 2008 and 2009, while coming in at 10th in Merced, California, Riverside-San Bernardino, California, and Modesto, California, in 2009.  *See* 2008 "Worst Ten in the Worst Ten" Report; 2009 "Worst Ten in the Worst Ten" Report.

### 8.    MortgageIT's Systematic Disregard of Underwriting Standards

221.    MortgageIT, Inc. ("MortgageIT") originated or contributed a material portion of the loans underlying the MHL 2006-1 offering.  *See infra* Table 10.

222.    MortgageIT is a residential mortgage banking company headquartered in New York, New York.  On January 3, 2007, MortgageIT was acquired by Deutsche Bank Structured Products.  Less than a year after the acquisition, MortgageIT began its precipitous decline from one of the largest mortgage originators in the country, laying off hundreds of employees and closing multiple branches.

223.    MortgageIT faces a civil mortgage fraud lawsuit brought in May 2011 by the United States Department of Justice ("DOJ") that alleges MortgageIT made repeated false certifications to the U.S. Department of Housing and Urban Development ("HUD") in connection with its residential mortgage origination and sponsorship practices.  *See United States v. Deutsche Bank AG and MortgageIT, Inc.*, No. 11-cv-02976 (S.D.N.Y.).  An amended complaint was filed on August 22, 2011 ("DOJ Complaint").

224.    The United States alleges that "MortgageIT repeatedly lied to be included in a Government program to select mortgages for insurance by the Government.

FIRST AMENDED COMPLAINT

1  Once in that program, they recklessly selected mortgages that violated program rules in
2  blatant disregard of whether borrowers could make mortgage payments."  DOJ
3  Complaint ¶ 1.

4       225.   According to the DOJ Complaint, "As of June 2011, HUD has paid
5  more than $368 million in FHA insurance claims and related costs arising out of
6  MortgageIT's approval of mortgages for FHA insurance.  Many of those claims arose
7  out of FHA mortgage insurance provided by HUD based on MortgageIT's false
8  certifications of due diligence."  *Id.* ¶ 233.

9       226.   The complaint also alleges that MortgageIT chronically understaffed
10  quality control: "Between 2006 and 2009, the sole employee at Deutsche Bank or
11  MortgageIT conducting quality control reviews of closed FHA-insured mortgages was
12  the Government Loan Auditor.  His review of closed FHA-insured mortgages
13  continually declined during that period, and declined most significantly after Deutsche
14  Bank acquired MortgageIT.  By the end of 2007, the Government Loan Auditor was
15  no longer spending any time conducting quality control reviews of closed mortgage
16  files.  To increase sales, Deutsche Bank and MortgageIT shifted his work from quality
17  control reviews of closed mortgages (*i.e.*, quality control audits) to assistance with
18  production.  By the end of 2007, not a single person at Deutsche Bank or MortgageIT
19  was conducting quality control reviews of closed FHA-insured mortgages, as required
20  by HUD rules."  *Id.* ¶ 143-144.

21       227.   MortgageIT allegedly also ignored quality control measures.  For
22  example, MortgageIT contracted with an outside vendor to conduct quality control
23  reviews of FHA insured loans.  The vendor provided the reviews in letters detailing
24  underwriting violations found in FHA-insured mortgages to MortgageIT.  The
25  findings included identification of serious underwriting violations.  Instead of reading
26  the letters, MortgageIT employees "stuffed the letters, unopened and unread, in a
27  closet in MortgageIT's Manhattan headquarters."  It was not until MortgageIT hired its
28  first quality control manager that these letters were taken out of the closet and read.

FIRST AMENDED COMPLAINT

Accordingly, "MortgageIT's failure to read the audit reports from its outside vendor prevented MortgageIT from taking appropriate actions to address patterns of ongoing underwriting violations." *Id.* ¶ 111-124.

228.   The Amended DOJ Complaint further alleges that "Deutsche Bank's and MortgageIT's failure to implement the required quality control systems rendered them unable to prevent patterns of mortgage underwriting violations and mortgage fraud." *Id.* ¶ 145.

229.   Additionally, the complaint alleges that "contrary to the certifications appearing on each and every mortgage endorsed by MortgageIT, MortgageIT engaged in a nationwide pattern of failing to conduct due diligence in accordance with HUD rules and with sound and prudent underwriting principles." *Id.* ¶ 162.

230.   The complaint cites many examples of MortgageIT's failure to perform due diligence.  These examples, all violations of HUD rules, include the following:

- failure to develop a credit score for borrowers who had no credit score;
- failure to verify a borrower's cash investment in a property;
- failure to verify employment by telephone, and to record the name and telephone number of the person who verified employment on behalf of the employer;
- failure to verify the source of earnest money deposits that appear excessive in relation to the borrower's savings by completing a verification of deposit, or by collecting bank statements, to document that the borrower had sufficient funds to cover the deposit;
- failure to ensure that gift funds are not provided by a party to the sales transaction; failure to examine irregularities in mortgage applications such as conflicting records of employment in the same file;
- failure to obtain the required documentation to verify the borrower's mortgage payment history and income;

- failure to obtain the required documentation to verify the borrower's employment, income, and depositary assets; failure to verify a borrower's current employment and obtain the borrower's most recent pay stub, along with failure to obtain income tax returns for a self-employed borrower or borrower paid on commission; and

- failure to obtain a credit report on all borrowers who will be obligated on the mortgage note.

*See id.* ¶¶ 162-230.

231.   On May 9, 2012, the parties settled the case for $202.3 million.

### 9.   Option One Mortgage Corporation's Systematic Disregard of Underwriting Standards

232.   Option One Mortgage Corporation ("Option One") was a California corporation headquartered in Irvine, California.  Option One originated, serviced, acquired, and sold non-prime residential mortgages.  The company was founded in 1992 and, from June 1997 until April 2008, was a subsidiary of Block Financial Corporation.  In April 2008, Option One's assets were sold to American Home Mortgage Servicing, Inc.

233.   Option One originated or contributed a material portion of the loans in the mortgage pool underlying the SVHE 2005-OPT4 offering.  *See infra* Table 10.

234.   Option One disregarded its underwriting practices while focusing on selling the loans it originated to Wall Street banks for securitization, according to the complaint in *Cambridge Place Inv. Mgmt. v. Morgan Stanley & Co.*, No. 10-2741 (Mass. Super. Ct. filed July 9, 2010); *see also* Tom Hals, *Fund Sues Banks for $1.2 Billion Loss Tied to Subprime*, REUTERS, July 12, 2010, *available at* http://www.reuters.com/article /2010/07/12/us-cambridgeplace-subprime-lawsuit-idUSTRE66B61220100712.

235.   In that case, the court denied Morgan Stanley's motion to dismiss, holding that the plaintiff had adequately alleged misstatements regarding compliance with underwriting guidelines, LTV ratios, and owner-occupancy ratios for RMBS that

FIRST AMENDED COMPLAINT

included Option One loans. Notably, the court relied on statements from former Option One employees that "of course [Option One] inflated [appraisal] values," and that if an Option One underwriter questioned appraisal values, an account executive or branch manager would override the objection. *See Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, No. 10-2741, 2012 WL 5351233 (Mass. Super. Ct. Sept. 28, 2012).

236.    The Massachusetts Attorney General sued Option One, alleging, among other things, that Option One failed to follow its own underwriting standards by overstating applicants' incomes and inflating appraisal values. *See Massachusetts v. H&R Block, Inc.*, Complaint ¶ 8, No. 08-2474-BLS (Mass. Super. Ct. filed June 3, 2008); *see also* Tim McLaughlin, *Caturano Being Acquired by RSM McGladrey*, Boston Bus. J., June 24, 2010, *available at* http://www.bizjournals.com/boston/stories/2010/06/21 /daily45.html?page=all.

237.    That suit settled in 2011 for value of $115 million. After three years of investigation and litigation, Massachusetts's Attorney General stated that Option One "employed a business model that absolutely failed to gauge the ability of borrowers to repay the loans…. In other words, they knew or should have known that those loans were going to fail." *Massachusetts Settles Suit Against a Mortgage Lender*, NY Times, Aug. 9, 2011, *available at* http://www.nytimes.com/2011/08/10/business/massachusetts-settles-lawsuit-against-mortgage-firm.html.

238.    The FHLB Chicago Am. Complaint also contains statements from confidential witnesses describing Option One's systematic disregard of its underwriting guidelines.

239.    According to one confidential witness, who was a senior review appraiser at a California branch from April 2001 to December 2006, underwriters often failed to spot "red flags" in the appraisal value for a loan. Option One also "watered down" its appraisal system so that fewer loans were "kicked over to the appraisal department." FHLB Chicago Am. Compl. ¶ 377. Even when Option One's staff appraisers did

receive loans for review and decided that the appraisals needed to be adjusted, Option One would sometimes disregard those appraisers' reports. *See id.* ¶ 378.

240.    The same confidential witness explained how Option One wanted its employees to "be more aggressive"; it was made clear that the main objective of the company was to generate loans—"[a]s long as they could sell it, that's what mattered." *Id.* ¶ 375.

241.    Another confidential witness, who was a senior account manager at a Georgia branch from August 2005 until April 2006, one particular broker who worked with Option One "was given preferential treatment and his loans were always pushed through" despite the fact that his loan files did not contain the required documentation because he provided the company with "lots and lots of loans." *Id.* ¶ 376.

### 10.    Residential Funding Co.'s Systematic Disregard of Underwriting Guidelines

242.    Residential Funding Co. ("RFC") originated or contributed a material portion of the loans in the mortgage pool underlying the HVMLT 2007-2 offering. *See infra* Table 10.

243.    RFC's underwriting practices are implicated in two lawsuits filed by MBIA, Inc.  MBIA provided monoline insurance, a form of credit enhancement that insured loans in the event of default, for RMBS containing RFC-originated loans.  In its suits, MBIA alleges misrepresentations regarding the loans underlying the RMBS that it insured.  The RMBS in these suits were issued in 2006 and 2007.  *See* Compl.*, MBIA Ins. Corp. v. Ally Fin., Inc.*, No. 12-18889 (MN Ct., Hennepin Cnty. filed Sept. 17, 2012) ("*MBIA v. Ally* Compl."); First Am. Compl., *MBIA Ins. Corp. v. Residential Funding Co.*, No. 603552/2008 (N.Y. Sup. Ct. filed Mar. 19, 2010) ("*MBIA v. RFC* Compl.").

244.    Ally Financial was the parent company of RFC.  *See* Ally Financial, Inc., Form 10-K, Ex. 21 (2011); GMAC LLC, Form 10-K, Ex. 21 (2006).

245.   RFC sponsored RMBS at issue in those suits and originated or acquired many of the loans underlying RMBS at issue in those suits.  *See MBIA v. Ally* Compl. ¶¶ 5, 22; *MBIA v. RFC* Compl. ¶ 2.

246.   After sustaining large losses due to loan defaults, MBIA conducted forensic analyses of several thousand loans underlying the RMBS sponsored by RFC. In *MBIA v. RFC*, MBIA reviewed 7,913 loans and found that 7,019 (88%) contained material misrepresentations.  *MBIA v. RFC* Compl. ¶ 50; *see also MBIA v. Ally* Compl. ¶ 80.  The material misrepresentations included, among other things, routine disregard of underwriting guidelines, debt-to-income ("DTI") and CLTV that exceeded the amounts allowed in the underwriting guidelines, failure to verify employment as required by underwriting guidelines, and improper reliance on the Assetwise program. *See MBIA v. Ally* Compl. ¶¶ 76-83; *MBIA v. RFC* Compl. ¶¶ 47-72.

247.   Representative examples of the misrepresentations MBIA uncovered include:

- On November 30, 2006, a loan with a principal balance of $140,000 was made to a borrower in Newton, Massachusetts on a property with an original appraisal value of $740,000 and a senior loan balance of $513,567.  The property subject to the loan was a non-owner occupied investment property.  The borrower stated his income to be $41,666 per month ($500,000 per year) as the owner of a Wine/Spirits store.  Further, the borrower did not demonstrate any liquid assets.  The stated income was unreasonable based on the borrower's employment and not substantiated by the borrower's credit/asset profile.  Notably, the borrower filed for bankruptcy in 2007 in connection with which the borrower claimed to have earned $0.00 for 2006.  Further, the appraisal indicated the property failed to conform to legal standards and the loan file lacked any letter from the local authority regarding rebuilding.  RFC Underwriting Guidelines require verification of 6 months of reserves for

the monthly Principle, Interest, Taxes and Insurance ("PITI") payments for stated income loans on non-owner occupied investment properties yet there is no indication in the loan files that these reserves were identified or verified.  Finally, RFC guidelines limit loans under the non-owner occupied loan program to $100,000, $40,000 less than was loaned.

- On March 16, 2007, a loan with a principal balance of $40,000 was made to a borrower in Bradenton, Florida on a property with an original appraisal value of $440,000 and a senior loan balance of $328,000.  The borrower [wa]s retired and receive[d] a fixed income that was stated as $6,450 per month.  The borrower's FICO credit score of 688 required the DTI for the loan not to exceed 45%, however, the borrower's DTI was 55.93%.  Because the borrower received a fixed income, the borrower d[id] not meet the residual income requirements for a higher DTI under RFC's Underwriting Guidelines.  Further, the loan file lacks any evidence of 2 months of PITI reserves as required by RFC's Underwriting Guidelines.

- On July 24, 2006, a loan with a principal balance of $29,500 was made to a borrower in Flint, Michigan on a property with an original appraisal value of $57,497 and a senior loan balance of $24,676.  The borrower stated income of $3,700 per month and had a FICO score of 650.  The CLTV for the mortgage loan was 94.2%.  Pursuant to RFC's Underwriting Guidelines, the borrower was required to have monthly income of $4,000 and the CLTV for the loan could not exceed 80%.  Further, the loan file lacks evidence of a full appraisal for the property as well as evidence of 2 months of PITI reserves, both of which are required by RFC's Underwriting Guidelines.

- On November 12, 2006, a loan with a principal balance of $135,000.00 was made to a borrower in Scottsdale, Arizona on a property with an

FIRST AMENDED COMPLAINT

original appraisal value of $540,000.00 and a senior loan balance of
$405,000.00.  The borrower stated income of $11,000 per month as a
sales manager at a concrete company, however, the borrower could only
demonstrate assets of $11,491.  The stated income was unreasonable
based on the borrower's employment and not substantiated by the
borrower's credit/asset profile.  Notably, the borrower filed for
bankruptcy in 2008 in connection with which the borrower claimed to
have actually earned $43,523 for 2006 and $20,401 for 2007.
Additionally, the bank account used to verify the borrower's reserves is
actually held in the name of the loan officer that issued the loan.

*MBIA v. RFC* Compl. ¶ 52.

248.   These suits are still pending.  The *MBIA v. RFC* suit has survived a
motion to dismiss.  Order, *MBIA v. RFC*, No. 603552/08 (N.Y. Sup. Ct. Dec. 22,
2009).

### 11.   Silver State Mortgage's Systematic Disregard of Underwriting Standards

249.   Silver State Mortgage Company ("Silver State") was a national wholesale
and residential mortgage lender headquartered in Las Vegas, Nevada.  Silver State
ceased operations in February 2007 amid the turmoil of the subprime mortgage crisis.
The details of Silver State's mortgage lending practices slowly emerged after it ceased
operations.  Silver State originated or contributed a critical portion of loans in the
mortgage pool underlying the NAA 2006-AR4 and NHELI 2007-1 offerings.  *See infra*
Table 10.

250.   A former Silver State employee recounted his experiences as a loan
officer with Silver State in a May 9, 2008 This American Life story on NPR entitled
"The Giant Pool of Money."  Mike Garner, the former Silver State employee, related
how Silver State did not adequately assess whether the income of borrowers under

Silver State's "stated income" product was reasonable compared to the borrowers' line of work:

> Garner:   The next guideline lower is just stated income, stated assets. Then you state what you make and state what's in your bank account. They call and make sure you work where you say you work.   Then an accountant has to say for your field it is possible to make what you said you make.   But they don't say what you make, they just say it's possible that they could make that.

Alex Blumberg & Adam Davidson, *The Giant Pool of Money* (National Public Radio broadcast May 9, 2008), *transcript available at* http://www.thisamericanlife.org/sites/default/files/355_transcript.pdf.

251.   Alex Blumberg, one of the NPR interviewers, commented on how easy it could have been to simply provide a W-2.  Garner responded by describing the means by which loan officers would determine whether the income was reasonable for the occupation:

> Blumberg:  It's just so funny that instead of just asking people to prove what they make, there's this theater in place of you have to find an accountant sitting right in front of me who could very easily provide a W2, but we're not asking for a W2 form, but we do want this accountant to say yeah, what they're saying is plausible in some universe.
>
> Garner:   Yeah, and loan officers would have an accountant they could call up and say "Can you write a statement saying a truck driver can make this much money?" Then the next one, came along, and it was no income, verified assets. So you don't have to tell the people what you do for a living. You don't have to tell the people what you do for work.  All you have to do is state you have a certain amount of money in your bank

FIRST AMENDED COMPLAINT

account.  And then, the next one, is just no income, no asset.  You don't

have to state anything.  Just have to have a credit score and a pulse.

*Id.*

252.   Garner recounted how his boss at Silver State despised these types of

loan products that permitted such wanton disregard of underwriting standards.

Garner concluded:

> Garner:  Yeah.  And my boss was in the business for 25 years.  He hated
> those loans.  He hated them and used to rant and say, "It makes me sick
> to my stomach the kind of loans that we do."  He fought the owners and
> sales force tooth and neck about these guidelines.  He got [the] same
> answer.  Nope, other people are offering it.  We're going to offer them
> too.  We're going to get more market share this way.  House prices are
> booming, everything's gonna [sic] be good.  And . . . the company was
> just rolling in the cash.  The owners and the production staff were just
> raking it in.

*Id.*

253.   Instead, Silver State, like many other originators, focused on keeping up

with the competition, sacrificing adherence to underwriting guidelines.  This quixotic

quest for higher profits and more market share ultimately failed as Silver State ceased

operations in 2007, no longer maintaining any share of the mortgage market.

254.   Witnesses quoted in Amended Complaint, *City of Ann Arbor Emps.' Ret.*

*Sys. v. Citigroup Mortg. Loan Trust, Inc.*, No. 08-1418 (E.D.N.Y. filed Apr. 6, 2009),

described Silver State's abandonment of underwriting guidelines.

255.   A Las Vegas appraiser recounted conducting over 300 appraisals for

Countrywide, Wells Fargo, Silver State, Aames, Argent, and Ameriquest that were

inflated.  Those originators typically demanded that appraisals exceed actual market

value by 15% to 25%.  *See id.* ¶ 81.

FIRST AMENDED COMPLAINT

256.   A former member of Silver State's Conditions Group – a group that attempted to cure conditions that disqualified borrowers – stated that in some cases underwriters would learn that the unverified information provided by borrowers could not be accurate, but would nonetheless ignore the inaccuracies.  *See id.* ¶¶ 154, 156.

**12.   WaMu's Systematic Disregard of Underwriting Standards**

257.   WaMu contributed a material portion of the loans in the mortgage pool underlying the HVMLT 2006-8 and LUM 2007-1 offerings.  *See infra* Table 10.

258.   WaMu was a Seattle-based thrift that rapidly grew from a regional to a national mortgage lender from 1991 to 2006.  At over $300 billion in total assets, WaMu was at one time the largest institution regulated by the Office of Thrift Supervision ("OTS").  On September 25, 2008, however, federal regulators closed WaMu when loan losses, borrowing capacity limitations, a plummeting stock price, and rumors of WaMu's problems led to a run on the thrift by depositors.  Federal regulators facilitated the sale of WaMu to J.P. Morgan Chase & Co., in September 2008.

259.   In April 2010, the Treasury OIG, issued a report entitled, "Evaluation of Federal Regulatory Oversight of Washington Mutual Bank," Report No. EVAL-10-002 (the "WaMu OIG Report"), discussing the reasons for WaMu's meteoric rise and consequent collapse.  The WaMu OIG Report found, "WaMu failed primarily because of management's pursuit of a high-risk lending strategy that included liberal underwriting standards and inadequate risk controls."  WaMu OIG Report at 2.  The report elaborated on how WaMu adopted this new strategy to compete with Countrywide and maximize profits:

> In 2005, WaMu management made a decision to shift its business strategy away from originating traditional fixed-rate and conforming single family residential loans, towards riskier nontraditional loan products and subprime loans.  WaMu pursued the new strategy in anticipation of increased earnings and to compete with Countrywide. . . .

FIRST AMENDED COMPLAINT

. . .

WaMu estimated in 2006 that its internal profit margin from subprime loans could be more than 10 times the amount for a government-backed loan product and more than 7 times the amount for a fixed-rate loan product.

*Id.* at 8 (footnote omitted).

260.   As previously noted in this Complaint, the PSI issued its report on the causes of the economic crisis.  The PSI Wall Street Report used WaMu as its case study into lending practices of the mortgage industry during the housing bubble.  Citing internal e-mails and correspondence the PSI obtained as part of its investigation, the PSI made the following factual findings:

(1) High Risk Lending Strategy.  [WaMu] executives embarked upon a High Risk Lending Strategy and increased sales of high risk home loans to Wall Street, because they projected that high risk home loans, which generally charged higher rates of interest, would be more profitable for the bank than low risk home loans.

(2) Shoddy Lending Practices.  WaMu and its affiliate, [Long Beach], used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.

(3) Steering Borrowers to High Risk Loans.  WaMu and Long Beach too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans or sell their homes before the payments shot up.

FIRST AMENDED COMPLAINT

(4) Polluting the Financial System.  WaMu and Long Beach securitized over $77 billion in subprime home loans and billions more in other high risk home loans, used Wall Street firms to sell the securities to investors worldwide, and polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss.

(5) Securitizing Delinquency-Prone and Fraudulent Loans.   At times, WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered.

(6) Destructive Compensation.  WaMu's compensation system rewarded loan officers and loan processors for originating large volumes of high risk loans, paid extra to loan officers who overcharged borrowers or added stiff prepayment penalties, and gave executives millions of dollars even when their High Risk Lending Strategy placed the bank in financial jeopardy.

PSI Wall Street Report at 50-51.

261.   In particular, the PSI Wall Street Report noted that WaMu had engaged in internal reviews of its lending practices and the lending practices of its subsidiary, Long Beach.  WaMu's Chief Risk Officer, Ron Cathcart commissioned a study to look into the quality of loans originated by Long Beach.  The review found that the "top five priority issues" were as follows:

"Appraisal deficiencies that could impact value and were not addressed[;] Material misrepresentations relating to credit evaluation were confirmed[;]

FIRST AMENDED COMPLAINT

1    Legal documents were missing or contained errors or discrepancies[;]

2    Credit evaluation or loan decision errors[; and]

3    Required credit documentation was insufficient or missing from the file."

4    *Id.* at 82 (quoting e-mail from Ron Cathcart, Chief Risk Officer, WaMu, to Cory

5    Gunderson (Dec. 11, 2006 9:21 AM PST)).

6        262.   Pushing "Option ARMs" was a major part of WaMu's new "high risk"

7    lending strategy.  In a bipartisan memorandum from Senators Carl Levin and Tom

8    Coburn to the Members of the PSI, dated April 13, 2010, Option ARMS were labeled

9    WaMu's "flagship" product. *Wall Street and the Financial Crisis: The Role of High Risk*

10   *Home Loans, Hearing Before S. Permanent Subcomm. on Investigations*, 112th Cong. (2010)

11   ("PSI High Risk Home Loans Hearing"), Senate Ex. 1.a, at 3.  The WaMu OIG

12   Report describes the inherently dangerous nature of WaMu's Option ARMs:

13       WaMu's Option ARMs provided borrowers with the choice to pay their

14       monthly mortgages in amounts equal to monthly principal and interest,

15       interest-only, or a minimum monthly payment.  Borrowers selected the

16       minimum monthly payment option for 56 percent of the Option ARM

17       portfolio in 2005.

18

19       The minimum monthly payment was based on an introductory rate, also

20       known as a teaser rate, which was significantly below the market interest

21       rate and was usually in place for only 1 month.  After the introductory

22       rate expired, the minimum monthly payment feature introduced two

23       significant risks to WaMu's portfolio:   payment shock and negative

24       amortization.    WaMu projected that, on average, payment shock

25       increased monthly mortgage amounts by 60 percent.  At the end of 2007,

26       84 percent of the total value of Option ARMs on WaMu's financial

27       statements was negatively amortizing.

28   WaMu OIG Report at 9.

FIRST AMENDED COMPLAINT

263.   The WaMu OIG Report notes that "Option ARMs represented as much as half of all loan originations from 2003 to 2007 and approximately $59 billion, or 47 percent, of the home loans on WaMu's balance sheet at the end of 2007." *Id.*

264.   The OIG also notes that WaMu's "new strategy included underwriting subprime loans, home equity loans, and home equity lines of credit to high-risk borrowers.  In line with that strategy, WaMu purchased and originated subprime loans, which represented approximately $16 billion, or 13 percent, of WaMu's 2007 home loan portfolio." *Id.* at 10.

265.   WaMu's careless underwriting practices rendered these already high risk loan products even more risky.  *See id.*  The WaMu OIG Report stated that the OTS and the FDIC repeatedly "identified concerns with WaMu's high-risk lending strategy" and loan underwriting, weaknesses in management, and "inadequate internal controls." *Id.* at 3-4.  Those concerns included "questions about the reasonableness of stated incomes contained in loan documents, numerous underwriting exceptions, miscalculations of loan-to-value ratios, and missing or inadequate documentation." *Hearing on Wall Street & the Fin. Crisis: The Role of Bank Regulators Before the United States S. Homeland Security and Governmental Affairs Comm., Permanent Subcomm. on Investigations*, 111th Cong. 9 (Apr. 16, 2010) (statement of the Hon. Eric M. Thorson, Inspector General, Dep't of the Treasury) ("Thorson Statement").

266.   WaMu management began to notice the pattern of "first payment default" ("FPD") for loans its Long Beach subsidiary originated.  In June 2007, WaMu closed Long Beach as a separate entity and placed its subprime lending operations in a new division called "Wholesale Specialty Lending."

267.   In late 2007, WaMu performed an internal review to determine whether its plans to address its poor underwriting practices were effective.  The review focused on 187 loans that experienced FPD, originated from November 2006 to March 2007. As an initial matter, the review found:

FIRST AMENDED COMPLAINT

The overall system of credit risk management activities and process has major weaknesses resulting in unacceptable level of credit risk.  Exposure is considerable and immediate corrective action is essential in order to limit or avoid considerable losses, reputation damage, or financial statement errors.

PSI High Risk Home Loans Hearing, Senate Ex. 21, "WaMu Corporate Credit Review: Wholesale Specialty Lending-FPD" at 2 (Sept. 28, 2007).

268.   Specifically, the WaMu internal review reported the following findings regarding the 187 FPD loans:

- (High) Ineffectiveness of fraud detection tools – 132 of the 187 (71%) files were reviewed by Risk Mitigation for fraud.  Risk Mitigation confirmed fraud on 115 files and could not confirm on 17 of the files, but listed them as "highly suspect."  This issue is a repeat finding with CCR.

- (High) Weak credit risk infrastructure impacting credit quality.  Credit weakness and underwriting deficiencies is a repeat finding with CCR.  It was also identified as a repeat finding and Criticism in the OTS Asset Quality memo 3 issued May 17, 2007.  Internal Audit in their August 20, 2007 Loan Origination & Underwriting report identified it as a repeat issue.  Findings from the CCR FPD review in relation to credit quality:
  - 132 of the 187 loans sampled were identified with red flags that were not addressed by the business unit
  - 80 of the 112 (71%) stated income loans were identified for lack of reasonableness of income
  - 87 files (47%) exceeded program parameters in place at the time of approval
  - 133 (71%) had credit evaluation or loan decision errors present
  - 25 (13%) had the title report issues that were not addressed

       o     28 (14%) had income calculation errors and 35 (19%) had income documentation errors

       o     58 (31%) had appraisal discrepancies that raised concerns that the value was not supported

*Id.* at 3.

269. An OTS memorandum on Loan Fraud Investigation, dated June 19, 2008, noted the systematic nature of the problem: "[T]he review defines an origination culture focused more heavily on production volume rather than quality. An example of this was a finding that production personnel were allowed to participate in aspects of the income, employment, or asset verification process, a clear conflict of interest. . . . Prior OTS examinations have raised similar issues including the need to implement incentive compensation programs to place greater emphasis on loan quality." PSI High Risk Home Loans Hearing, Senate Ex. 25, Memorandum from D. Schneider, President Home Loans, to A. Hedger, OTS Examiner and B. Franklin, OTS EIC at 1 (June 19, 2008).

270. A WaMu Significant Incident Notification, Date Incident Reported – 04/01/2008, Loss Type – Mortgage Loan, stated:

> One Sales Associate admitted that during that crunch time some of the Associates would "manufacture" assets statements from previous loan docs and submit them to the Loan Fulfillment Center ("LFC"). She said the pressure was tremendous from the LFC to get them the docs since the loan had already been funded and there was pressure from the Loan Consultants to get the loans funded.

PSI High Risk Home Loans Hearing, Senate Ex. 30, "Significant Incident Notification (SIN)" at 1 (Apr. 1, 2008).

271. A New York Times article described WaMu's underwriting practices as follows: "On a financial landscape littered with wreckage, WaMu, a Seattle-based bank that opened branches at a clip worthy of a fast-food chain, stands out as a singularly

1   brazen case of lax lending."  Peter S. Goodman & Gretchen Morgenson, *Saying Yes,*

2   *WaMu Built Empire on Shaky Loans*, N.Y. TIMES, Dec. 27, 2008, at A1.

3   272.   Sherri Zaback, a former underwriter at a WaMu branch in San Diego,

4   California, stated that "[m]ost of the loans she . . . handled merely required borrowers

5   to provide an address and Social Security number, and to state their income and

6   assets."  *Id.*  On one occasion, Zaback asked a loan officer for verification of a

7   potential borrower's assets.  The officer sent her a letter from a bank showing a

8   balance of approximately $150,000 in the borrower's account.  Zaback called the bank

9   to confirm and was told the balance was only $5,000.  The loan officer yelled at her,

10  Ms. Zaback recalled.  "She said, 'We don't call the bank to verify.'"  *Id.*

11  273.   Zaback also recalled that the sheer volume of loans precluded WaMu

12  employees from adhering to underwriting standards.  According to Zaback, she would

13  typically spend a maximum of 35 minutes per file:  "'Just spit it out and get it done.

14  That's what they wanted us to do.  Garbage in, and garbage out.'"  *Id.*  Another WaMu

15  agent in Irvine, California told the New York Times that she "coached brokers to

16  leave parts of applications blank to avoid prompting verification if the borrower's job

17  or income was sketchy."  *Id.*

18  274.   WaMu's underwriting critically failed with respect to appraisals as well.

19  An accurate appraisal of a property's market value is as crucial to the underwriting

20  process as the property provides collateral for the loan in case of default.

21          WaMu's review of appraisals establishing the value of single family homes

22          did not always follow standard residential appraisal methods because

23          WaMu allowed a homeowner's estimate of the value of the home to be

24          included on the form sent from WaMu to third-party appraisers, thereby

25          biasing the appraiser's evaluation.

26  WaMu OIG Report at 11.

27  275.   The New York Times reported, "WaMu pressured appraisers to provide

28  inflated property values that made loans appear less risky, enabling Wall Street to

- 98 -                    FIRST AMENDED COMPLAINT

1   bundle them more easily for sale to investors." Goodman & Morgenson, *Saying Yes,*

2   *WaMu Built Empire on Shaky Loans* at A1. The article quoted the founder of one

3   appraisal company that did business with WaMu until 2007 as saying, "'It was the Wild

4   West.' . . . 'If you were alive, they would give you a loan. Actually, I think if you were

5   dead, they would still give you a loan.'" *Id.* (quoting Steven Knoble, founder Mitchell,

6   Maxwell & Jackson).

7        276.   Nor did WaMu adequately monitor non-employee third-party brokers

8   who originated most of WaMu's loans. As Eric Thorson explained before the PSI:

9            In addition to originating retail loans with its own employees, WaMu

10           began originating and purchasing wholesale loans through a network of

11           brokers and correspondents. From 2003 to 2007, wholesale loan

12           channels represented 48 to 70 percent of WaMu's total single family

13           residential loan production. WaMu saw the financial incentive to use

14           wholesale loan channels for production as significant. According to an

15           April 2006 internal presentation to the WaMu Board, it cost WaMu about

16           66 percent less to close a wholesale loan ($1,809 per loan) than it did to

17           close a retail loan ($5,273). So while WaMu profitability increased

18           through the use of third-party originators, it had far less oversight and

19           control over the quality of the originations.

20   Thorson Statement at 5.

21        277.   According to the WaMu OIG Report, WaMu had only 14 employees

22   monitoring the actions of 34,000 third-party brokers. *See* WaMu OIG Report at 11.

23   This lack of oversight led to WaMu "identif[ying] fraud losses attributable to third-

24   party brokers of $51 million for subprime loans and $27 million for prime loans" in

25   2007. *Id.*

26        278.   Federal regulators also noted that "WaMu acquired 11 institutions and

27   merged with 2 affiliates" from 1991 to 2006, yet failed to "fully integrate . . .

28   information technology systems, risk controls, and policies and procedures" from its

acquisitions and institute "a single enterprise-wide risk management system."  Thorson Statement at 5.  An integrated risk management system was critically important in light of WaMu's high-risk lending strategy.  *See id.*

279.   Based on interviews with two dozen former employees, mortgage brokers, real estate agents and appraisers, Goodman and Morgenson of the New York Times noted the "relentless pressure to churn out loans" while "disregarding borrowers' incomes and assets" came from WaMu's top executives.  Goodman & Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1.  According to Dana Zweibel, a former financial representative at a WaMu branch in Tampa, Florida, even if she doubted whether a borrower could repay the loan, she was told by WaMu management that it was not her concern:  her concern was "'just to write the loan.'"  *Id.*  Said Zweibel, "'It was a disgrace'. . . .  'We were giving loans to people that never should have had loans.'"  *Id.*

280.   In November 2008 the New York Times, quoting Keysha Cooper, a Senior Mortgage Underwriter at WaMu from 2003 to 2007, recounted "'[a]t WaMu it wasn't about the quality of the loans; it was about the numbers'. . . .  'They didn't care if we were giving loans to people that didn't qualify.  Instead, it was how many loans did you guys close and fund?'"  Gretchen Morgenson, *Was There a Loan It Didn't Like?*, N.Y. Times, Nov. 1, 2008.  According to the article, "[i]n February 2007 . . . the pressure became intense.  WaMu executives told employees they were not making enough loans and had to get their numbers up. . . ."  Cooper concluded, "'I swear 60 percent of the loans I approved I was made to' . . . 'If I could get everyone's name, I would write them apology letters.'"  *Id.*

281.   WaMu blatantly inflated salaries of baby sitters and mariachi singers to the six-figure range.  Indeed, the only verification of the mariachi singer's income was a photograph of the mariachi singer in his outfit included in the loan application file.  The New York Times reported:

FIRST AMENDED COMPLAINT

As a supervisor at a Washington Mutual mortgage processing center, John D. Parsons was accustomed to seeing baby sitters claiming salaries worthy of college presidents, and schoolteachers with incomes rivaling stockbrokers'. He rarely questioned them. A real estate frenzy was under way and WaMu, as his bank was known, was all about saying yes.

Yet even by WaMu's relaxed standards, one mortgage four years ago raised eyebrows. The borrower was claiming a six-figure income and an unusual profession: mariachi singer.

Mr. Parsons could not verify the singer's income, so he had him photographed in front of his home dressed in his mariachi outfit. The photo went into a WaMu file. Approved.

"I'd lie if I said every piece of documentation was properly signed and dated," said Mr. Parsons.

. . .

At WaMu, getting the job done meant lending money to nearly anyone who asked for it — the force behind the bank's meteoric rise and its precipitous collapse this year in the biggest bank failure in American history.

. . .

Interviews with two dozen former employees, mortgage brokers, real estate agents and appraisers reveal the relentless pressure to churn out loans that produced such results.

Goodman & Morgenson, Saying Yes, WaMu Built Empire on Shaky Loans at A1.

E.     **Loans That Did Not Comply with the Underwriting Guidelines Were Routinely Collateral for RBS-Underwritten RMBS**

282.   A February 2010 report from J.P. Morgan noted that "[t]he outstanding balance of [private-label] mortgages grew from roughly $600 billion at the end of 2003 to $2.2 trillion at its peak in 2007."  Gary J. Madich *et al.*, *Non-Agency Mortgage-Backed Securities: Managing Opportunities and Risks*, J.P. Morgan Asset Management at 2 (Feb. 2010), *available at* http://www.jpmorganinstitutional.com/cm/BlobServer/Non-Agency_Mortgage-Backed_Securities.pdf?blobkey=id&blobwhere=1321154800608&blobheader=application%2Fpdf&blobcol=urldata&blobtable=MungoBlobs&isAMIA=yes.  While unknown to reasonable investors at that time, it now is apparent that this massive expansion in the origination of loans over a short period of time was accomplished by ignoring underwriting standards.  The J.P. Morgan report also noted that home prices rose, requiring larger loans:  "[private-label] mortgage providers initially met this need for larger loans while maintaining stringent qualifications.  However, investment banks were willing to buy lower quality mortgages and bundle them for issuance into new and innovative forms of Asset Backed Securities (ABS) and Collateralized Debt Obligations (CDOs)."  *Id.*

283.   During the FCIC investigation referenced above (*supra* at Section VII.D.1), Clayton Holdings provided evidence that RBS securitized a significant number of loans that did not comply with the stated underwriting guidelines.

284.   Clayton was the leading provider of due diligence services for RMBS offerings during the relevant time period.  This gave Clayton "a unique inside view of the underwriting standards that originators were actually applying."  FCIC Report at 166.

285.   Banks routinely hired Clayton to inspect the mortgage loans that the banks securitized into RMBS.  Clayton would determine whether the loans complied with the originators' stated underwriting guidelines, and prepare a report of its findings

FIRST AMENDED COMPLAINT

for the bank.  *See* FCIC Testimony of Vicki Beal, Senior Vice President of Clayton Holdings (Sept. 23, 2010), *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Beal.pdf.

286.   From January 1, 2006 through June 30, 2007, Clayton reviewed 911,039 loans.  Only 54% of those met the originators' underwriting guidelines.  Clayton's former President and CEO, Keith Johnson, testified that the "54% says there [was] a quality control issue in the [originators]."  FCIC Report at 166; Audiotape of FCIC Interview with Keith Johnson, former President of Clayton ("Johnson FCIC Interview") (Sept. 2, 2010) ("Beal FCIC Testimony") ("Even if the guideline was bad, [the loans] didn't adhere to the guideline . . . .  To me in hindsight, [the data] just said there was a . . . fundamental breakdown."), *available at* http://fcic.law.stanford.edu/interviews/view/220.  Another 18% of the loans failed the underwriting guidelines but were deemed to have adequate compensating factors.  That left a large number – 28% – that did not meet the underwriting guidelines and had no compensating factors.  *See* All Clayton Trending Reports, 1st Quarter 2006 – 2nd Quarter 2007, at 1 (2007), *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-Report.pdf ("All Clayton Trending Report").

287.   Clayton confirmed that the RMBS sold by RBS from the beginning of 2006 through the middle of 2007—which includes all but two of the Certificates listed in Tables 1 and 2 of this Complaint—contained a substantial number of loans that were not originated in conformity with underwriting guidelines.  *See* All Clayton Trending Report at 6.  The First Franklin 2005-FFH4 and Soundview 2005-OPT4 were issued slightly earlier in November 2005.

288.   As revealed during the FCIC investigation in 2010, Clayton routinely found large numbers of loans that were not properly originated under the applicable underwriting guidelines.  Despite identifying these defectively originated loans, Clayton

1  stated that they often were included into the RMBS that was being sold to investors.

2  *See* FCIC Report at 166-67; All Clayton Trending Report at 1.

3      289.   Clayton reviewed 67,257 loans for RBS.  It found that 12,361 (18.4%) did

4  not comply with the stated underwriting guidelines and did not have compensating

5  factors.  RBS waived the defects for 6,953 of the 12,361 (53.3%).

6      290.   Clayton typically performed due diligence on a small sample of the loans

7  that were being securitized into an RMBS offering – approximately 10%.  FCIC *See*

8  Beal Testimony at 2.  No due diligence was performed on the remaining loans.  Thus,

9  of the small sample of loans that Clayton did review, approximately 10% did not

10  comply with the underwriting guidelines and did not have compensating factors, but

11  were nonetheless securitized.  Extrapolating Clayton's results shows that for the

12  remaining 90% of loans that were not reviewed, nearly 20% did not comply with the

13  underwriting guidelines and did not have compensating factors, but were nonetheless

14  securitized.  In total, Clayton's data shows that between 15-20% of the loans RBS

15  securitized were defective.  All Clayton Trending Reports at 6.

16  **F.  Additional Evidence Confirms That Defective Loans Were Routinely Packaged into RBS's RMBS.**

17  

18      291.   Clayton officials offered an explanation for why so many defective loans

19  were packaged into RMBS.  When asked what caused the financial crisis, one pointed

20  to the banks belief that they had no liability for loans' compliance with underwriting

21  guidelines: "When it came to the underwriting [guidelines] . . . and [securitizers] could

22  perhaps distribute that risk quickly, then that wasn't as high on their priorities."

23  Johnson FCIC Interview.

24      292.   A number of loan originators had an express policy of attempting to sell

25  loans that had already been rejected.  Because only a small percentage of the pools

26  were reviewed by a due diligence firm like Clayton (or its chief competitor, Bohan),

27  there was a very strong likelihood that those defective loans would enter the pool on

28  the second or third attempt.  Clayton referred to this practice as the "three strikes,

1  you're out rule."  Transcript, FCIC Hearing, The Financial Crisis at the Community

2  Level—Sacramento, CA at 178 (Sept. 23, 2010) (testimony of D. Keith Johnson,

3  former President of Clayton), *available at* http://fcic-

4  static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-transcript.pdf.

5       293.   The FCIC Report also concluded that banks like RBS that securitized

6  loans were reluctant to review or reject loans in greater numbers because doing so

7  would endanger their relationship with originators.  FCIC Report at 166 ("[Clayton's

8  former CEO] concluded that his clients often waived in loans to preserve their

9  business relationship with the loan originator—a high number of rejections might lead

10 the originator to sell the loans to a competitor."); PAUL MUOLO & MATTHEW PADILLA,

11 CHAIN OF BLAME 228-29 (2010) ("There were two reasons the [Wall] Street firms

12 reviewed only a small sample of the loans they were buying . . . .  The most important

13 reason was the relationship with the lender.  'The lower the sample you requested [of

14 the lender], the more likely it was that you'd win the bid.'").

15 **VIII.  THE OFFERING DOCUMENTS CONTAINED UNTRUE**

16 **STATEMENTS OF MATERIAL FACT**

17      294.   The Offering Documents included material untrue statements or omitted

18 facts necessary to make the statements made, in light of the circumstances under

19 which they were made, not misleading.

20      295.   For purposes of Section 11 liability, the prospectus supplements are part

21 of and included in the registration statements of the offerings pursuant to 17 C.F.R. §§

22 230.158, 230.430B (2008); *see also* Securities Offering Reform, 70 Fed. Reg. 44,722-01,

23 44,768-69 (Aug. 3, 2005).

24      **A.    Offering Documents Misrepresented Weighted Average Loan-to-**
        **Value Ratios**

25      296.   The Offering Documents included detailed representations regarding the

26 weighted average LTV for the pools underlying the RMBS.

27

28

297.   The LTV ratio is the ratio of a mortgage loan's original principal balance to the appraised value of the mortgaged property.  For instance, if a borrower borrows $80,000 to purchase a house estimated to be worth $100,000, the LTV ratio is $100,000/$80,000 or 80%.

298.   A "weighted average" is an average in which each value to be averaged is assigned a weight that determines the relative importance of each value to the average. A weighted average can be contrasted with a straight arithmetic mean in which each of the values to be averaged contributes equally to the average.  In the context of LTVs, the higher the balance of the loan(s) secured by the property, the more "weight" it is given in relation to the average.  To calculate the weighted average LTV ratio for a pool of loans, each loan's LTV ratio is multiplied by the loan balance, and the sum of those numbers is divided by the total loan balance of the pool.  The weighted average LTV ratio is a factor in describing the risk of a particular RMBS.

299.   The NCUA Board commissioned forensic reviews that calculated LTV ratios for the loans underlying the HVMLT 2006-8, HVMLT 2006-10, HVMLT 2007-4, MHL 2006-1, NHELI 2007-1, and WMLT 2006-ALT1 offerings.  The forensic reviews used a retrospective automated valuation model ("AVM").  A retrospective AVM calculates the value of a property at a point in time in the past using data that was available at that time, such as comparable property values, comparable sales, and home price indices at the time of loan origination.  That is, a retrospective AVM is able to calculate the value of a property in 2006 using the data that was available in 2006.

300.   The forensic review commissioned by NCUA Board calculated the value of the mortgaged properties underlying the RMBS at the time the mortgage loans were originated.  For each Offering in Table 7, at least 35.3% of the loans were analyzed.

301.   The forensic review demonstrated that, for the Offerings in Table 7, the Offering Documents materially understated the LTV ratios, and thus the risks, of the mortgage pools.  The appraised values given to the mortgaged properties were

1  significantly higher than what the properties were actually worth at the time of

2  origination.

3          302.    For the Offerings in Table 7, the Offering Documents contained

4  representations about the purported weighted average LTV ratio for the loan pools.

5  The forensic review found that on average, the actual weighted average LTV ratio was

6  38.9% higher than the weighted average LTV ratio reported in the Offering

7  Documents.  *See infra* Table 7.

8

9                                    **Table 7**

| RMBS | Represented Weighted Average LTV Ratio | Actual Weighted Average LTV Ratio | Actual Weighted Average LTV ___% Higher than Represented |
|---|---|---|---|
| HVMLT 2006-8 | 75.67% | 127.99% | 52.31% |
| HVMLT 2006-10 | 76.04% | 87.56% | 11.52% |
| HVMLT 2007-4 | 71.56% | 119.16% | 47.60% |
| MHL 2006-1 | 73.62% | 120.77% | 47.15% |
| NHELI 2007-1 | 76.73% | 138.48% | 61.75% |
| WMLT 2006-ALT1 | 76.12% | 89.07% | 12.95% |

16         303.    The Offering Documents for the HVMLT 2006-8, HVMLT 2006-10,

17  HVMLT 2007-1, NHELI 2007-1, and WMLT 2006-ALT1 offerings contained

18  aggregated loan-by-loan statistics about the weighted average CLTV ratios for the

19  pools underlying the RMBS.  The related CLTV ratio takes into account other liens on

20  the property, such as a second mortgage.  The CLTV ratio adds additional specificity

21  to the basic LTV ratio by indicating that additional liens on the property have been

22  considered in the calculation of the ratio.  Like LTV ratio, CLTV ratio is a key statistic

23  for investors in evaluating both the price and the risk of RMBS.

24         304.    Because the representations in the Offering Documents regarding CLTV

25  ratios were based on false loan-level information, the aggregated statistics were also

26  false.

27         305.    For the Offerings in Table 8, the forensic review shows that on average,

28  the actual weighted average CLTV ratio was 31.7% higher than the weighted average

- 107 -                          FIRST AMENDED COMPLAINT

CLTV ratio represented in the Offering Documents.  The table below shows the difference between the weighted average CLTV ratios that the Offering Documents represented for the relevant RMBS, and the actual weighted average CLTV ratios as revealed by forensic review.

**Table 8**

| RMBS | Represented Weighted Average CLTV Ratio | Actual Weighted Average CLTV Ratio | Actual Weighted Average CLTV ___% Higher than Represented |
|---|---|---|---|
| HVMLT 2006-8 | 75.67% | 128.42% | 52.74% |
| HVMLT 2006-10 | 79.41% | 94.16% | 14.75% |
| HVMLT 2007-4 | 77.76% | 120.22% | 42.46% |
| WMLT 2006-ALT1 | 85.72% | 102.64% | 16.92% |

306.   The discrepancy between the reported weighted average LTV and CLTV ratios and the ratios calculated using the retroactive AVM provides additional evidence that the Originators systematically disregarded underwriting standards contrary to representations in the Offering Documents.  Where the weighted average LTV and CLTV are close to or exceeds 100% for the RMBS, the borrowers collectively had virtually no equity in the mortgaged properties, increasing the risk of losses when the borrowers defaulted on the mortgaged properties.  The actual weighted LTV and CLTV ratio shows that the RMBS were significantly riskier than represented in the Offering Documents.

**B.     Untrue Statements in the Offering Documents About Owner-Occupancy Ratios**

307.   The Offering Documents represented the percentage of properties that would be occupied by the borrower for the loans underlying each RMBS.  RBS performed due diligence regarding the occupancy status of the underlying properties.

308.   Representations regarding the occupancy type of a mortgaged property are material because borrowers are less likely to default on mortgages on their primary residences.  As one bank explained:

1         Most home owners become anchored to their communities through the

2         schools their children attend and the friends they make.  As a result,

3         defaulting on the mortgage backing one's primary residence can be a

4         jarring experience, one that most people would choose to avoid.  By

5         contrast, an investment property primarily represents a stream of income

6         or speculative opportunity, making the decision to default more one of

7         dollars and cents than of a major life change.  As a result, all else being

8         equal, borrowers are less likely to default on a mortgage backed by their

9         primary residence than on one backed by an investment property.

10  Barclays Capital, Barclays Loan Transition Model, at 9 (Nov. 30, 2010).

11       309.   The forensic review used borrower- and property-specific public records

12  to test loan-level occupancy data for two offerings.

13       310.   First, the forensic review analyzed contemporaneous property tax records

14  to determine whether: (1) borrowers received their property tax bill for the mortgaged

15  property at the address of the mortgaged property; and (2) borrowers took a property

16  tax exemption on the mortgaged property that is only available for owner-occupied

17  properties.  Borrowers are likely to have a tax bill sent to their primary residence to

18  ensure their ability to make timely payment.  However, if borrowers have tax records

19  sent to a different address, then they probably do not actually reside at the mortgaged

20  property.  And if borrowers decline to take certain tax exemptions dependent on the

21  borrowers residing at their mortgaged properties, then the borrowers probably do not

22  reside at those properties.

23       311.   Second, the forensic review analyzed public records to determine

24  whether borrowers owned any other properties during the same time period in which

25  they owned the securitized property.  The forensic review then examined whether the

26  borrowers consistently identified the securitized property as their mailing address for

27  property tax bills on each concurrently owned property.  Inconsistencies in tax bill

28

      FIRST AMENDED COMPLAINT

1  mailing addresses for concurrently-owned properties strongly suggest that the

2  securitized property was not, in fact, owner-occupied.

3          312.    Third, the forensic review conducted a review of lien records on

4  concurrently-owned properties to determine whether borrowers indicated that any

5  property other than the securitized property was owner-occupied.  This test examines

6  all liens originated after the securitized mortgage and compares owner-occupancy

7  representations with those in the loan tapes.  If liens on concurrently-owned properties

8  indicate that those properties are owner-occupied, then the borrower probably does

9  not reside at the mortgaged property.

10         313.    Fourth, the forensic review examined the mailing addresses identified for

11  liens on concurrently-owned properties to determine whether the address of the

12  securitized property was listed as the mailing address for bills and other

13  correspondence between borrowers and the lienholders.  If the securitized property

14  address is not identified, then the securitized property is probably not owner-occupied.

15         314.    Finally, the forensic review reviewed credit records to help determine

16  whether a given borrower occupied the mortgaged property.  Specifically, the forensic

17  review investigated whether creditors were reporting the securitized property's address

18  as the borrower's mailing address six months after the origination of the loan.  Within

19  six months of closing on a mortgage, one would expect borrowers to have changed

20  their billing address with each of their creditors.  If a borrower was telling creditors to

21  send bills to another address even six months after buying the property, it is likely the

22  borrower was living at a different location.

23         315.    In assessing the accuracy of the Offering Documents' representations

24  about owner-occupancy, the forensic review considered mortgages that failed multiple

25  owner-occupancy tests to not have actually have been backed by owner-occupied

26  properties.  Even with this high threshold, the forensic review revealed systemic

27  overstatements of owner-occupancy rates within each of the RMBS at issue.

28

FIRST AMENDED COMPLAINT

316.    For each Offering in Table 9, at least 71% of the loans were analyzed. The forensic review's analysis demonstrates that, for the Offerings in Table 9, the Offering Documents drastically overstated the percentage of owner-occupied properties in the collateral pools.  *See infra* Table 9.

**Table 9**

| RMBS | Represented Percentage of Owner-Occupied Properties | Actual Percentage of Owner-Occupied Properties | Percentage Overstatement |
|---|---|---|---|
| HVMLT 2006-10 | 72.1% | 61.5% | 10.6% |
| WMLT 2006-ALT1 | 67.8% | 56.3% | 11.5% |

**C.    Untrue Statements Concerning Compliance with Underwriting Guidelines**

317.    Statements in the Offering Documents concerning the following subjects were material and untrue at the time they were made:  (1) adherence to stated underwriting guidelines; (2) the "loan-to-value" ratio for the mortgaged property and the accuracy of appraisals; and (3) the existence of credit enhancement to minimize the risk of loss.

318.    The following chart, Table 10, lists which originators contributed loans to each RMBS.  Under SEC's Regulation AB, the Offering Documents must disclose the originators that contributed more than 10% of the loans underlying the RMBS, and the Offering Documents must include underwriting guidelines for the originators that contributed more than 20% of the loans underlying the RMBS.  *See* 17 C.F.R. § 229.1110 (2005).

**Table 10**

| CUSIP(S) | ISSUING ENTITY | TRANCHE | ORIGINATOR(S) |
|---|---|---|---|
| 65538DAB1 | NAA 2006-AR4 | A1B | FNBN (24.81%); Silver State (13.69%) |

- 111 -

| CUSIP(S) | ISSUING ENTITY | TRANCHE | ORIGINATOR(S) |
|---|---|---|---|
| 026935AD8 | AHMA 2007-3 | 1-2A2 | American Home (100%) |
| 32027NXE6 | FFMLT 2005-FFH4 | M-2 | First Franklin (100%) |
| 41161GAE3 | HVMLT 2006-8 | 2A-1C | **Group 2:**<br>BankUnited (23.31%);<br>First Federal Bank of California (15.21%);<br>Paul Financial (16.12%);<br>Residential Mortgage Capital (10.87%);<br>WaMu (12.09%) |
| 41161XAM8<br>41161XAN6 | HVMLT 2006-9 | 2A-1C1<br>2A-1B2 | Countrywide (100%) |
| 41162CAD3 | HVMLT 2006-10 | 2A-1B | **Group 2:**<br>Paul Financial (17.26%);<br>BankUnited (16.85%);<br>Residential Mortgage Capital (15.92%);<br>Loan Center of California (12.78%);<br>NL dba Residential Pacific Mortg. (10.89%);<br>First Federal Bank of California (10.77%) |
| 41162GAB8 | HVMLT 2006-11 | A-1B | Countrywide (100%) |
| 41162DAG4<br>41162DAH2 | HVMLT 2006-12 | 2A-2B<br>2A-2C | Countrywide (100%) |
| 41162NAD9<br>41162NAH0 | HVMLT 2006-14 | 2A-1B<br>2A-2C | IndyMac (64.12%);<br>American Home (12.66%) |
| 41164MAF4<br>41164MAP2 | HVMLT 2007-1 | B1<br>2A-1C2 | Countrywide (100%) |
| 41164LAC3 | HVMLT 2007-2 | 2A-1B | American Home (22.52%);<br>Paul Financial (21.18%);<br>Kay-Co dba Pro30 Funding (15.91%);<br>Residential Funding Co. (10.28%) |

- 112 -

FIRST AMENDED COMPLAINT

| CUSIP(S) | ISSUING ENTITY | TRANCHE | ORIGINATOR(S) |
|---|---|---|---|
| 41164YAD3 | HVMLT 2007-4 | 2A-3 | Paul Financial (25.83%);<br>Plaza Home Mortgage (15.92%);<br>First Federal Bank of California (14.90%) |
| 41165AAC6<br>41165AAD4 | HVMLT 2007-5 | A1B<br>A1C | American Home (100%) |
| 45667SAN7<br>45667SAP2 | INDX 2006-AR35 | 2-A-3A<br>2-A-3B | IndyMac (100%) |
| 55028CAA3<br>55028CAB1<br>55028CAE5 | LUM 2007-1 | I-A-1<br>I-A-2<br>2-A-3 | **Group 1:**<br>WaMu (88.16%); Metrocities (11.84%)<br><br>**Group 2:**<br>IndyMac (100%) |
| 61915RCL8 | MHL 2006-1 | 2-A1C | MortgageIT (100%) |
| 65537KAB6<br>65537KAC4 | NHELI 2007-1 | II-2A1A<br>II-2A1B | **Group 2:**<br>Silver State (31.67%) |
| 83611MJM1 | SVHE 2005-OPT4 | M-2 | Option One (100%) |
| 92978GAC3 | WMLT 2006-ALT1 | A3 | National City (65.93%);<br>Accredited Home Lenders (18.88%);<br>Wachovia Mortgage Corp. (12.44%);<br>AmNet (2.75%) |

319.   Listed below are examples of material untrue statements and/or omissions of fact from the RMBS listed above.

**D.    Untrue Statements Concerning Adherence to Stated Underwriting Guidelines**

320.   The NHELI 2007-1 Prospectus Supplement represented:

FIRST AMENDED COMPLAINT

FNBN's underwriting guidelines are applied in a standard procedure that is intended to comply with applicable federal and state laws and regulations. However, the application of FNBN's underwriting guidelines does not imply that each specific criterion was satisfied individually. FNBN will have considered a mortgage loan to be originated in accordance with a given set of underwriting guidelines if, based on an overall qualitative evaluation, in FNBN's discretion such mortgage loan is in substantial compliance with such underwriting guidelines or if the borrower can document compensating factors. A mortgage loan may be considered to comply with a set of underwriting guidelines, even if one or more specific criteria included in such underwriting guidelines were not satisfied, if other factors compensated for the criteria that were not satisfied or the mortgage loan is considered to be in substantial compliance with the underwriting guidelines.

NHELI 2007-1 Prospectus Supplement at S-105-106; NAA 2006-AR4 Prospectus Supplement at S-49-50; *see* NAA 2006-AR4 Free Writing Prospectus, Nov. 17, 2006, at the "Underwriting Standards of FNBN" section.

321. The NHELI 2007-1 Prospectus Supplement represented:

All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section.

NHELI 2007-1 Prospectus Supplement at S-108; NAA 2006-AR4 Free Writing Prospectus, Nov. 17, 2006, at the "Underwriting Standards of the Sponsor" section.

322. The NHELI 2007-1 Prospectus Supplement represented:

FIRST AMENDED COMPLAINT

1      In addition, FNBN may make certain exceptions to the underwriting
2      guidelines described herein if, in FNBN's discretion, compensating
3      factors are demonstrated by a prospective borrower.
4  NHELI 2007-1 Prospectus Supplement at S-104; NAA 2006-AR4 Prospectus
5  Supplement at S-48.
6      323.   The NHELI 2007-1 Prospectus Supplement represented the sponsor,
7  Nomura Credit & Capital, Inc.'s underwriting standards as follows:
8      In addition, certain exceptions to the underwriting standards described in
9      this prospectus supplement are made in the event that compensating
10      factors are demonstrated by a prospective borrower.
11  NHELI 2007-1 Prospectus Supplement at S-109.
12      324.   The NHELI 2007-1 Prospectus Supplement represented:
13      FNBN's underwriting guidelines are primarily intended to evaluate the
14      prospective borrower's credit standing and ability to repay the loan, as
15      well as the value and adequacy of the proposed Mortgaged Property as
16      collateral.  A prospective borrower applying for a mortgage loan is
17      required to complete an application, which elicits pertinent information
18      about the prospective borrower including, depending upon the loan
19      program, the prospective borrower's financial condition (assets, liabilities,
20      income and expenses), the property being financed and the type of loan
21      desired.
22  NHELI 2007-1 Prospectus Supplement at S-105; NAA 2006-AR4 Prospectus
23  Supplement at S-49; NAA 2006-AR4 Free Writing Prospectus, Nov. 17, 2006, at the
24  "Underwriting Standards of FNBN" section.
25      325.   The NHELI 2007-1 Prospectus Supplement represented:
26      Based on the data provided in the application and certain verifications (if
27      required), a determination will have been made that the borrower's
28      monthly income (if required to be stated or verified) should be sufficient

1  to enable the borrower to meet its monthly obligations on the mortgage
2  loan and other expenses related to the Mortgaged Property (such as
3  property taxes, standard hazard insurance and other fixed obligations
4  other than housing expenses).  Generally, scheduled payments on a
5  mortgage loan during the first year of its term plus taxes and insurance
6  and other fixed obligations equal no more than a specified percentage of
7  the prospective borrower's gross income.  The percentage applied varies
8  on a case-by-case basis depending on a number of underwriting criteria
9  including, but not limited to, the loan-to-value ratio of the mortgage loan
10  or the amount of liquid assets available to the borrower after origination.

11  NHELI 2007-1 Prospectus Supplement at S-105; NAA 2006-AR4 Prospectus
12  Supplement at S-49.

13       326.   The NHELI 2007-1 Prospectus Supplement stated:
14  Silver State Mortgage's underwriting guidelines are primarily intended to
15  evaluate the prospective borrower's credit standing and ability to repay
16  the loan, as well as the value and adequacy of the proposed Mortgaged
17  Property as collateral.  A prospective borrower applying for a mortgage
18  loan is required to complete an application which elicits pertinent
19  information about the prospective borrower including, depending upon
20  the loan program, the prospective borrower's financial condition (assets,
21  liabilities, income and expenses), the property being financed and the
22  type of loan desired.

23  Nomura HELT 2007-1 Prospectus Supplement at S-107.

24       327.   The NHELI 2007-1 Prospectus Supplement represented:
25  Based on the data provided in the application and certain verifications (if
26  required), a determination will have been made that the borrower's
27  monthly income (if required to be stated or verified) should be sufficient
28  to enable the borrower to meet its monthly obligations on the mortgage

- 116 -

1        loan and other expenses related to the Mortgaged Property (such as

2        property taxes, standard hazard insurance and other fixed obligations

3        other than housing expenses).

4 Nomura HELT 2007-1 Prospectus Supplement at S-108.

5        328.   The NHELI 2007-1 Prospectus Supplement represented:

6        Generally, each borrower will have been required to complete an

7        application designed to provide to the original lender pertinent credit

8        information concerning the borrower.  As part of the description of the

9        borrower's financial condition, the borrower generally will have furnished

10        certain information with respect to its assets, liabilities, income (except as

11        described below), credit history, employment history and personal

12        information, and furnished an authorization to apply for a credit report

13        which summarizes the borrower's credit history with local merchants and

14        lenders and any record of bankruptcy.  The borrower may also have been

15        required to authorize verifications of deposits at financial institutions

16        where the borrower had demand or savings accounts.

17 NHELI 2007-1 Prospectus Supplement at S-109.

18        329.   The AHMA 2007-3 Prospectus Supplement represented:

19        The Originator's underwriting philosophy is to weigh all risk factors

20        inherent in the loan file, giving consideration to the individual

21        transaction, borrower profile, the level of documentation provided and

22        the property used to collateralize the debt.  Because each loan is different,

23        the Originator expects and encourages underwriters to use professional

24        judgment based on their experience in making a lending decision.

25 AHMA 2007-3 Prospectus Supplement at S-51-52.

26        330.   The AHMA 2007-3 Prospectus Supplement represented:

27        The Originator realizes that there may be some acceptable quality loans

28        that fall outside published guidelines and encourages "common sense"

FIRST AMENDED COMPLAINT

1   underwriting.   Because a multitude of factors are involved in a loan

2   transaction, no set of guidelines can contemplate every potential

3   situation.  Therefore, each case is weighed individually on its own merits

4   and exceptions to the Originator's underwriting guidelines are allowed if

5   sufficient compensating factors exist to offset any additional risk due to

6   the exception.

7   AHMA 2007-3 Prospectus Supplement at S-53.

8   331.   The AHMA 2007-3 Prospectus Supplement represented:

9   In order to determine if a borrower qualifies for a non-conforming loan,

10  the loans have been either approved by Fannie Mae's Desktop

11  Underwriter or Freddie Mac's Loan Prospector automated underwriting

12  systems or they have been manually underwritten by the Originator

13  underwriters.  The Originator's Alt-A loan products have been approved

14  manually by contract underwriters provided by certain mortgage

15  insurance companies.  American Home Solutions products must receive

16  an approval from the Assetwise automated underwriting system.   For

17  manually underwritten loans, the underwriter must ensure that the

18  borrower's income will support the total housing expense on an ongoing

19  basis.   Underwriters may give consideration to borrowers who have

20  demonstrated an ability to carry a similar or greater housing expense for

21  an extended period.  In addition to the monthly expense the underwriter

22  must evaluate the borrower's ability to manage all recurring payments on

23  all debts, including the monthly housing expense.  When evaluating the

24  ratio of all monthly debt payments to the borrower's monthly income

25  (debt-to-income ratio), the underwriter should be aware of the degree

26  and frequency of credit usage and its impact on the borrower's ability to

27  repay the loan.  For example, borrowers who lower their total obligations

28  should receive favorable consideration and borrowers with a history of

1    heavy usage and a pattern of slow or late payments should receive less

2    flexibility.

3    AHMA 2007-3 Prospectus Supplement at S-52-53.

4        332.   The AHMA 2007-3 Prospectus Supplement represented:

5    The Originator obtains a credit report that summarizes each borrower's

6    credit history.   The credit report contains information from the three

7    major credit repositories, Equifax, Experian and TransUnion.   These

8    companies have developed scoring models to identify the comparative

9    risk of delinquency among applicants based on characteristics within the

10   applicant's credit report.   A borrower's credit score represents a

11   comprehensive view of the borrower's credit history risk factors and is

12   indicative of whether a borrower is likely to default on a loan.  Some of

13   the factors used to calculate credit scores are a borrower's incidents of

14   previous delinquency, the number of credit accounts a borrower has, the

15   amount of available credit that a borrower has utilized, the source of a

16   borrower's existing credit, and recent attempts by a borrower to obtain

17   additional credit.   Applicants who have higher credit scores will, as a

18   group, have fewer defaults than those who have lower credit scores.  The

19   minimum credit score allowed by the Originator non-conforming loan

20   guidelines for these loans is 620 and the average is typically over 700.

21   For American Home Alt-A products, the minimum credit score is

22   generally 580.  If the borrowers do not have a credit score they must have

23   an alternative credit history showing at least three trade lines with no

24   payments over 60 days past due in the last 12 months.

25

26   In addition to reviewing the borrower's credit history and credit score,

27   the Originator underwriters closely review the borrower's housing

28   payment history.   In general, for non-conforming loans the borrower

- 119 -                    FIRST AMENDED COMPLAINT

1    should not have made any mortgage payments over thirty days after the
2    due date for the most recent twelve months.  In general, for Alt-A loans
3    the borrower may have no more than one payment that was made over
4    thirty days after the due date for the most recent twelve months.
5  AHMA 2007-3 Prospectus Supplement at S-52.
6        333.   The AHMA 2007-3 Prospectus Supplement represented:
7    The Originator underwrites a borrower's creditworthiness based solely on
8    information that the Originator believes is indicative of the applicant's
9    willingness and ability to pay the debt they would be incurring.
10  AHMA 2007-3 Prospectus Supplement at S-52.
11        334.   The FFMLT 2005-FFH4 Prospectus Supplement represented:
12    All of the Mortgage Loans were originated or acquired by the Originator,
13    generally in accordance with the underwriting criteria described herein.
14    . . .
15    The Originator's underwriting standards are primarily intended to assess
16    the ability and willingness of the borrower to repay the debt and to
17    evaluate the adequacy of the mortgaged property as collateral for the
18    mortgage loan. . . .  The Originator considers, among other things, a
19    mortgagor's credit history, repayment ability and debt service-to-income
20    ratio ("Debt Ratio"), as well as the value, type and use of the mortgage
21    property.
22  FFMLT 2005-FFH4 Prospectus Supplement at S-54.
23        335.   The FFMLT 2005-FFH4 Prospectus Supplement represented:
24    All of the Mortgage Loans were underwritten by the Originator's
25    underwriters having the appropriate signature authority.   Each
26    underwriter is granted a level of authority commensurate with their
27    proven judgment, maturity and credit skills. On a case by case basis, the
28    Originator may determine that, based upon compensating factors, a

FIRST AMENDED COMPLAINT

1     prospective mortgagor not strictly qualifying under the underwriting risk

2     category guidelines described below warrants an underwriting exception.

3     Compensating factors may include, but are not limited to, low loan-to-

4     value ratio, low Debt Ratio, substantial liquid assets, good credit history,

5     stable employment and time in residence at the applicant's current

6     address.  It is expected that a substantial portion of the Mortgage Loans

7     may represent such underwriting exceptions.

8   FFMLT 2005-FFH4 Prospectus Supplement at S-56.

9     336.   The HVMLT 2007-5 Prospectus Supplement represented:

10     The mortgage loans have been purchased or originated, underwritten and

11     documented in accordance with the guidelines of Fannie Mae, Freddie

12     Mac, the Federal Housing Administration (FHA), the U.S. Department

13     of Veterans Affairs (VA), the U.S. Department of Agriculture

14     Guaranteed Rural Housing Program (GRH), Ginnie Mae, the

15     underwriting guidelines of specific private investors, and the non-

16     conforming or Alt-A underwriting guidelines established by American

17     Home.

18   HVMLT 2007-5 Prospectus Supplement at S-29; HarborView 2007-2 Prospectus

19   Supplement at S-33.

20     337.   The HVMLT 2007-5 Prospectus Supplement represented:

21     American Home's underwriting philosophy is to weigh all risk factors

22     inherent in the loan file, giving consideration to the individual

23     transaction, borrower profile, the level of documentation provided and

24     the property used to collateralize the debt.  These standards are applied in

25     accordance with applicable federal and state laws and regulations.

26     Exceptions to the underwriting standards may be permitted where

27     compensating factors are present. . . .  Because each loan is different,

28

1     American Home expects and encourages underwriters to use professional
2     judgment based on their experience in making a lending decision.
3  HVMLT 2007-5 Prospectus Supplement at S-29-30; HVMLT 2007-2 Prospectus
4  Supplement at S-33.
5     338.   The HVMLT 2007-5 Prospectus Supplement represented:
6     American Home underwrites a borrower's creditworthiness based solely
7     on information that American Home believes is indicative of the
8     applicant's willingness and ability to pay the debt they would be incurring.
9  HVMLT 2007-5 Prospectus Supplement at S-30; HVMLT 2007-2 Prospectus
10 Supplement at S-33.
11    339.   The HVMLT 2007-4 Prospectus Supplement represented the following
12 with respect to originator Paul Financial:
13    An applicant's creditworthiness is determined based on the borrower's
14    ability and willingness to repay the loan.  The loan decision is based upon
15    the applicant's financial information, employment and income stability,
16    credit history and collateral value.
17 HVMLT 2007-4 Prospectus Supplement at S-34; HVMLT 2007-2 Prospectus
18 Supplement at S-35.
19    340.   The HVMLT 2007-5 Prospectus Supplement represented:
20    American Home realizes that there may be some acceptable quality loans
21    that fall outside published guidelines and encourages "common sense"
22    underwriting.  Because a multitude of factors are involved in a loan
23    transaction, no set of guidelines can contemplate every potential
24    situation.  Therefore, each case is weighed individually on its own merits
25    and exceptions to American Home's underwriting guidelines are allowed
26    if sufficient compensating factors exist to offset any additional risk due to
27    the exception.
28

- 122 -                    FIRST AMENDED COMPLAINT

HVMLT 2007-5 Prospectus Supplement at S-31; HVMLT 2007-2 Prospectus Supplement at S-35.

341.   The HVMLT 2007-4 Prospectus Supplement stated:

Paul Financial's underwriting guidelines are applied to evaluate the applicant, the property and the applicant's income, employment and credit history in the context of the loan program and documentation requirements.  These are guidelines only and each loan is evaluated based upon its own merits.  Exceptions to the guidelines may be acceptable if there are compensating factors.

HVMLT 2007-4 Prospectus Supplement at S-34; HVMLT 2007-2 Prospectus Supplement at S-35.

342.   The HVMLT 2007-4 Prospectus Supplement represented:

Paul Financial's underwriting standards are applied by or on behalf of Paul Financial to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  Except under the No Income programs, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.

HVMLT 2007-4 Prospectus Supplement at S-35; HVMLT 2007-2 Prospectus Supplement at S-36.

343.   The HVMLT 2007-1 Prospectus Supplement represented:

Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's

- 123 -

1        monthly housing expenses of up to 33% and a debt-to-income ratio

2        based on the borrower's total monthly debt of up to 38%.

3  HVMLT 2007-1 Prospectus Supplement at S-32; HVMLT 2006-12 Prospectus

4  Supplement at S-70; HVMLT 2006-11 Prospectus Supplement at S-36; HVMLT 2006-

5  9 Prospectus Supplement at S-65.

6        344.   The HVMLT 2007-1 Prospectus Supplement represented:

7        As part of its evaluation of potential borrowers, Countrywide Home

8        Loans generally requires a description of income.  If required by its

9        underwriting guidelines, Countrywide Home Loans obtains employment

10       verification providing current and historical income information and/or a

11       telephonic employment confirmation.  Such employment verification

12       may be obtained, either through analysis of the prospective borrower's

13       recent pay stub and/or W-2 forms for the most recent two years, relevant

14       portions of the most recent two years' tax returns, or from the

15       prospective borrower's employer, wherein the employer reports the

16       length of employment and current salary with that organization.  Self-

17       employed prospective borrowers generally are required to submit relevant

18       portions of their federal tax returns for the past two years.

19  HVMLT 2007-1 Prospectus Supplement at S-29-30; HVMLT 2006-12 Prospectus

20  Supplement at S-68; HVMLT 2006-11 Prospectus Supplement at S-34; HVMLT 2006-

21  9 Prospectus Supplement at S-63.

22        345.   The HVMLT 2006-10 Prospectus Supplement represented:

23        In determining whether a prospective borrower has sufficient monthly

24       income available to meet the monthly housing expenses and other

25       financial obligations on the proposed mortgage loan, BankUnited

26       generally considers, when required by the applicable documentation type,

27       the ratio of such amounts to the proposed borrower's acceptable stable

28       monthly gross income.  Such ratio varies depending on a number of

underwriting criteria, including loan-to-value ratios, and is determined on a loan-by-loan basis.    Under its One Month MTA Guidelines, BankUnited generally permits a debt-to-income ratio based on the borrower's total monthly debt of 42%.    Higher debt-to-income ratios may also be acceptable with evidence of specific compensating factors.

HVMLT 2006-10 Prospectus Supplement at S-64; HVMLT 2006-14 Prospectus Supplement at S-66.

346.    The HVMLT 2006-10 Prospectus Supplement represented:  "Such underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  Exceptions to the underwriting standards are permitted where compensating factors are present."  HarborView 2006-10 Prospectus Supplement at S-63 (representing BankUnited's underwriting guidelines); HarborView 2006-14 Prospectus Supplement at S-65.

347.    The HVMLT 2006-8 Prospectus Supplement stated:  "BankUnited has represented to the depositor that the mortgage loans were originated generally in accordance with such [underwriting] policies."  HarborView 2006-8 Prospectus Supplement at S-60.

348.    The HVMLT 2006-8 Prospectus Supplement represented:

Such underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.    Exceptions to the underwriting standards are permitted where compensating factors are present.

Generally, each borrower will have been required to complete an application designed to provide pertinent credit information concerning the borrower.  The borrower will have given information with respect to

FIRST AMENDED COMPLAINT

1   its assets, liabilities, income (except as described below), credit history,

2   employment history and personal information, and will have furnished

3   the lender with authorization to obtain a credit report that summarizes

4   the borrower's credit history.

5 HVMLT 2006-8 Prospectus Supplement at S-60.

6   349. The HVMLT 2006-8 Prospectus Supplement represented:

7   In determining whether a prospective borrower has sufficient monthly

8   income available (i) to meet the borrower's monthly obligation on their

9   proposed mortgage loan and (ii) to meet the monthly housing expenses

10   and other financial obligations on the proposed mortgage loan,

11   BankUnited generally considers, when required by the applicable

12   documentation type, the ratio of such amounts to the proposed

13   borrower's acceptable stable monthly gross income.  Such ratios vary

14   depending on a number underwriting criteria, including loan-to-value

15   ratios, and are determined on a loan-by-loan basis.

16 HVMLT 2006-8 Prospectus Supplement at S-60-61.

17   350. The INDX 2006-AR35 Prospectus Supplement represented:

18   Mortgage loans that are acquired by IndyMac Bank are underwritten by

19   IndyMac Bank according to IndyMac Bank's underwriting guidelines,

20   which also accept mortgage loans meeting Fannie Mae or Freddie Mac

21   guidelines regardless of whether such mortgage loans would otherwise

22   meet IndyMac Bank's guidelines, or pursuant to an exception to those

23   guidelines based on IndyMac Bank's procedures for approving such

24   exceptions.  Conventional mortgage loans are loans that are not insured

25   by the FHA or partially guaranteed by the VA.  Conforming mortgage

26   loans are loans that qualify for sale to Fannie Mae and Freddie Mac,

27   whereas non-conforming mortgage loans are loans that do not so qualify.

28   Non-conforming mortgage loans originated or purchased by IndyMac

1    Bank pursuant to its underwriting programs typically differ from

2    conforming loans primarily with respect to loan-to-value ratios, borrower

3    income, required documentation, interest rates, borrower occupancy of

4    the mortgaged property and/or property types.  To the extent that these

5    programs reflect underwriting standards different from those of Fannie

6    Mae and Freddie Mac, the performance of loans made pursuant to these

7    different underwriting standards may reflect higher delinquency rates

8    and/or credit losses.

9  INDX 2006-AR35 Prospectus Supplement at S-67; *see* INDX 2006-AR35 Registration

10  Statement, Feb. 24, 2006, at S-28.

11    351.   The INDX 2006-AR35 Prospectus Supplement represented:

12    IndyMac Bank has two principal underwriting methods designed to be

13    responsive to the needs of its mortgage loan customers:  traditional

14    underwriting and e-MITS (Electronic Mortgage Information and

15    Transaction System) underwriting.  E-MITS is an automated, internet-

16    based underwriting and risk-based pricing system.  IndyMac Bank

17    believes that e-MITS generally enables it to estimate expected credit loss,

18    interest rate risk and prepayment risk more objectively than traditional

19    underwriting and also provides consistent underwriting decisions.

20    IndyMac Bank has procedures to override an e-MITS decision to allow

21    for compensating factors.

22  INDX 2006-AR35 Prospectus Supplement at S-67; *see* INDX 2006-AR35 Registration

23  Statement, Feb. 24, 2006, at S-28.

24    352.   The INDX 2006-AR35 Prospectus Supplement represented:

25    Underwriting procedures vary by channel of origination.  Generally,

26    mortgage loans originated through the mortgage professional channel will

27    be submitted to e-MITS for assessment and subjected to a full credit

28    review and analysis.  Mortgage loans that do not meet IndyMac Bank's

1         guidelines may be manually re-underwritten and approved under an

2         exception to those underwriting guidelines.  Mortgage loans originated

3         through the consumer direct channel are subjected to essentially the same

4         procedures, modified as necessary to reflect the fact that no third-party

5         contributes to the preparation of the credit file.

6 INDX 2006-AR35 Prospectus Supplement at S-69; *see* INDX 2006-AR35 Registration

7 Statement, Feb. 24, 2006, at S-30.

8         353.   The INDX 2006-AR35 Prospectus Supplement represented:

9         Exceptions to underwriting standards are permitted in situations in which

10         compensating factors exist.  Examples of these factors are significant

11         financial reserves, a low loan-to-value ratio, significant decrease in the

12         borrower's monthly payment and long-term employment with the same

13         employer.

14 INDX 2006-AR35 Prospectus Supplement at S-69; INDX 2006-AR35 Registration

15 Statement, Feb. 24, 2006, at S-31.

16         354.   The INDX 2006-AR35 Prospectus Supplement represented:

17         Additionally, maximum total monthly debt payments-to-income ratios

18         and cash-out limits may be applied.  Other factors may be considered in

19         determining loan eligibility such as a borrower's residency and

20         immigration status, whether a non-occupying borrower will be included

21         for qualification purposes, sales or financing concessions included in any

22         purchase contract, the acquisition cost of the property in the case of a

23         refinance transaction, the number of properties owned by the borrower,

24         the type and amount of any subordinate mortgage, the amount of any

25         increase in the borrower's monthly mortgage payment compared to

26         previous mortgage or rent payments and the amount of disposable

27         monthly income after payment of all monthly expenses.

28

FIRST AMENDED COMPLAINT

1    INDX 2006-AR35 Prospectus Supplement at S-68; INDX 2006-AR35 Registration

2    Statement, Feb. 24, 2006, at S-30.

3          355.   The INDX 2006-AR35 Prospectus Supplement stated:

4          IndyMac Bank's underwriting criteria for traditionally underwritten

5          mortgage loans includes an analysis of the borrower's credit history,

6          ability to repay the mortgage loan and the adequacy of the mortgaged

7          property as collateral.   Traditional underwriting decisions are made by

8          individuals authorized to consider compensating factors that would allow

9          mortgage loans not otherwise meeting IndyMac Bank's guidelines.

10   INDX 2006-AR35 Prospectus Supplement at S-67; *see* INDX 2006-AR35 Registration

11   Statement, Feb. 24, 2006, at S-28.

12         356.   The LUM 2007-1 Prospectus Supplement represented:

13         The mortgage loans have been originated generally in accordance with

14         the following underwriting standards established by WMMSC or

15         underwriting guidelines established by WaMu.

16   LUM 2007-1 Prospectus Supplement at S-32.

17         357.   The LUM 2007-1 Prospectus Supplement represented:

18         Each mortgage loan has been underwritten under one of the following

19         documentation programs.   Under a full/alternative documentation

20         program, a borrower's employment and income are verified.   The

21         employment and income as stated in the prospective borrower's loan

22         application are verified either directly with the borrower's stated

23         employer(s) or through receipt of alternative documentation such as the

24         borrower's recent pay stub(s) and/or W-2 form(s) reflecting a minimum

25         of 12 months of employment and income or, in the case of self-

26         employed borrowers or borrowers who derive a substantial portion of

27         their income from commissions, receipt of the borrower's personal (and,

28         if applicable, business) tax returns.   For self-employed borrowers, profit

---

FIRST AMENDED COMPLAINT

1   and loss statements may also be required.   Generally, under a

2   full/alternative documentation program, the borrower's stated assets are

3   also verified either directly with the stated financial institution holding the

4   stated asset or through receipt of alternative documentation such as the

5   borrower's recent bank and/or brokerage statement(s). In addition, the

6   borrower's employment may be verified with the employer by telephone

7   or by other independent means.

8   LUM 2007-1 Prospectus Supplement at S-33-34.

9        358.   The LUM 2007-1 Prospectus Supplement represented: "Mortgage loans

10  that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to

11  IndyMac Bank's underwriting guidelines…"  LUM 2007-1 Prospectus Supplement at

12  S-36.

13       359.   The LUM 2007-1 Prospectus Supplement represented:

14  Exceptions to underwriting standards described above may be made on a

15  case-by-case basis if compensating factors are present.   In those cases,

16  the basis for the exception is documented.   Compensating factors may

17  include, but are not limited to, low loan-to-value ratio, low debt-to-

18  income ratio, good credit standing, the availability of other liquid assets,

19  stable employment and time in residence at the prospective borrower's

20  current address.

21  LUM 2007-1 Prospectus Supplement at S-34.

22       360.   The LUM 2007-1 Prospectus Supplement represented:

23  Exceptions to underwriting standards are permitted in situations in which

24  compensating factors exist.   Examples of these factors are significant

25  financial reserves, a low loan-to-value ratio, significant decrease in the

26  borrower's monthly payment and long-term employment with the same

27  employer.

28  LUM 2007-1 Prospectus Supplement at S-39.

- 130 -

1           361.   The LUM 2007-1 Prospectus Supplement represented:

2           Under all documentation programs other than the no ratio programs and

3           the no documentation programs, in evaluating a prospective borrower's

4           ability to repay a mortgage loan, the loan underwriter considers the ratio

5           of the borrower's mortgage payments, real property taxes and other

6           monthly housing expenses to the borrower's gross income (referred to as

7           the "housing-to-income ratio" or "front end ratio"), and the ratio of the

8           borrower's total monthly debt (including certain non-housing expenses)

9           to the borrower's gross income (referred to as the "debt-to-income ratio"

10          or "back end ratio").   The maximum acceptable ratios may vary

11          depending on other loan factors, such as loan amount and loan purpose,

12          loan-to-value ratio, credit score and the availability of other liquid assets.

13          Exceptions to the ratio guidelines may be made when compensating

14          factors are present.

15  LUM 2007-1 Prospectus Supplement at S-33.

16           362.   The LUM 2007-1 Prospectus Supplement represented:

17           Additionally, maximum total monthly debt payments-to-income ratios

18           and cash-out limits may be applied.  Other factors may be considered in

19           determining loan eligibility such as a borrower's residency and

20           immigration status, whether a non-occupying borrower will be included

21           for qualification purposes, sales or financing concessions included in any

22           purchase contract, the acquisition cost of the property in the case of a

23           refinance transaction, the number of properties owned by the borrower,

24           the type and amount of any subordinate mortgage the amount of any

25           increase in the borrower's monthly mortgage payment compared to

26           previous mortgage or rent payments and the amount of disposable

27           monthly income after payment of all monthly expenses.

28  LUM 2007-1 Prospectus Supplement at S-38.

363.   The LUM 2007-1 Prospectus Supplement represented:

Such underwriting standards or guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Some mortgage loans are manually underwritten, in which case an underwriter reviews a loan application and supporting documentation, if required, and a credit report of the borrower, and based on that review determines whether to originate a loan in the amount and with the terms stated in the loan application.  Some mortgage loans may be underwritten through an automated underwriting system, including WaMu's automated underwriting system, described below.

LUM 2007-1 Prospectus Supplement at S-32.

364.   The LUM 2007-1 Prospectus Supplement represented:

IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral.   Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac Bank's guidelines.

LUM 2007-1 Prospectus Supplement at S-36.

365.   The MHL 2006-1 Prospectus Supplement represented:

MortgageIT's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt.  Because each loan is different, MortgageIT expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.

MHL 2006-1 Prospectus Supplement at S-64.

366.   The MHL 2006-1 Prospectus Supplement represented:

MortgageIT realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting.  Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation.  Therefore, exceptions to these underwriting guidelines are considered, so long as the borrower has other reasonable compensating factors, on a case-by-case basis.

MHL 2006-1 Prospectus Supplement at S-66.

367.   The MHL 2006-1 Prospectus Supplement represented:

In order to determine if a borrower qualifies for a Pay Option ARM or Alt-A loan, MortgageIT underwriting staff or contract underwriters provided by certain mortgage insurance companies have manually underwritten and approved such loans.  For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis.  Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period.  In addition to the monthly housing expense the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense.  When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan.  For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

FIRST AMENDED COMPLAINT

MHL 2006-1 Prospectus Supplement at S-65-66.

368.   The MHL 2006-1 Prospectus Supplement represented:

MortgageIT underwrites a borrower's creditworthiness based solely on information that MortgageIT believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

MHL 2006-1 Prospectus Supplement at S-64.

369.   The MHL 2006-1 Prospectus Supplement represented:

In addition to reviewing the borrower's credit history and credit score, MortgageIT underwriters closely review the borrower's housing payment history.  In general, for non-conforming loans the borrower should not have made any mortgage payments over 30 days after the due date for the most recent 24 months.  In general, for Pay Option ARM and Alt-A loans the borrower may have no more than one payment that was made over 30 days after the due date for the most recent 24 months.

MHL 2006-1 Prospectus Supplement at S-65.

370.   The SVHE 2005-OPT4 Prospectus Supplement represented:  The Mortgage Loans will have been originated generally in accordance with Option One's Guidelines (the 'Option One Underwriting Guidelines')."  SVHE 2005-OPT4 Prospectus Supplement at S-54.

371.   The SVHE 2005-OPT4 Prospectus Supplement represented:  "On a case-by-case basis, exceptions to the Option One Underwriting Guidelines are made where compensating factors exist."  SVHE 2005-OPT4 Prospectus Supplement at S-54.

372.   The SVHE 2005-OPT4 Prospectus Supplement represented:

Option One Underwriting Guidelines require a reasonable determination of an applicant's ability to repay the loan.  Such determination is based on a review of the applicant's source of income, calculation of a debt

service-to-income ratio based on the amount of income from sources indicated on the loan application or similar documentation, a review of the applicant's credit history and the type and intended use of the property being financed.

SVHE 2005-OPT4 Prospectus Supplement at S-55.

373.    The SVHE 2005-OPT4 Prospectus Supplement represented:

The Option One Underwriting Guidelines are primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan.

SVHE 2005-OPT4 Prospectus Supplement at S-54.

374.    The WMLT 2006-ALT1 Prospectus Supplement represented:

National City Mortgage's underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.    These standards are applied in accordance with the applicable federal and state laws and regulations.    Exceptions to the underwriting standards are permitted where compensating factors are present.

WMLT 2006-ALT1 Prospectus Supplement at S-34.

375.    The WMLT 2006-ALT1 Prospectus Supplement represented:

In determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligation on the proposed mortgage loan, the originator generally considers, when required by the applicable documentation program, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income.    Such ratios vary

1     depending on a number of underwriting criteria, including loan-to-value

2     ratios, and are determined on a loan-by-loan basis.

3  WMLT 2006-ALT1 Prospectus Supplement at S-35.

4     376.   The NHELI 2007-1 Prospectus Supplement represented FNBN's

5  reduced documentation underwriting guidelines as the following:

6     Under the stated income documentation and the no ratio programs, more

7     emphasis is placed on a prospective borrower's credit score and on the

8     value and adequacy of the Mortgaged Property as collateral and other

9     assets of the prospective borrower rather than on income underwriting.

10    The stated income documentation program requires prospective

11    borrowers to provide information regarding their assets and income.

12    Information regarding assets is verified through written communications

13    or bank statements.  Information regarding income is not verified.  The

14    no ratio program requires prospective borrowers to provide information

15    regarding their assets, which is then verified through written

16    communications or bank statements.  The no ratio program does not

17    require prospective borrowers to provide information regarding their

18    income.   In both the stated income and no ratio programs, the

19    employment history is verified through written or telephonic

20    communication.

21  NHELI 2007-1 Prospectus Supplement at S-106; NAA 2006-AR4 Prospectus

22  Supplement at S-50.

23    377.   The AHMA 2007-3 Prospectus Supplement represented:

24    Certain non-conforming stated income or stated asset products allow for

25    less verification documentation than Fannie Mae or Freddie Mac require.

26    Certain non-conforming Alt-A products also allow for less verification

27    documentation than Fannie Mae or Freddie Mac require.  For these Alt-

28    A products the borrower may not be required to verify employment

- 136 -                    FIRST AMENDED COMPLAINT

income, assets required to close or both.  For some other Alt-A products the borrower is not required to provide any information regarding employment income, assets required to close or both.  Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements.

AHMA 2007-3 Prospectus Supplement at S-52; HVMLT 2007-5 Prospectus Supplement at S-30; HVMLT 2007-2 Prospectus Supplement at S-33.

378.   The HVMLT 2006-8 Prospectus Supplement represented:

Under the Stated Income Verified Asset Documentation type, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the assets are consistent with the borrower's income.

HVMLT 2006-8 Prospectus Supplement at S-61.

379.   The HVMLT 2006-14 Prospectus Supplement represented:

Under the Stated Income Verified Asset Documentation type, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the assets are consistent with the borrower's income.  BankUnited obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment.

HVMLT 2006-14 Prospectus Supplement at S-66; HVMLT 2006-10 Prospectus Supplement at S-64.

380.   The HVMLT 2006-14 Prospectus Supplement represented:

Under the Stated Income Documentation Program and the No Ratio Program, more emphasis is placed on the prospective borrower's credit score and on the value and adequacy of the mortgaged property as collateral and other assets of the prospective borrower than on income

FIRST AMENDED COMPLAINT

1    underwriting.   The Stated Income Documentation Program requires
2    prospective borrowers to provide information regarding their assets and
3    income.   Information regarding assets is verified through written
4    communications.  Information regarding income is not verified.  The No
5    Ratio Program requires prospective borrowers to provide information
6    regarding their assets, which is then verified through written
7    communications.  The No Ratio Program does not require prospective
8    borrowers to provide information regarding their income.  Employment
9    is orally verified under both programs.

10   HVMLT 2006-14 Prospectus Supplement at S-70.

11       381.   The HVMLT 2007-1 Prospectus Supplement represented:

12   Under the Reduced Documentation Program, some underwriting
13   documentation concerning income, employment and asset verification is
14   waived. Countrywide Home Loans obtains from a prospective borrower
15   either a verification of deposit or bank statements for the two-month
16   period immediately before the date of the mortgage loan application or
17   verbal verification of employment.   Since information relating to a
18   prospective borrower's income and employment is not verified, the
19   borrower's debt-to-income ratios are calculated based on the information
20   provided by the borrower in the mortgage loan application.   The
21   maximum Loan-to-Value Ratio ranges up to 95%.

22   HVMLT 2007-1 Prospectus Supplement at S-32; HVMLT 2006-12 Prospectus
23   Supplement at S-70; HVMLT 2006-11 Prospectus Supplement at S-37; HVMLT 2006-
24   9 Prospectus Supplement at S-66.

25       382.   The HVMLT 2007-4 Prospectus Supplement represented:

26   Under the Reduced Documentation program, the mortgage loan
27   application is reviewed to determine that the stated income is reasonable
28   for the borrower's employment.   Generally, employment is verified by

- 138 -                          FIRST AMENDED COMPLAINT

1          verbal verification.  Paul Financial obtains from a prospective borrower

2          either a verification of deposit or bank statements for a two-month

3          period within 120 days of the date of the mortgage loan application or

4          verbal verification of employment.   Since information relating to a

5          prospective borrower's income is not verified, the borrower's debt-to-

6          income ratios are calculated based on the information provided by the

7          borrower in the mortgage loan application.

8 HVMLT 2007-4 Prospectus Supplement at S-36.

9         383.   The INDX 2006-AR35 Prospectus Supplement represented:

10          The Stated Income Documentation Program requires prospective

11          borrowers to provide information regarding their assets and income.

12          Information regarding a borrower's assets, if applicable, is verified

13          through written communications.  Information regarding income is not

14          verified and employment verification may not be written.

15 INDX 2006-AR35 Prospectus Supplement at S-68; *see* INDX 2006-AR35 Registration

16 Statement, Feb. 24, 2006, at S-29.

17         384.   The MHL 2006-1 Prospectus Supplement represented:

18          Generally, under a "stated income/verified assets" program, no

19          verification of a mortgagor's income is undertaken by the origination;

20          however, verification of the mortgagor's assets is obtained.

21 MHL 2006-1 Prospectus Supplement at S-65.

22         385.   The MHL 2006-1 Prospectus Supplement represented:

23          Generally, under both "full/alternative" documentation programs, at

24          least one month of income documentation is provided.   This

25          documentation is also required to include year-to-date income or prior

26          year income in case the former is not sufficient to establish consistent

27          income.

28 MHL 2006-1 Prospectus Supplement at S-65.

FIRST AMENDED COMPLAINT

386.   The MHL 2006-1 Prospectus Supplement represented:

The Pay Option ARM and Alt-A mortgage loans are generally documented to the requirements of Fannie Mae and Freddie Mac in that the borrower provides the same information on the loan application along with documentation to verify the accuracy of the information on the application such as income, assets, other liabilities, etc.  Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require. Certain Pay Option ARM and Alt-A products also allow for less verification documentation than Fannie Mae or Freddie Mac requires. For these Pay Option ARM and Alt-A products, the borrower may not be required to verify employment income, assets required to close or both.  For some other Pay Option ARM and Alt-A products the borrower is not required to provide any information regarding employment income, assets required to close or both.  Pay Option ARM and Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements.

MHL 2006-1 Prospectus Supplement at S-65.

387.   The WMLT 2006-ALT1 Prospectus Supplement represented:

*Stated Documentation.*   Under a stated income documentation program, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on a verified income of the borrower.  Although the income is not verified, the originators obtain a telephonic verification of the borrower's employment without reference to income.  Employment stability is a critical component in evaluating the borrower's continuing ability to meet obligations.  Borrower's assets may or may not be verified.

FIRST AMENDED COMPLAINT

1   WMLT 2006-ALT1 Prospectus Supplement at S-36.

2      388.   UNTRUE STATEMENTS AND OMITTED INFORMATION:  The
3   preceding statements were material at the time they were made, because the quality of
4   the loans in the mortgage pool directly affects the riskiness of the RMBS investment,
5   and the quality of the loans is dependent upon the underwriting process employed.
6   The preceding statements were untrue at the time they were made because, as alleged
7   herein, the Originators did not adhere to the stated underwriting guidelines, did not
8   effectively evaluate the borrowers' ability or likelihood to repay the loans, did not
9   properly evaluate whether the borrower's debt-to-income ratio supported a conclusion
10   that the borrower had the means to meet his/her monthly obligations, and did not
11   ensure that adequate compensating factors justified the granting of exceptions to
12   guidelines.  Rather, as alleged herein, the Originators systematically disregarded the
13   stated underwriting guidelines in order to increase the volume of mortgages originated
14   (*see supra* Section VII.D).  Further evidence of this fact is found in, among other things,
15   the surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5), the
16   rate at which actual losses outpaced expected losses within the first year after the
17   offerings (*see supra* Figure 2), the collapse of the credit ratings (*see supra* Table 4), and
18   the fact that the Originators were engaged in high OTD lending (*see supra* Table 6).

19      **E.      Untrue Statements Concerning Loan-to-Value Ratios**

20      389.   The AHMA 2007-3 Prospectus Supplement represented:

21      The Originator sets various maximum loan-to-value ratios based on the
22      loan amount, property type, loan purpose and occupancy of the subject
23      property securing the loan.  In general, the Originator requires lower
24      loan-to-value ratios for those loans that are perceived to have a higher
25      risk, such as high loan amounts, loans in which additional cash is being
26      taken out on a refinance transaction or loans on second homes.  A lower
27      loan-to-value ratio requires a borrower to have more equity in the

28

FIRST AMENDED COMPLAINT

1   property which is a significant additional incentive to the borrower to

2   avoid default on the loan.

3   AHMA 2007-3 Prospectus Supplement at S-53.

4   390.   The INDX 2006-AR35 Prospectus Supplement represented: "Maximum

5   loan-to-value and combined loan-to-value ratios and loan amounts are established

6   according to the occupancy type, loan purpose, property type, FICO Credit Score,

7   number of previous late mortgage payments and the age of any bankruptcy or

8   foreclosure actions."  INDX 2006-AR35 Prospectus Supplement at S-68; *see* INDX

9   2006-AR35 Registration Statement, Feb. 24, 2006, at S-30.

10   391.   The LUM 2007-1 Prospectus Supplement represented: "Maximum loan-

11   to-value and combined loan-to-value ratios and loan amounts are established

12   according to the occupancy type, loan purpose, property type, FICO Credit Score,

13   number of previous late mortgage payments and the age of any bankruptcy or

14   foreclosure actions."  LUM 2007-1 Prospectus Supplement at S-38.

15   392.   The MHL 2006-1 Prospectus Supplement represented:

16   The appraiser's value conclusion is used to calculate the ratio (loan-to-

17   value) of the loan amount to the value of the property.  For loans made

18   to purchase a property this ratio is based on the lower of the sales price

19   of the property and the appraised value.   MortgageIT sets various

20   maximum loan-to-value ratios based on the loan amount, property type,

21   loan purpose and occupancy of the subject property securing the loan.

22   In general, MortgageIT requires lower loan-to-value ratios for those loans

23   that are perceived to have a higher risk, such as high loan amounts, loans

24   in which additional cash is being taken out on a refinance transaction or

25   loans on second homes. A lower loan-to-value ratio requires a borrower

26   to have more equity in the property, which is a significant additional

27   incentive to the borrower to avoid default on the loan.  In addition, for

28   all conventional loans in which the loan-to-value ratio exceeds 80%,

FIRST AMENDED COMPLAINT

1         MortgageIT requires that a private mortgage insurance company that is

2         approved by Fannie Mae and Freddie Mac insure the loan.  Higher loan-

3         to-value ratios require higher coverage levels.

4  MHL 2006-1 Prospectus Supplement at S-64-65.

5         393.   The SVHE 2005-OPT4 Prospectus Supplement represented:

6         Option One recognizes that an appraised value is an opinion and thus,

7         allows for variances to the appraisal based on a review of such appraisal,

8         the loan-to-value ratio ("LTV") and other risk factors.  The maximum

9         variance between the appraisal and a review of the appraisal is limited to

10         (i) 10% for LTVs that are less than or equal to 85%, (ii) 5% for LTVs

11         between 85.01% and 95%, and (iii) 3% for LTVs over 95%.

12  SVHE 2005-OPT4 Prospectus Supplement at S-55.

13         394.   UNTRUE STATEMENTS AND OMITTED INFORMATION:  The

14  preceding statements were material at the time they were made because the riskiness of

15  the RMBS investment is directly dependent on the quality of the underwriting process

16  and adequate assessment and limits on loan-to-value ratios (in addition to accurate

17  appraisals) is key to that process.  The preceding statements were untrue at the time

18  they were made because the Originators did not adhere to the maximum loan-to-value

19  ratios as represented in the offering document, encouraged inflated appraisals and

20  frequently granted loans with high loan-to-value ratios with no meaningful assessment

21  of the borrower's ability to repay the loan based on the borrower's credit profile (*see*

22  *supra* Section VII.D).  Further evidence of this fact is found in, among other things, the

23  surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5), the

24  huge discrepancy between expected and actual losses (*see supra* Figure 2), the collapse

25  of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged

26  in high OTD lending (*see supra* Table 6).

27

28

FIRST AMENDED COMPLAINT

**F.      Untrue Statements Concerning Credit Enhancement**

395.    With regard to credit enhancement, the NHELI 2007-1 Prospectus Supplement represented:

The credit enhancement features described in this prospectus supplement are intended to enhance the likelihood that holders of the Group I Senior Certificates and Group II Senior Certificates will receive regular distributions of interest and principal from amounts received or advanced on the related Mortgage Loans. However, we cannot assure you that the applicable credit enhancement will adequately cover any shortfalls in cash available to distribute to your certificates as a result of delinquencies or defaults on the related Mortgage Loans. If delinquencies or defaults occur on the related Mortgage Loans, neither the servicers nor any other entity will advance scheduled monthly payments of interest and principal on delinquent or defaulted Mortgage Loans if such advances are not likely to be recovered.

NHELI 2007-1 Prospectus Supplement at S-38.

396.    The AHMA 2007-3 Prospectus Supplement represented: "Any decrease in the value of the mortgage properties related to the mortgage loans may result in the allocation of losses which are not covered by credit enhancement to the offered certificates." AHMA 2007-3 Prospectus Supplement at S-24; *see* AHMA 2007-3 Registration Statement, Feb. 6, 2007, at S-16.

397.    The FFMLT 2005-FFH4 Prospectus Supplement represented:

The credit enhancement features described in the summary of this prospectus supplement are intended to enhance the likelihood that holders of the Class A Certificates, and to a limited extent, the holders of the Mezzanine Certificates and the Class B Certificates, will receive regular distributions of interest and principal.

FFMLT 2005-FFH4 Prospectus Supplement at S-16.

- 144 -

398.   The HVMLT 2006-8 Prospectus Supplement represented:

Subordination is designed to provide the holders of certificates with a higher payment priority with protection against losses realized when the remaining unpaid principal balance on a mortgage loan exceeds the amount of proceeds recovered upon the liquidation of that mortgage loan.

HVMLT 2006-8 Prospectus Supplement at S-10; HVMLT 2006-9 Prospectus Supplement at S-10; HVMLT 2006-10 Prospectus Supplement at S-10; HVMLT 2006-11 Prospectus Supplement at S-8; HVMLT 2006-12 Prospectus Supplement at S-10-11; HVMLT 2006-14 Prospectus Supplement at S-11; HVMLT 2007-1 Prospectus Supplement at S-9; HVMLT 2007-2 Prospectus Supplement at S-11; HVMLT 2007-4 Prospectus Supplement at S-11; HVMLT 2007-5 Prospectus Supplement at S-9.

399.   The INDX 2006-AR35 Prospectus Supplement represented:  "The subordination features of the issuing entity are intended to enhance the likelihood that senior certificate holders will receive regular payments of interest and principal, as applicable."  INDX 2006-AR35 Prospectus Supplement at S-25; *see* INDX 2006-AR35 Registration Statement, Feb. 24, 2006 at S-18.

400.   The LUM 2007-1 Prospectus Supplement represented:

Credit enhancement is intended to reduce the loss caused to holders of the certificates as a result of shortfalls in payments received and losses realized on the mortgage loans. The credit enhancement for each of the Class I and Class II offered certificates includes subordination, excess interest, overcollateralization and realized loss allocation with respect to the related group of mortgage loans.  In addition, substantially all of the mortgage loans with loan-to-value ratios equal to or greater than 75% are covered by one or more primary mortgage insurance policies that, subject to compliance with the terms of the policy, would cover a portion of any losses on a covered loan.

FIRST AMENDED COMPLAINT

LUM 2007-1 Prospectus Supplement at S-6.

401.   The SVHE 2005-OPT4 Prospectus Supplement represented:

The credit enhancement features described in this prospectus supplement are intended to enhance the likelihood that holders of the Class A Certificates and the Mezzanine Certificates, will receive regular distributions of interest and principal. However, we cannot assure you that the applicable credit enhancement will adequately cover any shortfalls in cash available to pay your certificates as a result of delinquencies or defaults on the Mortgage Loans. If delinquencies or defaults occur on the Mortgage Loans, neither the Servicer nor any other entity will advance scheduled monthly payments of interest and principal on delinquent or defaulted Mortgage Loans if such advances are not likely to be recovered.

SVHE 2005-OPT4 Prospectus Supplement at S-14.

402.   UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding  statements were material at the time they were made, because WesCorp nearly always purchased the highest rated tranches of the RMBS, and those highly-rated tranches relied on the credit enhancement, which purportedly afforded protection against financial loss. The preceding statements were untrue at the time they were made, because, due to the Originators' systematic disregard of underwriting standards, the mortgages in the pools were fatally impaired at the outset and destined to fail (*see supra* Section VII.D).  This rendered the protection allegedly afforded by the credit enhancement in the highest tranches illusory.  Further evidence of the Originators' pervasive disregard of underwriting standards is found in the surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5); the huge discrepancy between expected and actual losses (*see supra* Figure 2); the collapse of the

credit ratings (*see supra* Table 4); and the Originators' high OTD lending (*see supra* Table 6).

## IX.    THE CLAIMS ARE TIMELY

403.    For actions brought by the NCUA Board as Liquidating Agent, the FCUA extends the statute of limitations for at least three years from the date of the appointment of the NCUA Board as Conservator or Liquidating Agent.  *See* 12 U.S.C. § 1787(b)(14)(B)(i).

404.    The NCUA Board placed WesCorp into conservatorship and appointed itself as conservator on March 20, 2009.  On October 1, 2010, the NCUA Board placed WesCorp in liquidation and appointed itself Liquidating Agent.

405.    Actions brought under Sections 11 and 12(a)(2) of the Securities Act must be:

> brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence. . . .  In no event shall any such action be brought to enforce a liability created under section 77k or 77*l*(a)(1) of this title more than three years after the security was bona fide offered to the public, or under section 77*l*(a)(2) of this title more than three years after the sale.

15 U.S.C. § 77m.

406.    Actions brought under section 25501 of the California Corporate Securities Law of 1968, must be brought within "five years after the act or transaction constituting the violation or the expiration of two years after the discovery by the plaintiff of the facts constituting the violation, whichever shall first expire."  Cal. Corp. Code § 25506(b).

407.    As the Federal Reserve Board noted in November 2008, the "deteriorating lending standards" and "the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to

investors." Christopher Mayer *et al.*, *The Rise in Mortgage Defaults* at 15-16; *see also* FSOC
Risk Retention Report at 9.

408.   The FSOC explained that the origination and securitization process
contains inherent "information asymmetries" that put investors at a disadvantage
regarding critical information concerning the quality and performance of RMBS.  The
FSOC Risk Retention Report described the information disadvantage for investors of
RMBS:

> One important informational friction highlighted during the recent
> financial crisis has aspects of a "lemons" problem that exists between the
> issuer and investor. An originator has more information about the ability
> of a borrower to repay than an investor, because the originator is the
> party making the loan. Because the investor is several steps removed
> from the borrower, the investor may receive less robust loan
> performance information. Additionally, the large number of assets and
> the disclosures provided to investors may not include sufficient
> information on the quality of the underlying financial assets for investors
> to undertake full due diligence on each that backs the security.

FSOC Risk Retention Report at 9 (footnote omitted).

409.   Accordingly, WesCorp did not discover and could not have discovered
the material untrue statements and/or misleading omissions in the Offering
Documents more than one year prior to March 20, 2009, the date on which the
NCUA Board placed WesCorp into conservatorship.

410.   With respect to those RMBS purchases for which the NCUA Board
asserts claims under Section 11 of the Securities Act (Claims One through Seven), the
earliest date they were bona fide offered to the public was August 1, 2006, or not more
than three years prior to March 20, 2009.  Accordingly, the NCUA Board's Section 11
claims are not time-barred.

411.   With respect to those RMBS purchases for which the NCUA Board asserts claims under Section 12(a)(2) (Claims Eight through Thirteen), the earliest sale was August 1, 2006, or not more than three years prior to March 20, 2009. Accordingly, the NCUA Board's Section 12(a)(2) claims are not time-barred.

412.   With respect to those RMBS purchases for which the NCUA Board asserts claims under state law (Claim Fourteen), the earliest purchase date/offering date with respect to those claims was November 22, 2005, or not more than five years prior to March 20, 2009. Accordingly, the NCUA Board's state law claims are not time-barred.

## X.   NUMEROUS CLAIMS ARE INDEPENDENTLY TIMELY BY VIRTUE OF *AMERICAN PIPE*

413.   WesCorp and/or the NCUA Board as its Liquidating Agent are or were members of putative classes asserting claims on their behalf for certificates in the NAA 2006-AR4, HVMLT 2006-8, HVMLT 2006-9, HVMLT 2006-10, HVML 2006-11, HVMLT 2006-12, HVMLT 2006-14, HVMLT 2007-1, HVMLT 2007-2, HVMLT 2007-5, and INDX 2006-AR35 offerings.  Accordingly, the NCUA Board's claims relating to those offerings are subject to legal tolling of the statute of limitations and statute of repose under the doctrine announced in *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) ("*American Pipe*") and its progeny.  *See* Tables 11, 12 (attached as Appendix to Complaint).

414.   NAA 2006-AR4 offering:  *American Pipe* tolling applies to this offering from January 31, 2008 until January 20, 2011.  The Prospectus and Prospectus Supplement for this offering issued on November 17, 2006 and November 29, 2006, respectively.  On November 17, 2006, WesCorp purchased the A1B tranche of this offering from RBS.  The case which supplies this tolling is Complaint, *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No. 08-544 (Mass. Sup. Ct. filed January 31, 2008), *removed to* No. 08-10446 (D. Mass Mar. 18, 2008).  The named plaintiff, Plumbers' Union Local No. 12 Pension Fund, asserted Section 11 and

Section 12 claims against Nomura Asset Acceptance and RBS for misstatements and omissions in RMBS offering documents, such as the supposed compliance with stated underwriting guidelines.  The Pension Fund purported to represent a class of all individuals who purchased from several Nomura offerings issued between July 2005 and November 2006, including NAA 2006-AR4.  *See id.* ¶¶ 1, 12.  The Pension Fund did not disclose which certificates it purchased until November 24, 2008, when it disclosed that it had purchased certificates in the Alternative Loan Trust 2006-AF1 offering.  *Plumbers' Union*, Doc. 30-3 at 4 (D. Mass. Nov. 24, 2008); *see also id.* at 7 (Plumbers' & Pipefitters' Welfare Education Fund disclosing that it had purchased certificates from the Alternative Loan Trust 2006-AP1 offering).

415.  <u>HVMLT 2006-8 offering</u>:  *American Pipe* tolling applies to this offering from May 19, 2009 until July 18, 2011.  The Prospectus and Prospectus Supplement for this offering issued on August 10, 2006 and August 28, 2006, respectively.  On August 1, 2006, WesCorp purchased the 2A1C tranche of this offering from RBS.  The case which supplies this tolling is Consolidated First Amended Securities Class Action Complaint, *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, plc*, No. 08-5093 (S.D.N.Y. filed May 19, 2009).  The named plaintiff, New Jersey Carpenters Vacation Fund, asserted Section 11 and 12 claims against RBS and Greenwich Capital Acceptance for misstatements and omissions in RMBS offering documents, such as the supposed compliance with stated underwriting guidelines.  The Vacation Fund purported to assert claims on behalf of purchasers of certificates in the HVMLT 2006-8, HVMLT 2006-10, HVMLT 2006-11, HVMLT 2006-12, HVMLT 2006-14, HVMLT 2007-1, HVMLT 2007-2, and HVMLT 2007-5 offerings.  *See id.* ¶¶ 1, 34-35.  The Vacation Fund disclosed it had purchased a Class B1 certificate from HVMLT 2006-4, and another plaintiff – Boilermaker Blacksmith National Pension Trust – disclosed it had purchased a Class 2A1A certificate from HarborView 2007-7.  *See id.* ¶¶ 19-20.  On July 12, 2010 and July 30, 2010, the Midwest Operating Engineers Pension Fund ("Operating Engineers"), the Laborers' Pension Fund and Health and

FIRST AMENDED COMPLAINT

Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity ("Chicago Laborers"), and the Iowa Public Employees' Retirement System ("IPERS") moved to intervene and disclosed that they had purchased a Class 2A1A certificate in HVMLT 2006-10; a class 2A1A certificate in HVMLT 2006-14; and other certificates in the HVMLT 2006-7, HVMLT 2006-9, HVMLT 2006-10; HVMLT 2006-11, HVMLT 2006-12, and HVMLT 2007-7 offerings. *N.J. Carpenters*, Docs. 104-1 (S.D.N.Y. July 12, 2010) (Chicago Laborers), 104-2 (S.D.N.Y. July 12, 2010) (Operating Engineers), 118-1 (S.D.N.Y. July 30, 2010) (IPERS); *see also New Jersey Carpenters Health Fund v. Residential Capital, LLC*, Nos. 08 CV 8781, 08 CV 5093, 2010 WL 5222127 (S.D.N.Y. Dec. 22, 2010) (granting intervention).

416.   HVMLT 2006-9 offering:  *American Pipe* tolling applies to this offering from May 14, 2008 until July 18, 2011.  The Prospectus and Prospectus Supplement for this offering issued on August 10, 2006 and October 3, 2006, respectively.  On August 18, 2006, WesCorp purchased the 2A1C1 tranche of this offering from RBS. On March 8, 2007, WesCorp purchased the 2A1B2 tranche of this offering from RBS. The case which supplies this tolling is Complaint, *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-601451 (N.Y. Sup. Ct. filed May 14, 2008), *removed to* No. 08-5093 (S.D.N.Y. June 3, 2008).  The named plaintiff, New Jersey Carpenters Vacation Fund, asserted Section 11 and 12 claims against RBS and Greenwich Capital Acceptance for misstatements and omissions in RMBS offering documents, such as the supposed compliance with stated underwriting guidelines.  The Vacation Fund purported to assert claims on behalf of purchasers of certificates in the HVMLT 2006-9 offering.  *See id.* ¶ 1.  The Vacation Fund did not disclose which certificates it bought until March 24, 2009, when it disclosed that it had purchased a Class B1 certificate from HVMLT 2006-4.  *See New Jersey Carpenters*, Doc. 47-2 at 3 (S.D.N.Y. Mar. 24, 2009); *see also New Jersey Carpenters*, Doc. 47-3 at 3 (S.D.N.Y. Mar. 24, 2009) (Boilermaker Blacksmith National Pension Trust disclosing that it had

1  purchased a Class 2A1A certificate from HVMLT 2007-7); *New Jersey Carpenters,*

2  Consolidated First Amended Securities Class Action Complaint, Doc. 54 at ¶¶ 19-20

3  (S.D.N.Y. May 19, 2009) (amended complaint setting forth the prior purchases).  On

4  July 12, 2010 and July 30, 2010, the Operating Engineers, Chicago Laborers, and

5  IPERS moved to intervene and disclosed that they had purchased a Class 2A1A

6  certificate in HVMLT 2006-10; a class 2A1A certificate in HVMLT 2006-14; and other

7  certificates in the HVMLT 2006-7, HVMLT 2006-9, HVMLT 2006-10; HVMLT

8  2006-11, HVMLT 2006-12, and HVMLT 2007-7 offerings.  *N.J. Carpenters,* Docs. 104-

9  1 (S.D.N.Y. July 12, 2010) (Chicago Laborers), 104-2 (S.D.N.Y. July 12, 2010)

10  (Operating Engineers), 118-1 (S.D.N.Y. July 30, 2010) (IPERS); *see also New Jersey*

11  *Carpenters Health Fund v. Residential Capital, LLC,* Nos. 08 CV 8781, 08 CV 5093, 2010

12  WL 5222127 (S.D.N.Y. Dec. 22, 2010) (granting intervention).

13      417.  <u>HVMLT 2006-10 offering</u>:  *American Pipe* tolling applies to this offering

14  from May 19, 2009 until July 18, 2011.  The Prospectus and Prospectus Supplement

15  for this offering issued on August 10, 2006 and November 10, 2006, respectively.  On

16  October 18, 2006, WesCorp purchased the 2A1B tranche of this offering from RBS.

17  The case which supplies this tolling is Consolidated First Amended Securities Class

18  Action Complaint, *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland*

19  *Group, plc,* No. 08-5093 (S.D.N.Y. filed May 19, 2009).  The facts regarding this case

20  from paragraph 415 are incorporated herein.

21      418.  <u>HVMLT 2006-11 offering</u>:  *American Pipe* tolling applies to this offering

22  from May 19, 2009 until July 18, 2011.  The Prospectus and Prospectus Supplement

23  for this offering issued on August 10, 2006 and November 10, 2006, respectively.  On

24  October 27, 2006, WesCorp purchased the A1B tranche of this offering from RBS.

25  The case which supplies this tolling is Consolidated First Amended Securities Class

26  Action Complaint, *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland*

27  *Group, plc,* No. 08-5093 (S.D.N.Y. filed May 19, 2009).  The facts regarding this case

28  from paragraph 415 are incorporated herein.

419.   HVMLT 2006-12 offering:  *American Pipe* tolling applies to this offering from May 19, 2009 until July 18, 2011.  The Prospectus and Prospectus Supplement for this offering issued on August 10, 2006 and December 11, 2006, respectively.  On October 19, 2006, WesCorp purchased the 2A2B tranche of this offering from RBS. On November 29, 2006, WesCorp purchased the 2A2C tranches of this offering from RBS.  The case which supplies this tolling is Consolidated First Amended Securities Class Action Complaint, *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-5093 (S.D.N.Y. filed May 19, 2009).  The facts regarding this case from paragraph 415 are incorporated herein.

420.   HVMLT 2006-14 offering:  *American Pipe* tolling applies to this offering from May 19, 2009 until July 18, 2011.  The Prospectus and Prospectus Supplement for this offering issued on August 10, 2006 and December 20, 2006, respectively.  On December 5, 2006, WesCorp purchased the 2A1B and 2A2C tranches of this offering from RBS.  The case which supplies this tolling is Consolidated First Amended Securities Class Action Complaint, *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-5093 (S.D.N.Y. filed May 19, 2009).  The facts regarding this case from paragraph 415 are incorporated herein.

421.   HVMLT 2007-1 offering:  *American Pipe* tolling applies to this offering from May 19, 2009 until July 18, 2011.  The Prospectus and Prospectus Supplement for this offering issued on January 30, 2007 and March 7, 2007, respectively.  On February 14, 2007, WesCorp purchased the B1 tranche of this offering from RBS.  On February 16, 2007, WesCorp purchased the 2A1C2 tranche of this offering from RBS. On March 12, 2007, WesCorp purchased the 2A1C2 tranche of this offering from RBS.  The case which supplies this tolling is Consolidated First Amended Securities Class Action Complaint, *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-5093 (S.D.N.Y. filed May 19, 2009).  The facts regarding this case from paragraph 415 are incorporated herein.

422.  <u>HVMLT 2007-2 offering</u>: *American Pipe* tolling applies to this offering from May 19, 2009 until July 18, 2011.  The Prospectus and Prospectus Supplement for this offering issued on March 26, 2007 and March 29, 2007, respectively.  On March 1, 2007, WesCorp purchased the 2A1B tranche of this offering from RBS.  The case which supplies this tolling is Consolidated First Amended Securities Class Action Complaint, *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-5093 (S.D.N.Y. filed May 19, 2009).  The facts regarding this case from paragraph 415 are incorporated herein.

423.  <u>HVMLT 2007-5 offering</u>: *American Pipe* tolling applies to this offering from May 19, 2009 until July 18, 2011.  The Prospectus and Prospectus Supplement for this offering issued on July 5, 2007 and July 11, 2007, respectively.  On June 26, 2007, WesCorp purchased the A1B and A1C tranches of this offering from RBS.  The case which supplies this tolling is Consolidated First Amended Securities Class Action Complaint, *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-5093 (S.D.N.Y. filed May 19, 2009).  The facts regarding this case from paragraph 415 are incorporated herein.

424.  <u>INDX 2006-AR35</u>: *American Pipe* tolling applies to this offering from January 20, 2009 until July 18, 2011.  The Prospectus and Prospectus Supplement for this offering issued on October 26, 2006 and November 29, 2006, respectively.  On November 28, 2006, WesCorp purchased the 2A3A and 2A3B tranches of this offering from RBS.  The cases which supply the tolling are Complaint, *IBEW Local 103 v. IndyMac MBS, Inc.*, No. BC405843 (L.A. Sup. Ct. filed Jan. 20, 2009), *removed to* No. 09-1520 (C.D. Cal. Mar. 4, 2009); Complaint, *Police & Fire Retirement System of the City of Detroit v. IndyMac MBS, Inc.*, No. 09-4583 (S.D.N.Y. filed May 14, 2009); and Complaint, *Wyoming State Treasurer v. Olinski*, No. 09-5933 (S.D.N.Y. filed June 29, 2009).  The named plaintiffs, IBEW Local 103, Police and Fire Retirement System of Detroit ("PFRS"), and Wyoming State Treasurer asserted Section 11 and 12 claims against RBS for misstatements and omissions in RMBS offering documents, such as

FIRST AMENDED COMPLAINT

1   the supposed compliance with stated underwriting guidelines.  They purported to

2   assert claims on behalf of purchasers of certificates in the INDX 2006-AR35 offering.

3   *See IBEW Local 103*, No. 09-1520, Doc. 1-4 at ¶¶ 1, 28; *PFRS v. IndyMac*, No. 09-4583,

4   Doc. 1 at ¶¶ 2-3, 24, 40; *Wyoming State Treasurer*, No. 09-5933, Doc. 1 at ¶¶ 1, 22, 38.

5   IBEW Local 103 did not disclose which certificates it had purchased until July 13,

6   2009, when it disclosed that it had purchased an INDX 2006-AR25 Certificate.  *See*

7   *PFRS v. IndyMac*, No. 09-4583, Doc. 19-7 at 4 (S.D.N.Y. filed July 13, 2009).  On May

8   14, 2009, PFRS disclosed it had purchased a Class 1A1 certificate in the INDX 2007-

9   AR5 offering, Complaint, *PFRS v. IndyMac*, No. 09-4583 (S.D.N.Y. filed May 14,

10   2009).  On June 29, 2009, the Wyoming State Treasurer and Wyoming Retirement

11   System disclosed they had purchased certificates in 16 different IndyMac offerings,

12   including a Class 2A1A certificate from INDX 2006-AR35.  *Wyoming State Treasurer v.*

13   *Olinski*, No. 09-5933 (S.D.N.Y. filed June 29, 2009).  The cases were consolidated into

14   *In re IndyMac Mortg.-Backed Sec. Litig.*, No. 09-4583 (S.D.N.Y.), and the Wyoming

15   plaintiffs were appointed lead plaintiffs.  *See* Order, *PFRS v. IndyMac*, No. 09-4583,

16   Doc. 58 (S.D.N.Y. July 29, 2009).

17   **XI.   CLAIMS FOR RELIEF**

18
19   <div align="center">

**FIRST CLAIM FOR RELIEF**
**Section 11 of the Securities Act**
**(NAA 2006-AR4)**
</div>

20        425.   The NCUA Board realleges paragraphs 1 through 424 of this Complaint,

21   as though fully set forth here, except those paragraphs specific to the Issuer

22   Defendants other than Nomura Asset Acceptance Corp., or specific to offerings other

23   than the NAA 2006-AR4 offering.  The NCUA Board brings this cause of action

24   pursuant to Section 11 of the Securities Act, with respect to WesCorp's purchase of

25   the NAA 2006-AR4 certificate against Defendant RBS, as underwriter, and against

26   Defendant Nomura Asset Acceptance Corp., as issuer.

27
28

426.   The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

427.   At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

428.   The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificate would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

429.   WesCorp purchased the certificate pursuant to and traceable to the defective registration statement, as alleged above.

430.   At the time WesCorp purchased the certificate, it did not know of the untrue statements and omissions contained in the registration statement.

431.   RBS's and Nomura Asset Acceptance Corp's conduct as alleged above violated Section 11.

432.   WesCorp and the NCUA Board sustained damages as a result of Defendant RBS's and Defendant Nomura Asset Acceptance Corp.'s violations of Section 11.

433.   WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS and Defendant Nomura Asset Acceptance Corp., jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

### SECOND CLAIM FOR RELIEF
### Section 11 of the Securities Act
### (AHMA 2007-3)

434.   The NCUA Board realleges paragraphs 1 through 424 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer

1  Defendants other than American Home Mortgage Assets LLC, or specific to offerings

2  other than the AHMA 2007-3 offering.

3      435.   The NCUA Board brings this cause of action pursuant to Section 11 of

4  the Securities Act, with respect to WesCorp's purchase of the AHMA 2007-3

5  certificate against Defendant RBS, as underwriter, and against Defendant American

6  Home Mortgage Assets LLC, as the issuer.

7      436.   The NCUA Board expressly disclaims and disavows any allegation that

8  could be construed as alleging fraud.

9      437.   At the time the registration statement became effective, it (including the

10  prospectus and any prospectus supplements) contained untrue statements and omitted

11  facts that were necessary to make the statements made not misleading, as alleged

12  above.

13      438.   The untrue statements and omitted facts were material because a

14  reasonably prudent investor deciding whether to purchase the certificate would have

15  viewed them as important and as substantially altering the total mix of information

16  available, as alleged above.

17      439.   WesCorp purchased the certificate pursuant to and traceable to the

18  defective registration statement, as alleged above.

19      440.   At the time WesCorp purchased the certificate, it did not know of the

20  untrue statements and omissions contained in the registration statement.

21      441.   RBS's and American Home Mortgage Assets LLC's conduct as alleged

22  above violated Section 11.

23      442.   WesCorp and the NCUA Board sustained damages as a result of

24  Defendant RBS's and Defendant American Home Mortgage Assets LLC's violations

25  of Section 11.

26      443.   WHEREFORE, the NCUA Board requests the Court to enter judgment

27  in its favor against Defendant RBS and Defendant American Home Mortgage Assets

28

LLC, jointly and severally awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

**THIRD CLAIM FOR RELIEF**
**Section 11 of the Securities Act**
**(HVMLT 2007-5, HVMLT 2007-4, HVMLT 2007-2, HVMLT 2007-1, HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11, HVMLT 2006-10, HVMLT 2006-9, and HVMLT 2006-8)**

444.    The NCUA Board realleges paragraphs 1 through 424 of this Complaint as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than Greenwich Capital Acceptance, Inc., or specific to offerings other than the HVMLT 2007-5, HVMLT 2007-4, HVMLT 2007-2, HVMLT 2007-1, HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11, HVMLT 2006-10, HVMLT 2006-9, and HVMLT 2006-8 offerings.

445.    The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to WesCorp's purchases of the HVMLT 2007-5, HVMLT 2007-4, HVMLT 2007-2, HVMLT 2007-1, HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11, HVMLT 2006-10, HVMLT 2006-9, and HVMLT 2006-8 certificates against Defendant RBS, as underwriter, and against Defendant Greenwich Capital Acceptance, Inc., as the issuer.

446.    The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

447.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

448.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

449.    WesCorp purchased the certificates pursuant to and traceable to a defective registration statement, as alleged above.

450.    At the time WesCorp purchased the certificates, it did not know of the untrue statements and omissions contained in the registration statement.

451.    RBS's and Greenwich Capital Acceptance, Inc.'s conduct as alleged above violated Section 11.

452.    WesCorp and the NCUA Board sustained damages as a result of Defendant RBS's and Defendant Greenwich Capital Acceptance, Inc.'s violations of Section 11.

453.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS and Defendant Greenwich Capital Acceptance, Inc., jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## FOURTH CLAIM FOR RELIEF
### Section 11 of the Securities Act
### (INDX 2006-AR35)

454.    The NCUA Board realleges paragraphs 1 through 424 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the INDX 2006-AR35 offering.

455.    The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to WesCorp's purchase of the INDX 2006-AR35 certificates against Defendant RBS, as underwriter.

456.    The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

457.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

FIRST AMENDED COMPLAINT

1    458.   The untrue statements and omitted facts were material because a

2   reasonably prudent investor deciding whether to purchase the certificate would have

3   viewed them as important and as substantially altering the total mix of information

4   available, as alleged above.

5    459.   WesCorp purchased the certificate pursuant to and traceable to the

6   defective registration statement, as alleged above.

7    460.   At the time WesCorp purchased the certificate, it did not know of the

8   untrue statements and omissions contained in the registration statement.

9    461.   RBS's conduct as alleged above violated Section 11.

10    462.   WesCorp and the NCUA Board sustained damages as a result of

11   Defendant RBS's violations of Section 11.

12    463.   WHEREFORE, the NCUA Board requests the Court to enter judgment

13   in its favor against Defendant RBS awarding all damages, in an amount to be proven at

14   trial, costs, and such other relief as the Court deems appropriate and just.

**FIFTH CLAIM FOR RELIEF**
**Section 11 of the Securities Act**
**(LUM 2007-1)**

15

16

17    464.   The NCUA Board realleges paragraphs 1 through 424 of this Complaint,

18   as though fully set forth here, except those paragraphs specific to the Issuer

19   Defendants other than Lares Asset Securitization, Inc., or specific to offerings other

20   than the LUM 2007-1 offering.

21    465.   The NCUA Board brings this cause of action pursuant to Section 11 of

22   the Securities Act, with respect to WesCorp's purchase of the LUM 2007-1 certificates

23   against Defendant RBS, as underwriter, and against Defendant Lares Asset

24   Securitization, Inc., as the issuer.

25    466.   The NCUA Board expressly disclaims and disavows any allegation that

26   could be construed as alleging fraud.

27

28

467.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

468.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificate would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

469.    WesCorp purchased the certificate pursuant to and traceable to the defective registration statement, as alleged above.

470.    At the time WesCorp purchased the certificate, it did not know of the untrue statements and omissions contained in the registration statement.

471.    RBS's and Lares Asset Securitization, Inc.'s conduct as alleged above violated Section 11.

472.    WesCorp and the NCUA Board sustained damages as a result of Defendant RBS's and Defendant Lares Asset Securitization, Inc.'s violations of Section 11.

473.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS and Defendant Lares Asset Securitization, Inc., jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

### SIXTH CLAIM FOR RELIEF
### Section 11 of the Securities Act
### (NHELI 2007-1)

474.    The NCUA Board realleges paragraphs 1 through 424 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than Nomura Home Equity Loan, Inc., or specific to offerings other than the NHELI 2007-1 offering.

FIRST AMENDED COMPLAINT

475.   The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to WesCorp's purchase of the NHELI 2007-1 certificates against Defendant RBS, as underwriter, and against Defendant Nomura Home Equity Loan, Inc., as the issuer.

476.   The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

477.   At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

478.   The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificate would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

479.   WesCorp purchased the certificate pursuant to and traceable to the defective registration statement, as alleged above.

480.   At the time WesCorp purchased the certificate, it did not know of the untrue statements and omissions contained in the registration statement.

481.   RBS's and Nomura Home Equity Loan, Inc.'s conduct as alleged above violated Section 11.

482.   WesCorp and the NCUA Board sustained damages as a result of Defendant RBS's and Defendant Nomura Home Equity Loan, Inc.'s violations of Section 11.

483.   WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS and Defendant Nomura Home Equity Loan, Inc., jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## SEVENTH CLAIM FOR RELIEF
### Section 11 of the Securities Act
### (WMLT 2006-ALT1)

484. The NCUA Board realleges paragraphs 1 through 424 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than Wachovia Mortgage Loan Trust, LLC, or specific to offerings other than the WMLT 2006-ALT1 offering.

485. The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to WesCorp's purchase of the WMLT 2006-ALT1 certificate against Defendant RBS, as the underwriter, and against Defendant Wachovia Mortgage Loan Trust, LLC, as the issuer.

486. The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

487. At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

488. The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificate would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

489. WesCorp purchased the certificate pursuant to and traceable to the defective registration statement, as alleged above.

490. At the time WesCorp purchased the certificate, it did not know of the untrue statements and omissions contained in the registration statement.

491. RBS's and Wachovia Mortgage Loan Trust, LLC's conduct as alleged above violated Section 11.

FIRST AMENDED COMPLAINT

492.   WesCorp and the NCUA Board sustained damages as a result of Defendant RBS's and Defendant Wachovia Mortgage Loan Trust, LLC's violations of Section 11.

493.   WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS and Defendant Wachovia Mortgage Loan Trust, LLC, jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

### EIGHTH CLAIM FOR RELIEF
### Section 12(a)(2) of the Securities Act
### (AHMA 2007-3)

494.   The NCUA Board realleges paragraphs 1 through 424 of this Complaint, as though fully set forth here, except those paragraphs specific to the offerings other than the AHMA 2007-3 offering.

495.   The NCUA Board brings this cause of action pursuant to Section 12(a)(2) of the Securities Act, with respect to WesCorp's purchases of the AHMA 2007-3 certificate against Defendant RBS as the statutory seller and/or offeror of the certificate.

496.   The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

497.   Defendant RBS offered to sell and sold the securities to WesCorp through one or more instrumentalities of interstate commerce (*i.e.*, telephone, faxes, mails, e-mail, or other means of electronic communication).

498.   Defendant RBS offered to sell and sold the securities, for its own financial gain, to WesCorp by means of the prospectus and/or prospectus supplements, as alleged above, and/or oral communications related to the prospectuses and/or prospectus supplements.

FIRST AMENDED COMPLAINT

499.    The prospectuses and/or prospectus supplements contained untrue statements of material fact and omitted facts that were necessary to make the statements made not misleading, as alleged above.

500.    The untrue statements of material fact and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

501.    WesCorp purchased the certificates on the initial offering pursuant to the prospectus and/or prospectus supplements.

502.    At the time WesCorp purchased the certificates, it did not know of the untrue statements and omissions contained in the prospectuses and/or prospectus supplements.

503.    Defendant RBS's conduct as alleged above violated Section 12(a)(2).

504.    WesCorp and the NCUA Board sustained damages as a result of Defendant RBS's violations of Section 12(a)(2).

505.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS awarding damages in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## NINTH CLAIM FOR RELIEF
### Section 12(a)(2) of the Securities Act
**(HVMLT 2007-5, HVMLT 2007-4, HVMLT 2007-2, HVMLT 2007-1, HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11, HVMLT 2006-10, HVMLT 2006-9, HVMLT 2006-8)**

506.    The NCUA Board realleges paragraphs 1 through 424 of this Complaint, as though fully set forth here, except those paragraphs specific to the offerings other than HVMLT 2007-5, HVMLT 2007-4, HVMLT 2007-2, HVMLT 2007-1, HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11, HVMLT 2006-10, HVMLT 2006-9, and HVMLT 2006-8 offerings.

507.    The NCUA Board brings this cause of action pursuant to Section 12(a)(2) of the Securities Act, with respect to WesCorp's purchases of the HVMLT 2007-5, HVMLT 2007-4, HVMLT 2007-2, HVMLT 2007-1, HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11, HVMLT 2006-10, HVMLT 2006-9, and HVMLT 2006-8 certificates against Defendants RBS and Greenwich Capital Acceptance, Inc. as the statutory sellers and/or offerors of those certificates.

508.    The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

509.    Defendants RBS and Greenwich Capital Acceptance, Inc. offered to sell and sold the securities to WesCorp through one or more instrumentalities of interstate commerce (*i.e.*, telephone, faxes, mails, e-mail, or other means of electronic communication).

510.    Defendants RBS and Greenwich Capital Acceptance, Inc. offered to sell and sold the securities, for its own financial gain, to WesCorp by means of the prospectus and/or prospectus supplements, as alleged above, and/or oral communications related to the prospectuses and/or prospectus supplements.

511.    The prospectuses and/or prospectus supplements contained untrue statements of material fact and omitted facts that were necessary to make the statements made not misleading, as alleged above.

512.    The untrue statements of material fact and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

513.    WesCorp purchased the certificates on the initial offering pursuant to the prospectus and/or prospectus supplements.

514.    At the time WesCorp purchased the certificates, it did not know of the untrue statements and omissions contained in the prospectuses and/or prospectus supplements.

FIRST AMENDED COMPLAINT

515.    Defendant RBS and Greenwich Capital Acceptance, Inc.'s conduct as alleged above violated Section 12(a)(2).

516.    WesCorp and the NCUA Board sustained damages as a result of Defendants RBS and Greenwich Capital Acceptance, Inc.'s violations of Section 12(a)(2).

517.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendants RBS and Greenwich Capital Acceptance, Inc. awarding damages in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## TENTH CLAIM FOR RELIEF
### Section 12(a)(2) of the Securities Act
### (NAA 2006-AR4)

518.    The NCUA Board realleges paragraphs 1 through 424 of this Complaint, as though fully set forth here, except those paragraphs specific to the offerings other than the NAA 2006-AR4 offering.

519.    The NCUA Board brings this cause of action pursuant to Section 12(a)(2) of the Securities Act, with respect to WesCorp's purchases of the NAA 2006-AR4 certificate against Defendants RBS and Nomura Asset Acceptance Corp. as the statutory sellers and/or offerors of those certificates.

520.    The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

521.    Defendants RBS and Nomura Asset Acceptance Corp. offered to sell and sold the securities to WesCorp through one or more instrumentalities of interstate commerce (*i.e.*, telephone, faxes, mails, e-mail, or other means of electronic communication).

522.    Defendants RBS and Nomura Asset Acceptance Corp. offered to sell and sold the securities, for its own financial gain, to WesCorp by means of the prospectus

FIRST AMENDED COMPLAINT

1  and/or prospectus supplements, as alleged above, and/or oral communications related

2  to the prospectuses and/or prospectus supplements.

3      523.   The prospectuses and/or prospectus supplements contained untrue

4  statements of material fact and omitted facts that were necessary to make the

5  statements made not misleading, as alleged above.

6      524.   The untrue statements of material fact and omitted facts were material

7  because a reasonably prudent investor deciding whether to purchase the certificates

8  would have viewed them as important and as substantially altering the total mix of

9  information available, as alleged above.

10      525.   WesCorp purchased the certificates on the initial offering pursuant to the

11  prospectus and/or prospectus supplements.

12      526.   At the time WesCorp purchased the certificates, it did not know of the

13  untrue statements and omissions contained in the prospectuses and/or prospectus

14  supplements.

15      527.   Defendants RBS and Nomura Asset Acceptance Corp.'s conduct as

16  alleged above violated Section 12(a)(2).

17      528.   WesCorp and the NCUA Board sustained damages as a result of

18  Defendants RBS and Nomura Asset Acceptance Corp.'s violations of Section 12(a)(2).

19      529.   WHEREFORE, the NCUA Board requests the Court to enter judgment

20  in its favor against Defendants RBS and Nomura Asset Acceptance Corp. awarding

21  damages in an amount to be proven at trial, costs, and such other relief as the Court

22  deems appropriate and just.

### ELEVENTH CLAIM FOR RELIEF
### Section 12(a)(2) of the Securities Act
### (INDX 2006-AR35)

25      530.   The NCUA Board realleges paragraphs 1 through 424 of this Complaint,

26  as though fully set forth here, except those paragraphs specific to the offerings other

27  than the INDX 2006-AR35 offering.

28

    FIRST AMENDED COMPLAINT

531.   The NCUA Board brings this cause of action pursuant to Section 12(a)(2) of the Securities Act, with respect to WesCorp's purchases of the INDX 2006-AR35 certificates against Defendant RBS as the statutory seller and/or offeror of those certificates.

532.   The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

533.   Defendant RBS offered to sell and sold the securities to WesCorp through one or more instrumentalities of interstate commerce (*i.e.*, telephone, faxes, mails, e-mail, or other means of electronic communication).

534.   Defendant RBS offered to sell and sold the securities, for its own financial gain, to WesCorp by means of the prospectus and/or prospectus supplements, as alleged above, and/or oral communications related to the prospectuses and/or prospectus supplements.

535.   The prospectuses and/or prospectus supplements contained untrue statements of material fact and omitted facts that were necessary to make the statements made not misleading, as alleged above.

536.   The untrue statements of material fact and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

537.   WesCorp purchased the certificates on the initial offering pursuant to the prospectus and/or prospectus supplements.

538.   At the time WesCorp purchased the certificates, it did not know of the untrue statements and omissions contained in the prospectuses and/or prospectus supplements.

539.   Defendant RBS's conduct as alleged above violated Section 12(a)(2).

540.   WesCorp and the NCUA Board sustained damages as a result of Defendant RBS's violations of Section 12(a)(2).

FIRST AMENDED COMPLAINT

541.   WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS awarding damages in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## TWELTH CLAIM FOR RELIEF
### Section 12(a)(2) of the Securities Act
### (NHELI 2007-1)

542.   The NCUA Board realleges paragraphs 1 through 424 of this Complaint, as though fully set forth here, except those paragraphs specific to the offerings other than the NHELI 2007-1 offering.

543.   The NCUA Board brings this cause of action pursuant to Section 12(a)(2) of the Securities Act, with respect to WesCorp's purchases of the NHELI 2007-1 certificates against Defendants RBS and Nomura Home Equity Loan, Inc. as the statutory sellers and/or offerors of those certificates.

544.   The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

545.   Defendants RBS and Nomura Home Equity Loan, Inc. offered to sell and sold the securities to WesCorp through one or more instrumentalities of interstate commerce (*i.e.*, telephone, faxes, mails, e-mail, or other means of electronic communication).

546.   Defendants RBS and Nomura Home Equity Loan, Inc. offered to sell and sold the securities, for its own financial gain, to WesCorp by means of the prospectus and/or prospectus supplements, as alleged above, and/or oral communications related to the prospectuses and/or prospectus supplements.

547.   The prospectuses and/or prospectus supplements contained untrue statements of material fact and omitted facts that were necessary to make the statements made not misleading, as alleged above.

548.   The untrue statements of material fact and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates

FIRST AMENDED COMPLAINT

1  would have viewed them as important and as substantially altering the total mix of

2  information available, as alleged above.

3       549.   WesCorp purchased the certificates on the initial offering pursuant to the

4  prospectus and/or prospectus supplements.

5       550.   At the time WesCorp purchased the certificates, it did not know of the

6  untrue statements and omissions contained in the prospectuses and/or prospectus

7  supplements.

8       551.   Defendants RBS and Nomura Home Equity Loan, Inc.'s conduct as

9  alleged above violated Section 12(a)(2).

10       552.   WesCorp and the NCUA Board sustained damages as a result of

11  Defendants RBS and Nomura Home Equity Loan, Inc.'s violations of Section 12(a)(2).

12       553.   WHEREFORE, the NCUA Board requests the Court to enter judgment

13  in its favor against Defendants RBS and Nomura Home Equity Loan, Inc. awarding

14  damages in an amount to be proven at trial, costs, and such other relief as the Court

15  deems appropriate and just.

16                      **THIRTEENTH CLAIM FOR RELIEF**

17                      **Section 12(a)(2) of the Securities Act**
                        **(LUM 2007-1)**

18       554.   The NCUA Board realleges paragraphs 1 through 424 of this Complaint,

19  as though fully set forth here, except those paragraphs specific to the offerings other

20  than the LUM 2007-1 offering.

21       555.   The NCUA Board brings this cause of action pursuant to Section

22  12(a)(2) of the Securities Act, with respect to WesCorp's purchases of the LUM 2007-1

23  certificates against Defendants RBS and Lares Asset Securitization, Inc. as the

24  statutory sellers and/or offerors of those certificates.

25       556.   The NCUA Board expressly disclaims and disavows any allegation that

26  could be construed as alleging fraud.

27

28

FIRST AMENDED COMPLAINT

557.   Defendants RBS and Lares Asset Securitization, Inc. offered to sell and sold the securities to WesCorp through one or more instrumentalities of interstate commerce (*i.e.*, telephone, faxes, mails, e-mail, or other means of electronic communication).

558.   Defendants RBS and Lares Asset Securitization, Inc. offered to sell and sold the securities, for its own financial gain, to WesCorp by means of the prospectus and/or prospectus supplements, as alleged above, and/or oral communications related to the prospectuses and/or prospectus supplements.

559.   The prospectuses and/or prospectus supplements contained untrue statements of material fact and omitted facts that were necessary to make the statements made not misleading, as alleged above.

560.   The untrue statements of material fact and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

561.   WesCorp purchased the certificates on the initial offering pursuant to the prospectus and/or prospectus supplements.

562.   At the time WesCorp purchased the certificates, it did not know of the untrue statements and omissions contained in the prospectuses and/or prospectus supplements.

563.   Defendants RBS and Lares Asset Securitization, Inc.'s conduct as alleged above violated Section 12(a)(2).

564.   WesCorp and the NCUA Board sustained damages as a result of Defendants RBS and Lares Asset Securitization, Inc.'s violations of Section 12(a)(2).

565.   WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendants RBS and Lares Asset Securitization, Inc. awarding damages in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## FOURTEENTH CLAIM FOR RELIEF
### Violation of the California Corporate Securities Law of 1968
### Cal. Corp. Code §§ 25401 and 25501
### (NAA 2006-AR4, AHMA 2007-3, FFMLT 2005-FFH4, HVMLT 2007-5, HVMLT 2007-4, HVMLT 2007-2, HVMLT 2007-1, HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11, HVMLT 2006-10, HVMLT 2006-9, HVMLT 2006-8, INDX 2006-AR35, LUM 2007-1, MHL 2006-1, NHELI 2007-1, SVHE 2005-OPT4)

566.    The NCUA Board realleges paragraphs 1 through 424 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the NAA 2006-AR4, AHMA 2007-3, FFMLT 2005-FFH4, HVMLT 2007-5, HVMLT 2007-4, HVMLT 2007-2, HVMLT 2007-1, HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11, HVMLT 2006-10, HVMLT 2006-9, HVMLT 2006-8, INDX 2006-AR35, LUM 2007-1, MHL 2006-1, NHELI 2007-1, and SVHE 2005-OPT4 offerings.

567.    The NCUA Board brings this cause of action pursuant to Sections 25401 and 25501 of the California Corporate Securities Law of 1968, with respect to WesCorp's purchases of the NAA 2006-AR4, AHMA 2007-3, FFMLT 2005-FFH4, HVMLT 2007-5, HVMLT 2007-4, HVMLT 2007-2, HVMLT 2007-1, HVMLT 2006-14, HVMLT 2006-12, HVMLT 2006-11, HVMLT 2006-10, HVMLT 2006-9, HVMLT 2006-8, INDX 2006-AR35, LUM 2007-1, MHL 2006-1, NHELI 2007-1, SVHE 2005-OPT4 certificates against Defendant RBS, as the seller of those certificates.

568.    The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

569.    Defendant RBS offered to sell for its own financial gain and sold the certificates to WesCorp by means of written and/or oral communications which included untrue statements of material fact and omissions of material facts that were necessary to make the statements made not misleading, as alleged above.

570.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have

FIRST AMENDED COMPLAINT

1    viewed them as important and as substantially altering the total mix of information

2    available, as alleged above.

3        571.    Defendant RBS sold the certificates to WesCorp in California.

4        572.    Defendant RBS's sales of the certificates violated Cal. Corp. Code

5    § 25401.

6        573.    WesCorp and the NCUA Board sustained damages as a result of

7    Defendant RBS's violations of Cal. Corp. Code § 25401, and WesCorp and the NCUA

8    Board are entitled to the remedies provided by Cal. Corp. Code § 25501.

9        574.    WHEREFORE, the NCUA Board requests the Court to enter judgment

10    in its favor against Defendant RBS awarding damages in an amount to be proven at

11    trial, costs, and such other relief as the Court deems appropriate and just.

12                              **PRAYER FOR RELIEF**

13    WHEREFORE, Plaintiff prays for judgment as follows:

14           a)       For judgment against the Defendants in accordance with the

15                      prayers for relief set forth in each of the foregoing Claims for

16                      Relief;

17           b)       For Plaintiff's costs of suit; and

18           c)       For any other relief the Court deems just and proper.

19    PLAINTIFF DEMANDS A JURY TRIAL.

20

21

22

23

24

25

26

27

28

Dated: August 19, 2013

GEORGE A. ZELCS
KOREIN TILLERY LLC
205 North Michigan Avenue,
Suite 1950
Chicago, Illinois 60601
Telephone: (312) 641-9760
Fax: (312) 641-9751

STEPHEN M. TILLERY
DOUGLAS R. SPRONG
PETER H. RACHMAN
ROBERT L. KING
DIANE E. MOORE
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Telephone: (314) 241-4844
Fax: (314) 241-3525

MICHAEL J. MCKENNA
*General Counsel*
JOHN K. IANNO
*Associate General Counsel*
KEVIN S. TUININGA
*Trial Attorney*
NATIONAL CREDIT UNION
ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314-3428
Telephone: (703) 518-6350
Fax: (703) 518-6569

MARC M. SELTZER
BRYAN CAFORIO
SUSMAN GODFREY L.L.P.

MARK C. HANSEN
DAVID C. FREDERICK
dfrederick@khhte.com
WAN J. KIM
JOSEPH S. HALL
GREGORY G. RAPAWY
KELLOGG, HUBER, HANSEN,
 TODD, EVANS & FIGEL, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Fax: (202) 326-7999

By:  _____ /BJC
     Marc M. Seltzer

Attorneys for Plaintiff National
Credit Union Administration Board

# Appendix

## Table 11

| CUSIP | Issuing Entity | Date of Prospectus Supplement | Trade Date | Case(s) That Supplies American Pipe Tolling | American Pipe Tolling Start Date | American Pipe Tolling End Date |
|---|---|---|---|---|---|---|
| 6553DAB1 | NAA 2006-AR4 | 11/29/2006 | 11/17/2006 | *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,* No 08-544 (Mass Sup Ct filed January 31, 2008), *removed to* No 08-10446 (D Mass Mar 18, 2008) | 1/31/2008 | 1/20/2011 |
| 41161GAE3 | HVMLT 2006-8 | 8/28/2006 | 8/1/2006 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc,* No 08-5093 (S D N Y filed May 19, 2009) | 5/19/2009 | 7/18/2011 |
| 41161XAM8 | HVMLT 2006-9 | 10/3/2006 | 8/18/2006 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc,* No 08-601451 (N Y Sup Ct filed May 14, 2008), *removed to* No 08-5093 (S D N Y June 3, 2008) | 5/14/2008 | 7/18/2011 |
| 41161XAN6 | HVMLT 2006-9 | 10/3/2006 | 3/8/2007 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc,* No 08-601451 (N Y Sup Ct filed May 14, 2008), *removed to* No 08-5093 (S D N Y June 3, 2008) | 5/14/2008 | 7/18/2011 |
| 41162CAD3 | HVMLT 2006-10 | 11/10/2006 | 10/18/2006 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc,* No 08-5093 (S D N Y filed May 19, 2009) | 5/19/2009 | 7/18/2011 |
| 41162GAB8 | HVMLT 2006-11 | 11/10/2006 | 10/27/2006 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc,* No 08-5093 (S D N Y filed May 19, 2009) | 5/19/2009 | 7/18/2011 |
| 41162DAG4 | HVMLT 2006-12 | 12/11/2006 | 10/19/2006 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc,* No 08-5093 (S D N Y filed May 19, 2009) | 5/19/2009 | 7/18/2011 |

FIRST AMENDED COMPLAINT

| CUSIP | Issuing Entity | Date of Prospectus Supplement | Trade Date | Case(s) That Supplies American Pipe Tolling | American Pipe Tolling Start Date | American Pipe Tolling End Date |
|---|---|---|---|---|---|---|
| 41162DAH2 | HVMLT 2006-12 | 12/11/2006 | 11/29/2006 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc,* No 08-5093 (S D N Y filed May 19, 2009) | 5/19/2009 | 7/18/2011 |
| 41162NAD9 41162NAH0 | HVMLT 2006-14 | 12/20/2006 | 12/5/2006 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc,* No 08-5093 (S D N Y filed May 19, 2009) | 5/19/2009 | 7/18/2011 |
| 41164MAF4 | HVMLT 2007-1 | 3/7/2007 | 2/14/2007 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc,* No 08-5093 (S D N Y filed May 19, 2009) | 5/19/2009 | 7/18/2011 |
| 41164MAP2 | HVMLT 2007-1 | 3/7/2007 | 2/16/2007 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc,* No 08-5093 (S D N Y filed May 19, 2009) | 5/19/2009 | 7/18/2011 |
| 41164MAP2 | HVMLT 2007-1 | 3/7/2007 | 3/12/2007 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc,* No 08-5093 (S D N Y filed May 19, 2009) | 5/19/2009 | 7/18/2011 |
| 41164LAC3 | HVMLT 2007-2 | 3/29/2007 | 3/1/2007 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc,* No 08-5093 (S D N Y filed May 19, 2009) | 5/19/2009 | 7/18/2011 |
| 41165AAC6 41165AAD4 | HVMLT 2007-5 | 7/11/2007 | 6/26/2007 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc,* No 08-5093 (S D N Y filed May 19, 2009) | 5/19/2009 | 7/18/2011 |
| 45667SAN7 45667SAP2 | INDX 2006-AR35 | 11/29/2006 | 11/28/2006 | *IBEW Local 103 v. IndyMac MBS, Inc.,* No BC405843 (L A Sup Ct filed Jan 20, 2009), *removed to* No 09-1520 (C D Cal Mar 4, 2009); *Police & Fire Retirement System of the City of Detroit v. IndyMac MBS, Inc.,* No 09-4583 (S D N Y filed May 14, 2009); *Wyoming State Treasurer v. Olinski,* No 09-5933 (S D N Y filed June 29, 2009) | 1/20/2009 | 7/18/2011 |

FIRST AMENDED COMPLAINT

## Table 12

| CUSIP | Issuing Entity | Date of Prospectus Supplement | Trade Date | Case That Supplies American Pipe Tolling | American Pipe tolling start date | American Pipe Tolling End Date | Federal Claims Timely with American Pipe Tolling? | Additional Tolling Based on Tolling Agreement – Aug. 18, 2010 to Apr. 29, 2011 | Federal Claims Timely with American Pipe + Tolling Agreement? |
|---|---|---|---|---|---|---|---|---|---|
| 6553DAB1 | NAA 2006-AR4 | 11/29/2006 | 11/17/2006 | *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No 08-544 (Mass. Sup. Ct. filed January 31, 2008), *removed to* No. 08-10446 (D. Mass Mar 18, 2008) | 1/31/2008 | 1/20/2011 | Yes | Yes | Yes |
| 41161GAE3 | HVMLT 2006-8 | 8/28/2006 | 8/1/2006 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-5093 (S.D.N.Y. filed May 19, 2009) | 5/19/2009 | 7/18/2011 | Yes | Yes | Yes |
| 41161XAM8 | HVMLT 2006-9 | 10/3/2006 | 8/18/2006 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-601451 (N.Y. Sup. Ct filed May 14, 2008), *removed to* No. 08-5093 (S.D.N.Y. June 3, 2008) | 5/14/2008 | 7/18/2011 | Yes | Yes | Yes |
| 41161XAN6 | HVMLT 2006-9 | 10/3/2006 | 3/8/2007 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-601451 (N.Y. Sup. Ct filed May 14, 2008), *removed to* No. 08-5093 (S.D.N.Y. June 3, 2008) | 5/14/2008 | 7/18/2011 | Yes | Yes | Yes |
| 4116ZCAD3 | HVMLT 2006-10 | 11/10/2006 | 10/18/2006 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-5093 (S.D.N.Y. filed May 19, 2009) | 5/19/2009 | 7/18/2011 | Yes | Yes | Yes |

| CUSIP | Issuing Entity | Date of Prospectus Supplement | Trade Date | Case That Supplies American Pipe Tolling | American Pipe tolling start date | American Pipe Tolling End Date | Federal Claims Timely with American Pipe Tolling? | Additional Tolling Based on Tolling Agreement— Aug. 18, 2010 to Apr. 29, 2011 | Federal Claims Timely with American Pipe + Tolling Agreement? |
|---|---|---|---|---|---|---|---|---|---|
| 41162GAB8 | HVMLT 2006-11 | 11/10/2006 | 10/27/2006 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-5093 (S.D.N.Y. filed May 19, 2009) | 5/19/2009 | 7/18/2011 | Yes | Yes | Yes |
| 41162DAG4 | HVMLT 2006-12 | 12/11/2006 | 10/19/2006 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-5093 (S.D.N.Y. filed May 19, 2009) | 5/19/2009 | 7/18/2011 | Yes | Yes | Yes |
| 41162DAH2 | HVMLT 2006-12 | 12/11/2006 | 11/29/2006 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-5093 (S.D.N.Y. filed May 19, 2009) | 5/19/2009 | 7/18/2011 | Yes | Yes | Yes |
| 41162NAD9 41162NAH0 | HVMLT 2006-14 | 12/20/2006 | 12/5/2006 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-5093 (S.D.N.Y. filed May 19, 2009) | 5/19/2009 | 7/18/2011 | Yes | Yes | Yes |
| 41164MAF4 | HVMLT2007-1 | 3/7/2007 | 2/14/2007 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-5093 (S.D.N.Y. filed May 19, 2009) | 5/19/2009 | 7/18/2011 | Yes | Yes | Yes |
| 41164MAP2 | HVMLT 2007-1 | 3/7/2007 | 2/16/2007 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-5093 (S.D.N.Y. filed May 19, 2009) | 5/19/2009 | 7/18/2011 | Yes | Yes | Yes |
| 41164MAP2 | HVMLT 2007-1 | 3/7/2007 | 3/12/2007 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-5093 (S.D.N.Y. filed May 19, 2009) | 5/19/2009 | 7/18/2011 | Yes | Yes | Yes |

FIRST AMENDED COMPLAINT

- App. 4 -

| CUSIP | Issuing Entity | Date of Prospectus Supplement | Trade Date | Case That Supplies American Pipe Tolling | American Pipe tolling start date | American Pipe Tolling End Date | Federal Claims Timely with American Pipe Tolling? | Additional Tolling Based on Tolling Agreement– Aug. 18, 2010 to Apr. 29, 2011 | Federal Claims Timely with American Pipe + Tolling Agreement? |
|---|---|---|---|---|---|---|---|---|---|
| 41164LAC3 | HVMLT 2007-2 | 3/29/2007 | 3/1/2007 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-5093 (S D N Y filed May 19, 2009) | 5/19/2009 | 7/18/2011 | Yes | Yes | Yes |
| 41165AAC6 41165AAD4 | HVMLT 2007-5 | 7/11/2007 | 6/26/2007 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, plc*, No. 08-5093 (S D N Y filed May 19, 2009) | 5/19/2009 | 7/18/2011 | Yes | Yes | Yes |
| 45667SAN7 45667SAP2 | INDX 2006-AR35 | 11/29/2006 | 11/28/2006 | *IBEW Local 103 v. IndyMac MBS, Inc.*, No BC405843 (L.A. Sup Ct. filed Jan. 20, 2009), *removed to* No 09-1520 (C.D. Cal Mar 4, 2009); *Police & Fire Retirement System of the City of Detroit v. IndyMac MBS, Inc.*, No. 09-4583 (S D N Y filed May 14, 2009); *Wyoming State Treasurer v. Okidoki*, No 09-5933 (S D N Y filed June 29, 2009) | 1/20/2009 | 7/18/2011 | Yes | Yes | Yes |

- App. 5 -

FIRST AMENDED COMPLAINT